**EXHIBIT 1**

German Federal Cartel Office

11th Rule-Making Department

B 11-17/06-5

### Order and Notice of Regulatory Fine

In the proceedings concerning violations of cartel regulations

v

1.      Mr. Arne Kirchem,
        born in Kiel on 07/06/1961,
        residing at Rudolf-Weissmann-Straße 26, 24534 Neumünster

– Respondent [*Betroffener*] –

2.      Unilever Deutschland GmbH,
        represented by its managing director Heinz Arnold, Hamburg *et. al.*

– Accessory Respondent [*Nebenbetroffene*] –

Attorney for the Defense for 1. and 2.:

Dr. Börries Ahrens, attorney at law

Jungfernstieg 51

20354 Hamburg

the 11th Rule-Making Department of the German Federal Cartel Office ruled on February 19, 2008:

[Inverted fax header]
02/19/2008      5:02 PM     +492289499167            BKARTA                          P. 02/30

- 2 -

I.

1.  Respondent is charged with having intentionally violated the prohibitions in § 1 of the German Act Against Restraints on Competition (GWB) both in the version promulgated on August 26, 1998 as well as in the version promulgated on July 15, 2005 as last amended by law on December 18, 2007, as well as the prohibition in Article 81 of the Treaty Establishing the European Community (EC):

    a)   Coordinated price increases for toothpaste:

         Coordinated increase (agreed with Mr. Wilfried Hadick, head of distribution and sales for Colgate-Palmolive GmbH during contacts in mid-2005) of the list prices for the toothpaste products of the brands "Signal" (Lever Fabergé Deutschland GmbH/ Unilever Deutschland GmbH) as well as "Dentagard" and "Colgate" (Colgate-Palmolive GmbH) within a range of approximately 5% as customary for price increases in this area to take effect as of January 1, 2006.

    b)   Exchange of information about the status of the negotiations with retailers

         Participation in the regular exchange of information about the negotiations with retailers, especially about the changes to the discounts agreed with retailers, among the members of the working group for "*Körperpflege, Wasch- und Reinigungsmittel*" [Personal Hygiene, Detergent and Cleaning Products] (KWR), of Markenverband e.V. [Brand Name Association] at least in the period between March 31, 2004 and February 17, 2006.

2.  The following monetary fines are imposed on <u>Respondent</u> in accordance with § 81 subsection 4 GWB and § 9 subsection 1 no. 1 OWiG [*Gesetz über Ordnungswidrigkeiten* /German Act Against Regulatory Violations] on grounds of the regulatory violations indicated above:

    -   for the coordinated price increases for toothpaste a monetary fine in the amount of

         **EUR 30,000.00**
         **(in words: thirty thousand euros),**

    -   for the exchange of information on the status of negotiations with retailers a monetary fine in the amount of

         **EUR 30,000.00**
         **(in words: thirty thousand euros),**

- 3 -

- 3 -

being, in aggregate, a total amount of

**EUR 60,000.00 (in words: sixty thousand euros).**

3.  The following monetary fines are imposed on <u>Accessory Respondent</u> in accordance with § 81 subsection 4, subsection 5 and subsection 7 in conjunction with the German Federal Cartel Office Guidelines for Regulatory Fines[1], § 30 subsection 1 no 1 in conjunction with § 9 subsection 1 no 1 OWiG as incidental legal consequences [*Nebenfolge*] of the regulatory violations committed by Respondent:

-   for coordinated price increases for toothpaste a monetary fine in the amount of
    **EUR 2,900,000.00**
    **(in words: two million nine hundred thousand euros),**

-   for the exchange of information on the status of the negotiations with retailers a monetary fine in the amount of

    **EUR 6,400,000.00**
    **(in words: six million four hundred thousand euros),**

being, in aggregate, a total amount of
**EUR 9,300,000**
**(in words: nine million three hundred thousand euros).**

4.  Respondent and Accessory Respondent shall bear the costs of the proceedings (fees and expenses (§ 105 subsection 1 OWiG in conjunction with §§ 464 subsection 1, 464a subsection 1, 465 subsection 1 StPO [*Strafprozessordnung*/ German Code of Criminal Procedure].)

In accordance with § 107 subsection 1 OwiG, the fees for <u>Respondent</u> are
-   based on the monetary fine for the coordinated price increase of toothpaste

- 4 -

- 4 -

---

[1] Notice no. 38/2006 of September 16, 2006 about the determination of monetary fines in accordance with § 81 subsection 4 sentence 2 GWB to be imposed on companies and associations of companies

- 4 -

**EUR 1,500.00**
**(in words: one thousand five hundred euros),**

-      based on the monetary fine for the exchange of information on the status of the negotiations with retailers

**EUR 1,500.00**
**(in words: one thousand five hundred euros),**

being, in aggregate, a total amount of

**<u>EUR 3,000.00</u>**
**(in words: three thousand euros),**

In accordance with § 107 subsection 1 OwiG, the fees for <u>Accessory Respondent</u> are

-      based on the monetary fine for the coordinated price increase of toothpaste

**EUR 7,500.00**
**(in words: seven thousand five hundred euros),**

-      based on the monetary fine for the exchange of information about the status of the negotiations with retailers

**EUR 7,500.00**
**(in words: seven thousand five hundred euros),**

being, in aggregate, a total amount of

**EUR 15,000.00**
**(in words: Fifteen thousand euros).**

The total expenses are

**<u>EUR 1,037.15</u>**
**(in words: one thousand seven hundred and thirty-seven euros and 15 cents)**

- 5 -

- 5 -

II.

Respondent and Accessory Respondent are requested to pay the fines and costs, that is a total of <u>EUR 63,000.00</u> for Respondent and a total of EUR <u>9,315,000.00</u> for Accessory Respondent no later than within two weeks after this regulatory penalty notice becomes effective, specifying the intended use as "BKartA-Titel 11201, B11-17/06-5" and using **payment number**

**810600164668**

into the account of the

      German Federal Treasury, Trier
      with the
      Deutsche Bundesbank, Saarbrücken branch office
      Bank routing number: 590 000 00
      Account number 590 010 20
      IBAN: DE81 5900 0000 0059 0010 20 BIC: MARKDEF 1590


The expenses in the amount of <u>EUR 1,037.15</u>, for which Respondent and Accessory Respondent are liable as joint and several debtors are also payable no later than within two weeks after this regulatory penalty notice becomes effective, specifying the intended use and payment number.

In the event that they are unable to pay, Respondent and/or Accessory Respondent shall state in writing or for the record why payment within the deadline represents an undue hardship in light of their financial circumstances (§ 66 subsection 2 no. 2b OWiG).

If this obligation is not met, the Düsseldorf Higher Regional Court [*Oberlandesgericht*] may, upon application by the German Federal Cartel Office, order detention to compel payment [*Erzwingungshaft*] after the expiration of a period of two weeks from the due date (§§ 95 subsection 1, 96 subsection 1, 99 OWiG, §§ 83, 86 GWB).

- 6 -

- 6 -

## III.
## Evidence

1.   Application of Colgate-Palmolive GmbH (hereinafter: CP) for a grant of state's evidence/immunity regulations [*Bonusregelung*] dated 11/28/2006 (Files of the proceedings, pp. 97-98, 1021).

2.   Record of the hearing of Mr. Wilfried Hadick, head of distribution and sales for Colgate-Palmolive GmbH on 02/28/2007 (files of the proceedings, pp. 172-176).

3.   Record of the hearing of Mr. Wilfried Hadick, head of distribution and sales for Colgate-Palmolive GmbH on 09/19/2007 (files of the proceedings, pp.  228-233).

4.   Overview of "Development of Retail Prices according to AC Nielsen" (company file no. 1 p. 76).

5.   Application of the firm Sara Lee for a grant of state's evidence regulations dated 09/03/2007 (files of the proceedings, pp. 210-218).

6.   Notes of KWR meetings provided on 09/06/2007 by Mr. Thomas Wieker, head of distribution and sales for the firm Sara Lee (Appendix 1 to the evidence file).

7.   Record of the hearing of Mr. Thomas Wieker, head of distribution and sales of the firm Sara Lee on 09/06/2007 (files of the proceedings pp. 219--223).

8.   Documents that were secured during a search by the Federal Cartel Office on 03/14/2007 (citation format: company number - exhibit number - page number): 5-8-1, 5-18-16; 5-19-7ff.; 5-22-10; 5-22-13; 5-22-18; 5-22-32; 5-22-33; 5-22-35; 5-22-47; 5-21-79; 5-22-126.

9.   Summary KWR membership list, files of the proceedings, p. 234.

10.   Summary list of KWR meetings and attendees, files of the proceedings, p. 235.

11.   Pleadings by Respondent and Accessory Respondent dated 08/13/2007 and 11/26/2007 as well as January 15, 2008 (company file no. 5, pp. 0-192, 227-277 and 278-280).

12.   Commercial register extract for Accessory Respondent (company file no. 5, pp. 3-21).

[Inverted fax header]
02/19/2008       5:02 PM    +492289499167             BKARTA                      P. 07/30

- 7 -

**IV.**
**Grounds**

**A.**

1.    Respondent and Accessory Respondent

Respondent served from at least from the beginning of 2004 until the middle of 2005 as Managing Director at Lever Fabergé Deutschland GmbH, which was merged into Accessory Respondent effective August 1, 2005 (date of the commercial register entry). Subsequent to this, he was employed at Accessory Respondent in the position of Customer Marketing Director. At least from the beginning of 2004 up to and including the meeting on February 17, 2006 he – together with 16 others in charge of distribution and sales for brand name manufacturers – was a member of the working group for Personal Hygiene, Detergent and Cleaning Products (KWR), of the brand name association. In 2006, Respondent received a total salary of approximately EUR 222,000 (c.f. Exhibit 5-8-1).

Accessory Respondent is the German subsidiary of the Dutch Unilever group and the supplier, in Germany, of brand name products in the food (including the brands "Rama," "SB," "Sanella," "Lipton," "Knorr," "Bi-Fi," "Langnese" etc.), personal hygiene (including the brands "Signal," "Dove," "Axe," "Rexona" etc.) and cleaning product (including the brands "Domestos," "Viss," etc.), as well as the laundry detergent (including the brands "Coral," Sunir," "Omo" etc.) segments. In 2006, Accessory Respondent generated sales revenues of approximately EUR 500 million from its products in the domestic and personal hygiene product segments in Germany (including app. EUR 13 million from "Signal" brand toothpaste.) In 2006, the Unilever Group generated approximately EUR 40 billion in sales revenues worldwide.

2.    Pricing of drug store articles
The manufacturers of brand name items in the product segments "Personal Hygiene, Detergent and Cleaning Products" (hereinafter referred to as drug store items)[2], distribute their products in Germany through drug store chains such as Schlecker, dm, Rossmann or Müller as well as through food retailers such as Edeka and Rewe in particular. In this connection, the effective price payable by the retailer represents the manufacturer's list price (also referred to as the manufacturer's distribution price or gross price) less the discount agreed with each respective retailer.

- 8 -

---
[2] Segment designation: Fast moving consumer goods.

- 8 -

It is the practice in Germany for manufacturers and retailers to establish any and all applicable discounts once a year in a comprehensive purchase agreement (annual contract). This involves discounts that apply only to specific products (item discounts) on the one hand and on the other hand so-called "advertising subsidies," which are additionally deductible retroactively at the end of the year.  In the final outcome, the net price payable by the retailer to the manufacturer may, in actual fact, be up to 60% below the list price.

Lately, changes to these net prices have resulted either from increases in the list prices on the part of the manufacturers or from a granting of additional discounts demanded by the retailers, with list price increases applying generally to all retailers while higher discounts affect only the bilateral relationship between the manufacturer and one retailer.

3.  Coordinated price increases for toothpaste

In 2005, Mr. Arne Kirchem and Mr. Wilfried Hadick, head of distribution and sales for CP, engaged in discussions about price increases in the toothpaste product segment against a backdrop of rising costs in the commodity area and a possibly upcoming value-added tax increase. These discussions were conducted in the period from June to September of 2005, both on the sidelines of meetings of the working group for "Personal Hygiene, Detergent and Cleaning Products": (KWR) of the Markenverband e.V. (especially at the KWR offsite conference in Santa Magherita Ligure/Italy on June 9 - 12, 2005) and also via the telephone. In the context of these discussions, Mr. Kirchem and Mr. Hadick informed each other of their mutual interest in raising the prices for the Signal (Unilever) or Colgate and Dentagard (CP) brands of toothpaste as of January 1, 2006. This exchange of information ultimately solidified into a common understanding by Mr. Kirchem and Mr. Hadick to the effect that the aforementioned toothpaste products would go up as of January 1, 2006 by approximately 5% and thus within the customary range for price increases in this segment.

Unilever thereupon increased its manufacturer's distribution prices (gross prices) for Signal brand toothpaste by 5.6% as of January 1, 2006 (from EUR 0.90 to EUR 0.95) (Appendix 8 to the files of the proceedings, pp. 84 and 98). CP increased its gross prices for the Colgate (base product) and Dentagard brand toothpaste as of January 1, 2006 by 5.2% each (in each case from EUR 0.96 to EUR 1.01) (Appendix 1 to the files of the proceedings, Doc. 1).

- 9 -

- 9 -

The above increases represent the usual order of magnitude for gross price increases. Within this range, it is also possible for retail companies to pass the increases on to consumers by increasing selling prices within an acceptable range. The gross price increases were accordingly combined with an increase in recommended retail selling prices by EUR 0.10 (5-22-10; 5-22-35; 5-22-47; Appendix 8 to the files of the proceedings, p. 15). In an in-house presentation on the subject of "Price Increases as of 01/01/2006" at Unilever in September of 2005, the simultaneous increase of recommended selling prices is described as a "win/win position for retailers," which should be offered to them (5-22-13).

In 2006, toothpaste generated sales revenues of approximately EUR 495 million in Germany (at final consumer selling prices according to AC Nielsen, c.f. files of the proceedings p. 177). The market is characterized by a large number of brands, spread over about 10 different brand families. In the past year, the brand families with the highest sales volumes shared in the aforementioned overall market volume as follows[3]

| Colgate (CP) | 9.2% |
|---|---|
| - of that **Colgate Base** products (CP) | **1.8%** |
| **Dentagard (CP)** | **4.3%** |
| **Signal (Unilever)** | **5.3%** |
| Elmex (Gaba/Wybert) | 10.3% |
| Aronal (Gaba/Wybert) | 2.0% |
| Aronal & Elmex (Gaba/Wybert) | 5.0% |
| Meridol (Gaba/Wybert) | 5.5% |
| Odol Med 3 (GSK) | 20.3% |
| Sensodyne (GSK) | 8.0% |
| Blend-a-med (Procter & Gamble) | 10.2% |
| Theramed (Henkel) | 5.8% |
| Periweiss (Murnauer) | 3.0% |

In this relatively fragmented market, the brands Signal, Dentagard as well as the so-called base products of the Colgate brand family constitute a separate low-price segment, in which the companies Unilever and CP are direct competitors.

- 10 -

---

[3] The manufacturers also base their market share analyses on the sales data collected from retailers by the market research institutes.

- 10 -

The products are similarly positioned by retailers with shelf prices averaging between EUR 0.80 to EUR 0.85 and special offer prices averaging between EUR 0.55 and EUR 0.60, while the price level of the large majority of the brands listed above is noticeably higher (average shelf price of app. EUR 1.50 and average special offer price of app. EUR 1.20) (as per AC Nielsen, c.f. 5-19-7 et. seq.). An in-house presentation at Unilever accordingly identifies two different price clusters in a depiction of market analyses, namely one for products with a selling price below EUR 1 and one for products with a selling price above EUR 2 (5-18-16).

The special competitive relationship between the aforementioned brands is also demonstrated by various internal Unilever documents intended as preparation for the price increases. According to these documents, there is to be "no change in the relative positioning of prices vis-à-vis Rot & Dentagard, i.e. no isolated price increase." (5-22-18). According to a handwritten note, the price increase for Signal is to be applied only "if there is an increase by competitors" (5-22-32) or, according to an in-house presentation "only if the competition moves" (5-22-35) and that only when a "move is visible in the market" (5-22-33). An in-house paper on the price increase for Signal reads as follows under the heading "Price Position vs. Competition:" "Priced similarly to Colgate rot & Dentagard" (5-22-126). A summary of the goals of the price increase for the Signal brand lists: "- an improvement in profitability - [to be] no more expensive than Colgate, Dentagard" and to cost "- less than EUR 1.00." In this context reference is made to the then momentarily identical shelf prices (EUR 0.89) of Colgate and Dentagard (5-22-47 and 5-22-126). The interchangeability of the brands resulting from the similar positioning in the market as well as the high sensitivity of demand to prices lead to a situation with respect to the Signal brand on the one hand and the Colgate and Dentagard brands on the other hand in which the price level of the respective main competitive brands is particularly relevant to their own success in the market.

In 2006, Unilever generated sales revenues of EUR 13.305 million from Signal toothpaste (5-21-79).

4.  <u>Exchange of information about the status of the negotiations with retailers</u>
    KWR members regularly reported on the status of negotiations with selected large retailers at their meetings within the framework of so-called "Round Table Surveys" conducted by the chair under the agenda item "Relations between Industry and Trade."

- 11 -

- 11 -

In this context, information was exchanged about

- any demands for discounts with which the respective retailers had approached the KWR member companies within the context of the annual discussions or also as part of negotiations during the year,
- what additional discount offers the KWR member companies had presented to the retailers in response,
- what the status of the negotiations was (i.e. already started, agreement likely / not likely, completed),
- and what understandings about what additional discounts to be granted would probably be reached and/or had already been reached.

The membership of the KWR in the years from 2004 to 2006 included the heads of distribution and sales for 17 manufacturers of brand name items[4]. A total of 13 KWR meetings were held between 03/31/2004 and 11/23/2006 – each after an interval of 2 to 3 months. The KWR member Thomas Wieker, head of distribution and sales for the firm Sara Lee, attended 12 meetings[5]. His handwritten notes from the meetings, which he handed over to the Federal Cartel Office on 09/06/2007 in connection with an application for a grant of state's evidence regulations[6], show details of the regular exchange of information on the status of the negotiations with retailers at the KWR meetings. The extracts from the notes quoted below are evidence of the scope of the information exchange cited above. Information about the brand item manufacturers' own conduct in the negotiations ("Offers") as well as the negotiating results ("Agreements") are highlighted in bold print:

(1)    KWR meeting on 03/31/2004 (Appendix 1 to BA, pp. 70-72):
- Topic: Annual negotiations with the firm Anton Schlecker (AS)
  Gilette:    **Off**(*er*)[7] **0.5** (%), open ...
  CP[8]:    AS => 5.9 Dem(*anded*)., currently open. **Off. < 1.0** business ongoing
  BDF:    Since Dec.; **done, on basis of 3 years ago**

- 11 -

---

[4] Summary KWR membership list, files of the proceedings, p. 234.
[5] c.f. Summary list of KWR meetings and attendees, files of the proceedings, p. 235.
[6] c.f. Appendix 1 to the evidence files (BA) pp. 14-84
[7] The additions shown in brackets in italics are merely intended for ease of understanding They are <u>not</u> part of Mr. Wieker's handwritten notes.
[8] The interpretation of the abbreviated company names chosen by Mr. Wieker and be found in the Overview of membership list cited above (files of the proceedings, p. 234).

- 12 -

SKB:        open, bus. ongoing, **0.6% offered**, dem. signif. higher.
DPN:        **Off. +0.4**, dem. signif. higher, bus. ongoing
Guhl:       Dem 2.8%, **offer 0.8**
Reckitt:              **offered just short of 1.0, +0.2 will still be offered …**
Lever:      **1.0% off.**, dem. = 7.5%, 7.4 next T.,
            **not likely to offer more than 1.0**


(2)    KWR meeting on 05/14/2004 (Appendix 1 to BA, pp. 67-69):


-      Topic: Annual talks with the firm Schlecker
       Gilette:     agreed, SPI (*sales price increase*) **done**
       Lever F:     **open, SPI done**
       DPN:         **open, 0.5% offered**


(3)    KWR meeting on 11/24-25/2004 (Appendix 1 to BA, pp. 60-64):


-      Topic: "30 years AS (Anton Schlecker)"
       Henkel WPR:  Discussions on principles conducted. **Special sizes offered**
       → declined, wants money. JG (*annual negotiations*) on hold for now. Dem. 0.9 -
       1.0%


-      Topic "Rewe"
       Guhl:        5-6% demanded; **offer: max 1%**
       GSK:         orig. 17-18 % + compensation for existing SKU's (*shelf keeping
                    units/items*), ∑ = 34 %
                    - Demand. = 5% after initial discuss.
                    - **writ. O**(*ffer*) **(0.45%) submitted**, response open
       Henkel WPR:  36-38%, Trust sheet [*Trauzettel*] being discussed: 3%
                    **writ. O**(*ffer*) **submitted (~ 1%),** 2nd meeting coming up
       LF:          **~** 30%, trust sheet, then: **~** 8%, **1% submitted**
                    current d. 3% through Huber
       P+G:         26-30% dem., **O**(ffer).: **just short of 1%**
                    **will close at just short of 1%**


                                                                            - 13 -

- 13 -

| | |
|---|---|
| CR | … D. now: -4%, **O**(ffer): **1.4%** (from customer perspective) |
| <u>DPN:</u> | D.: 5%, **O**(*ffer*): ~ 1% … |
| <u>SCJ:</u> | **… no current offer, max 0.5;** D. 18%, at the end: 2.5% |
| <u>BDF:</u> | D. 7-8%; good talks with trust sheet. → zero round !... |
| <u>SH:</u> | D. 8.75%; **will offer to further development**. |

- Topic "Kaufland":
  Dem. everywhere between 1-2% or 100-200k€  => everyone fighting from himself


- Topic "Edeka":

  | | |
  |---|---|
  | (LF): | Arne (*Kirchem/Lever Faberge*) **is done, just above 2%** |
  | | without regional + Budni/Kloppi |
  | <u>P+G:</u> | **done 2-3%** |


(4)    <u>KWR meeting on 01/21/2005 (Appendix 1 to BA, pp. 54-59):</u>

- Topic "Rewe":

  | | |
  |---|---|
  | <u>ER:</u> | D.: 5.98% + 25 SAV (service offset consideration) |
  | | **agreed just above 2%** |
  | | B items listed during talks |
  | | → no additional quid pro quo |
  | <u>LF:</u> | **done at just below 2%** |
  | <u>L'O:</u> | **O: 1.5% in the qualitative area, will close** |
  | <u>GSK:</u> | **O.: just below 1%;** all item based |
  | <u>DPN:</u> | SPI: + 3%; **agreed at 2%, no COKS** |
  | | (*conditions for core product portfolio to be carried*) |
  | <u>SCJ:</u> | **Done, 1.1% …** |
  | <u>CP:</u> | D. now 4-5, 1st discussion with Schmitz, **O: close to 2-2.5**, still |
  | open | <u>Henkel WPR:</u>  **closed at just below 2%; of that COKS 0.5.** |
  | | → **some of the conditions tied to sales** |
  | JJ | D.:  now 3% |
  | | **O.:**  "  0.7 |

- 14 -

- 14 -

(5)     KWR meeting on 04/14/2005 (Appendix 1 to BA, pp. 50-53, 3-2-8):

-    Topic "Edeka":
      (as above)        **0.25  …. rejected by all**
                          **- no general % granted**
                          **- on own sales only (ex Budni, Kloppi, <u>Globus</u>?)**
                          **- only if there is a quid pro quo**
      <u>ERI</u>:          Has paid 0.25%, blockbuster campaign in return
      **<u>Henkel WPR</u>**: Edeka offers to "pep up" <u>ongoing</u> blockbuster campaign →
                     **Not to be accepted under any circumstances.**

(6)     KWR meeting 11/17/2005 (Appendix 1 to BA, pp. 43-45. 3-3-20R-25, UA 3 pp. 330ff.):

-    Topic "Agenor"[9]:
      BDF:         1st talks = + 0.7% Demand → **trying to regionalize**
                      **to prevent Edeka from coming on top => main goal**
      <u>Henkel:</u>        Dem.: + 1.0%; quid pro quo: 50% Europromo
                      **Goal: count conditions against Edeka regio**
      <u>L'O:</u>         **Has terminated Agenor for 2005**
      <u>Gilette:</u>     … **... Strategy: local dem. to be offset (Edeka)**
      <u>GSK:</u>       +0.8% without quid pro quo, reconnaissance Alidis → **will**
                      **<u>definitely not</u> pass on to Edeka what Argenor already**
          **has today**
     → (*Concl.*)   **1. Effort not to apply existing conditions to Edeka**
                     **2. Reconnaissance → we don't understand at all**
                     **3. Budni, Kloppi: keep them out**
                     <u>Budni, Kloppi, Globus</u>: **DO NOT include under Agnor**
                     **=> Goal**. If so, the same would happen with Rewe + dm, etc.

[Inverted fax header]
02/19/2008     5:02 PM     +492289499167          BKARTA          P. 15/30

---

[9] Alidis/Agenor is a European Purchasing Association headquartered in Geneva, in which EDEKA acquired a one third stake in connection with the takeover of SPAR in 2005

- 15 -

-     Topic "Edeka":
  (as above)         Principles for CO (*Cooperation*) from Edeka:
                **Will not be accepted!**

(7)      <u>KWR meeting 01/25/2006 (Appendix 1 to BA, pp. 35-41. 3-1 pp. 3-4R, UA 3 pp. 163f.):</u>

-     Topic "Agenor":
  (as above)    **rejected for Edeka almost everywhere ...**

-     Topic "Edeka":
  <u>RB:</u>         **Closed ~1.5% .. Marriage bonus:**
                **offered for listings SPI accepted complete**
  <u>ER:</u>         ...<u>**closed**</u> **just short of 2% incl. 3 new nat. listings!**
  <u>LF:</u>         **Spar cond. offered as of 9/1**
                **Bonuses - no l.**
                **closed. -> investment as in 2005. incl. new listing + sales target**
  <u>SH:</u>         **JG closed, without bonuses Marriage bonus**
                **=> one-time amount paid for listings! ...**
  (as above)         Principles for CO (*Cooperation*): **generally rejected**

-     Topic "Rewe":
  <u>LF:</u>         <u>Rewe:</u> **JG: closed; just short of > 1%**

-     Topic "Müller":
  <u>SH:</u>         **Closed Friday: 1%**

-     Topic "Anton Schlecker (AS)":
  <u>ER:</u>         **Now closed > 2%; sales target > 20% committed by AS**
  <u>CP:</u>         **... closed just over 1%; SPI done**
  <u>GSK:</u>        **Offer < 0.5,** tiers remain

- 16 -

- 16 -

(8)    KWR meeting 01/17/2006 (Appendix 1 to BA, pp. 32-34. 3-1 pp. 8R-9R, UA 3
       pp. 164f.)
-    Topic "Edeka":
     <u>RB</u>:              **JB closed, no synergy b**(*onus*) **paid**
     <u>SH</u>:              **JG done (as 3 weeks ago), but quid pro quo remains open**
                      **Had 5 blockbuster campaigns in 05. => E wants money for**
**them**

                      **currently negotiating new activities.**
     <u>Henkel WPR</u>:    **JG done, have offered 0.5 for Alidis in HH**.
                      then renegotiated in Geneva. O.: wanted 2%, then 1%
                      = > have offered 3 Euro promos; **rejected by Henkel**
     <u>LF</u>:              JG done, no payment for Spar except alignment of conditions


-    Topic "AS":
     <u>RB, BDF</u>          **SPI** (*sales price increase*) **done**
     <u>SH, LF,</u>
     <u>Gilette, Coty</u>    **not**


(9)    KWR meeting on 04/06/2006 (Appendix 1 to BA, pp. 28-31):
-    Topic "Edeka":
     <u>SCJ:</u>            Done, fair offer – fair quid pro quo.
                      Agenor still open
     <u>ER:</u>             done, good deal agreed, Agenor not an issue
     <u>Coty:</u>           Done, moved from reg. up to national => was expensive ...
     <u>JJ:</u>             done, but quid pro quo being withdrawn
                      Agenor: Near closing – for adequate quid pro quo
     <u>L'O:</u>            Done. quid pro quo now gradually being withdrawn
     <u>GSK:</u>            done; Alidis: done, 2-year agreement
     <u>P&G:</u>            done, performance then withdrawn -> once again open
     <u>SH:</u>             done since Dec.; quid pro quo withdrawn -> back and forth, open
     <u>BDF:</u>            Done, moderate => Rickers no longer in position to negotiate


                                                                      - 17 -

- 17 -

O.: **done, without additional moneys (ex Budni, Kloppi, Globus)**

(10)     KWR meeting 06/16/2006 (Appendix 1 to BA, pp. 23-27. 3-1 pp. 31-32, UA 3
         p. 334):
-     Topic "Edeka: Agenor-Alidis":
      CP:          closed, incl. Budni etc.
      BDF:         closed (without Budni etc.)
                   has distributed sum from ITM equally over new group
                   no additional costs
      Müller supposedly to go to Edeka for offsetting
      -> result would be that Mü would then also get Agenor conditions

-     Topic "100 Years of Edeka";[10]
      (as above)           Demand 1.2% on 2007 sales, additional activities at
      EUR 500,000 each
                           Not on top activities; 5 activities expected from Proctor
                           **reject 1.2% under any circumstances,**
                           Letter from the Brand Name Association with resp. to the 1.2%

(11)     KWR meeting 09/21/2006 (Appendix 1 to BA, pp. 18-22, 3-1 pp. 42R-44R, UA 3
         pp. 335f.):
-     Topic "100 Years of Edeka":
      ER:          Paying 0.8% per anniversary per agreement.
                   nat. Campaign, 2 articles, fixed margin
                   plus one special item (overfill) for Edeka
      DPN:         1.2% demanded, down to 0.5% on 2005 sales, nat.
                   fixed purchase margin for one special item (f. Edeka only)
      GSK:         2-3 discussions. 1.2 + 2 campaigns. Overfill offer. No.
                   Link with JG -> No. Next meeting Rickers-Klaus
                   10/4. Klaus rather inflexible.
                   Quid pro quo not defined by Edeka until now.
      Henkel WPR:  1.2 -> 0.5% , + 2 x 500 k€. Open.

- 18 -

---

[10] The wording for this section is taken from notes by Mr. Hepe (3-1-p. 31R).

- 18 -

| | |
|---|---|
| <u>RB:</u> | Alidis + 100 Y + JG 2006 (one point) still open. |
| | Edk putting on pressure. RB has **offered campaign, special sizes**, |
| | but is **offsetting** special production **costs**. |
| | D.: 1.2% + 2 x 500k€ |
| <u>SCJ:</u> | CLOSED: **0.9 for listings! No campaign** |
| <u>BDF:</u> | 1.2% + 3 x 500k€ Campaign offered; far apart from E. |
| | everything open |
| <u>SH:</u> | 1,2 % + 3 x 500. **2 campaigns offered,** |
| | **costs of campaigns to be offset!!!** |

**- Seems that offsetting camapign costs is being accepted.**

-     Topic "Schlecker":
        Demands for higher shipping costs for ...
        <u>GSK</u> i.e.: Agreement already closed, thus no negotiations.
        **=> Hang TOUGH!**

<u>(12)    KWR meeting 11/23/2006 (Appendix 1 to BA, pp. 14-17, 3-4 pp. pp.2R-4, UA 3</u>
<u>        pp. 165f.):</u>

-     Topic: EDEKA demands on occasion of 100-Year anniversary

| | |
|---|---|
| <u>SCJ:</u> | … 100 Y **=> now <u>below</u> 1% with quid pro quo** |
| | **(being accepted by Edeka)** |
| <u>SH:</u> | 100 Y.: Activities included in plan, but conditions not yet finally done. |
| | **Demand for plus/minus 0.5%!! <u>Multiple</u> nat. activities negotiated in** |
| | **exchange.** |
| <u>Henkel:</u> | **paid 0.5, →will get 5 add.**(*itional*) **nat**(*ionwide*) **campaigns,** |
| | **done!** |
| | JG open. |
| <u>ER:</u> | **Anniv. done, 1 nat. campaign has even grown into 2.** |
| | **Cond. < 1.0%; JG < ~1%; likely to close next week on these terms** |

Until his departure from the KWR in late February/early March of 2006, which was due to functional and organizational changes associated with the merger of Lever Fabergé Deutschland GmbH with Accessory Respondent,

- 19 -

- 19 -

Mr. Kirchem attended at least 13 meetings in the above period. The information listed under "Lever," "LeverF" as well as "LF" in the notes by Mr. Wieker, which are reproduced above in the form of extracts, was contributed to the meetings by Mr. Kirchem.

B.

Evidence for these findings with respect to the coordinated price increases for toothpaste is offered in the application of CP for a grant of state's evidence regulations dated 11/28/2006 as well as in the testimony of Mr. Wilfried Hadick, head of distribution and sales for CP in hearings before the Federal Cartel Office on 02/28/2007 and 09/19.2007. The Rule-Making Department considers these statements, in which CP as well as Mr. Hadick incriminate themselves, to be credible. Their accuracy is also supported by the fact that their information was fully confirmed by the other participants in the case of the coordinated price increase for hand dishwashing liquid and was largely confirmed by the other participants in the case of the coordinated price increase for shower gel [11]. The findings concerning the connection between the gross price increases and the increase in the recommended selling prices, the market share and the product sales of Accessory Respondent as well as those concerning the special competitive relationship between Accessory Respondent and Colgate in the area of toothpaste were taken from documents that were secured from the business premises of Accessory Respondent on 14/03/2007.

The accuracy of the findings concerning the exchange of information about the status of negotiations with retailers is taken from the application of CP for a grant of state's evidence regulations dated 11/28/2006 as well as the application of Sara Lee Household & Body Care, branch office of Sara Lee Deutschland GmbH (hereinafter: Sara Lee) for a grant of state's evidence regulations dated 09/06/2007 and here, in particular, from the handwritten notes from KWR meetings by Mr. Thomas Wieker, head of distribution and sales for Sara Lee, that were handed over together with the state's evidence application. These notes show details of the regular exchange of information about the status of negotiations with retailers at the KWR meetings. The content of these notes is confirmed by the handwritten meeting notes secured on 03/14/2007 in the office of Mr. Jörg Hepe, head of distribution and sales for Schwarzkopf & Henkel GmbH,

- 20 -

---

[11] c.f. Company files no. 2, pp. 82f and no. 3, pp. 70, 154 ff., as well as the files for the proceedings, pp. 216 ff.

- 20 -

which the latter transcribed into clear text in letters dated 11/26/2007 and 12/18/2007.[12]


### C.

Respondent and Accessory Respondent were afforded an opportunity to respond to the charges brought against them. With respect to the list price increases for tooth paste, they partly conceded and/or explained details of the contacts between Respondent and Mr. Hadick. They stated however, that there had been no discussions about upcoming price increases. The price increase as of January 1, 2006 was said to have been decided in-house at Accessory Respondent without giving consideration to the competitors.

Respondent and Accessory Respondent conceded the exchange of information concerning the content and status of the negotiations with retailers in the context of the KWR but contested any related violations of § 1 GWB and/or Article 81 para. 1 EC.


### D.

1.      Violations of § 1 GWB and Article 81 EC

The above acts violate the prohibition against cartels under § 1 GWB. At the start of the anti-competitive actions described above, the GWB was applicable in the version promulgated on August 26, 1998 and in effect as of 01/01/1999. To the extent that said activities continued beyond July 2005, they are subject to the GWB in the version promulgated on July 15, 2005.

They were further likely to affect trade between member states and consequently also violate the prohibitions under Article 81 para. 1 EC. They were undertaken by companies with international operations, which are also selling their brand-name products at least across all of Europe, and cover the entire territory of the Federal Republic of Germany. Even though they are, in each case, related exclusively to Germany, their ultimate effect is nevertheless to reinforce the division of markets along national boundaries.[13]

- 21 -

---

[12] c.f. Exhibits 3-1 to 3-4 and company file (UA) no. 3, pp. 163 ff, 327 ff.

[13] Guidelines of the Commission on the concept of an effect on trade between member states contained in Articles 81 and 82 of the EU treaty, Official Journal 2004 C 101/81 margin no. 78

- 21 -

Coordinated price increases for toothpaste

The aforementioned exchange of information between Unilever and its competitor CP occurred before the notification of the intended price increase to retailers by Unilever and/or CP as well as several months before the price increases went into effect. By passing the information about the price increase planned at Unilever to Mr. Hadick, Mr. Kirchem sought and achieved a significant influence on the market behavior of the competitor CP, since he was able to assume that CP would also take the behavior of its immediate competitor, Unilever, into account in its in-house planning for price increases and that being aware of Unilever's intent to increase prices would, at minimum, make it easier for CP to arrive at the decision to apply an increase as well. On the other side, the information from Mr. Hadick that CP was also planning a price increase was important to Unilever. Even if Unilever had already made an internal decision to increase prices as of January 1, 2006 at this point in time (mid-2005) – as submitted by Accessory Respondent – there would still have been sufficient time for a change or reversal of this decision in the event of contrary information from Mr. Hadick. In any event, the information from Mr. Hadick confirmed any internal decision at Unilever that may already have been made, since the risks associated with its own price increases were significantly reduced by the expectation that the competitor would "go along."

The critical factor here is not whether specific information was exchanged about the precise amount of the planned price increase. The critical point – also according to the statement by Mr. Hadick – was the information that any price increase at all was to be implemented, with both sides assuming the usual range of approximately 5% for price increases in this segment.

The Rule-Making Department therefore considers the conduct of Respondent and Mr. Hadick to constitute at least mutually coordinated action between competitors, which is prohibited under § 1 GWG, Article 81 EC (c.f. Ruling of the OLG Düsseldorf of 09/13/2006, VI-Kart 2/06 (OWi).)

Exchange of information about the status of the negotiations with retailers

According to § 1 GWB and Article 81 paragraph 1 EC, the regular exchange of information about the negotiations with retailers as part of the KWR meetings constitutes an agreement between competitors,

- 22 -

- 22 -

that was aimed at, and resulted in, limiting the confidential nature of competition with respect to changes (not the total amount) in the discounts agreed with the retailers.

While it remained generally within the discretion of every KWR member to what extent he wished to report about negotiations with retailers at the KWR meetings, the above-referenced notes by Mr. Wieker nevertheless indicate that numerous KWR members disclosed information about their offering stance and/or agreements made with respect to changing discounts at nearly every meeting. Since any and all KWR members are quoted at least once as providing relevant information, a basic consensus among KWR members to exchange such information at the meetings can be assumed.

The reciprocal exchange of information among KWR members about the status of negotiations with the retailers with respect to the granted discounts, combined with the disclosure of both parties to the negotiations, of the member's own stance with respect to its offers, and of the agreements made, function as an identifiable market information process and represent a restraint on the confidentiality of competition with respect to a significant component of the price[14]. While no information about the absolute levels of the discounts was exchanged, the negotiations with the retailers are focused precisely on the additional discounts to be granted. The information to what extent the competitors would yield to additional demands by retailers is of great interest to every KWR member for the determination of its own negotiating strategy. The exchange of information, moreover, created at least a risk of coordinated market behavior on the part of the brand name manufacturers as evidenced by Mr. Wieker's notes from the meetings on 05/14/2005 about the topic "Edeka ("0.25 .. rejected by all..."), on 11/17/2007 about the topics "Agenor" ("*Conclusion*") and "Edeka" ("*Principles ... Will not be accepted!*"), on 06/16/2006 about the topic "100 Years of Edeka" ("*reject 1.2% under any circumstances*") and on 09/21/2006 about the topic of "Schlecker" (*Hang TOUGH!*").

2.     Regulatory violations according to § 81 subsection 1 no. 1, subsection 2, no. 1 GWB

Breaches of the prohibition against cartels under § 1 GWB and/or Article 81 paragraph 1 EC represent regulatory violations pursuant to § 82 subsection 2 no. 1 and/or subsection 1 no. 1 GWB.

- 23 -

---

[14] For principal rulings on the restraint of competition pursuant to § 1 GWB by foregoing confidentiality of competition, c.f. BGH [*Bundesgerichtshof* /German Federal Court of Justice], 01/29/1975 "*Aluminium Halbzeug*" WuW [*Wirtschaft und Wettbewerb* /Business and Competition]/E BGH 1337,1341 f., OLG Düsseldorf, 07/26/2002 "Transportbeton Sachsen" WuW/E DE-R 949, 950; for § 81 EG c.f. most recently ECJ [European Court of Justice], 10/02/2003 "Thyssen Stahl/Kommission" matter. C-194/99 margin numbers 81-86.

- 23 -

3. <u>Intentional participation</u>

Respondent participated in the regulatory violations. He acted with intent. There was no error on his part with respect to the elements of the offense and no unavoidable error with respect to the existence of the prohibition.

As a businessman having long occupied a leading position in distribution and sales, he was aware that non-public information about the pricing behavior of competitors is of great importance for a party's own market behavior and that a reciprocal exchange of such information is thus also "relevant to the market" and "sensitive." The KWR members Thomas Wieker and Jörg Hepe, who took part in the exchange of the information, prepared several pages of notes at every KWR meeting based on the information from the other KWR members about their negotiations with retailers. They would not have done so if this information had not been relevant to them.

Respondent would also have had to recognize that such an exchange was in violation of the Cartel Act. It is also conspicuous that according to the aforementioned meeting records the information that is relevant in this case merely concerned the agenda item "Relations between Industry and Trade," while all other agenda items were treated extensively in the official minutes which were, significantly, prepared by an attending lawyer for the association. To that extent, the exchange of information within the KWR was, in fact, conspiratorial in nature, if only because admission to the KWR was made contingent upon the personal qualification of the relevant head of distribution and sales[15]. It should further be mentioned that the handwritten notes by Mr. Wieker from the KWR meeting on 02/17/2006 include a remark that a search by the French antitrust agency occurred at Schwarzkopf & Henkel GmbH and at Reckitt Benckiser. The exchange of information between competitors about discount agreements with retailers is one of the targets of the French proceedings. Information about these proceedings was apparently reported to the KWR. It must be presumed that Respondent was aware of this background in relation to cartel law.

It follows finally from the presence of the association lawyer that Respondent was neither in error about the existence of a prohibition, nor would such error have been unavoidable. On the one hand there are no indications whatsoever that the association lawyer was even explicitly asked to state whether the exchange of information about the respective negotiations with the retailers was permissible under cartel law.

- 24 -

---

[15] c.f. Files of the proceedings, p. 87; KWR minutes of 11/17/2005: Discussion of the Chair with …, who have both been on the waiting list for admission to the KWR Working Group for some time. In both cases, the Chair gained the impression that good and successful cooperation will be possible and recommends admission."

- 24 -

The principal task of the lawyer for the Brand Name Association was more importantly to protect the brand name manufacturers against activities by the retailers that were improper under cartel law (headings: "sale below cost price," "attempt to extract benefits") rather than to examine whether the brand name manufacturers themselves were acting in violation of the prohibition against cartels. Such a legal opinion can only be expected from an independent attorney[16]. The fact that the Association lawyers did not include the exchange of information that is the subject of these charges in the official minutes further indicates that there were concerns about documenting these discussions. For this reason alone there would have been a duty to obtain an opinion from a third party.

4.    Company fine in accordance with § 30 subsections 1 and 2 OwiG
Mr. Arne Kirchem was employed as Managing Director of Lever Fabergé until mid-2005. As Managing Director, Mr. Kirchem was among the group of potential offenders within the meaning of § 20 subsection 1 no. 4 in conjunction with § 9 subsection 1 no. 1 OWiG. Following the merger of Lever Fabergé with Accessory Respondent effective August 1, 2005 (date of the commercial register entry), Mr. Kirchem continued to be employed as a senior executive in the sales and distribution unit of Accessory Respondent – as Customer Development Director – and must thus continue to be considered a person authorized to act within the meaning of § 30 subsection 1 no. 4 OWiG. The regulatory violations committed by Mr. Kirchem represented a breach of the operational obligations of the respective company. According to § 30 subsections 1 and 2 OwiG, a monetary fine can therefore also be imposed on the company. As the legal successor of Lever Fabergé by way of universal succession this applies to Accessory Respondent also with respect to the regulatory violations committed by Mr. Kirchem as Managing Director of Lever Fabergé.

5.    Determination of the regulatory fines
The amount of the monetary fine is determined by the law that was in effect at the time of the act that constitutes the regulatory violation. If the liability to a regulatory fine changes during the course of the act, the law must be applied as it is in effect at the end of the act (§ 4 subsections 1 and 2 OWiG). Both the coordinate price increase for toothpaste as well as the exchange of information about the status of the negotiations with retailers only came to an end after the revision of § 81 GWB in July of 2005.

- 25 -

---

[16] As it is, Accessory Respondent notified the Brand Name Association on 11/20/2007 that it would only continue to participate in KWR meetings if an independent attorney would be present (company file no. 2, p. 302).

- 25 -

The monetary fines imposed on Respondent and Accessory Respondent have therefore been determined on the basis of the range for regulatory fines under § 81 subsection 4 GWB. For the determination of the regulatory fines, the duration of the violations was based only on the period since the revision of the law in of July 2005.

5.1  <u>Determination of the regulatory fines for Respondent</u>

The monetary fines imposed on Respondent were determined on the basis of the range for regulatory fines under § 81 subsection 4 sentence 1 GWB in conformance with § 17 subsections 1 to 3 OWiG. According to the above, the regulatory violations are punishable by a monetary fine up to one million euros in each case. The determination must consider both the gravity as well as the duration of the violation. Respondent's sound financial circumstances as managing director and/or senior executive for many years were also a factor to be weighed.

<u>Coordinated price increases for toothpaste</u>

With respect to the coordinated price increase, a point to be considered as an aggravating factor against Respondent was the fact that the coordination occurred between the two main competitors in the low price segment, whose brands were thus highly dependent on each other in terms of their respective pricing. Moreover, the coordination resulted in actual price increases by the companies involved. A point in favor of Respondent is the fact that the measures affected no more than a share of app. 11% of the market for toothpaste.  Another point to be considered in favor of Respondent was that the anticompetitive contacts only occurred during a brief period.

A total monetary fine in the amount of EUR 30,000 is appropriate.

<u>Exchange of information about the status of the negotiations with retailers</u>

Regarding the exchange of information about the status of the negotiations with retailers, a point to be considered as an aggravating factor against Respondent was the fact that the leading brand name manufacturers in Germany participated in the exchange of information, that the exchange of information concerned changes in a significant component of the price and that this took place regularly at association meetings. A point in favor of Respondent was the circumstance that the information being exchanged was not very detailed and that the exchange, while occurring at regular intervals of approximately two months,

- 26 -

did, nevertheless, not take place continuously during the annual talks with retailers that extended frequently over numerous rounds negotiations.

A total monetary fine in the amount of EUR 30,000 is appropriate.

Pursuant to § 81 subsection 5 GWB in conjunction with § 17 subsection 4 OWiG, the Rule-Making Department has decided at its discretion after due assessment of the circumstances not to siphon off potential financial gains in addition to the imposition of the regulatory fines of EUR 30,000 each that are intended solely as penalty for the regulatory violations. Given the limited effect of the coordinated conduct on prices and the nature of the less grave violation of "restraint of the confidentiality of competition," the amount of the financial gain for Accessory Respondent as well as its effect on the income of Respondent could only have been determined with the required degree of certainty by expending a great deal of effort and expense.

5.2    Determination of the regulatory fine for Accessory Respondent

The monetary fines imposed on Accessory Respondent have been determined both on the basis of the range for regulatory fines in § 81 subsection 4 sentence 2 GWB – according to which the monetary fines imposed on companies may not exceed the amount of EUR 1 million by more than 10% of the company's total sales generated in the preceding financial year – and by application of the Guidelines for Regulatory Fines of the Federal Cartel Office (§ 81 subsection 7 GWB).

In accordance with the Guidelines for Regulatory Fines of the Federal Cartel Office, the first step is to determine a so-called baseline amount as penalty for anticompetitive violations that reflects the gravity and duration of the violation (margin number 4-11). The baseline amount is then adjusted upwards or downwards in consideration of aggravating and/or mitigating circumstances (margin number 14-17).

Coordinated price increases for toothpaste

According to the Guidelines for Regulatory Fines, the baseline amount may equal up to 30% of the sales revenues assumed to be relevant in terms of the violation for the entire duration of the violation.  In a case of price-fixing, the baseline amount is, as a rule, in the upper range of the highest possible amount (margin number 9). In the determination of the applicable share of sales revenues relevant to the violation, the circumstances was taken into account that the coordinated increase of list prices involves a restraint on competitive pricing between the two main competitors in the low-price toothpaste segment and that the coordinated behavior was in fact implemented by both companies involved.

- 27 -

- 27 -

A baseline amount equal to at least 17% of the sales revenue relevant to the violation is thus appropriate. The sales revenue relevant to the violation used by the Rule-Making Department was Accessory Respondent's sales revenue from Signal brand tooth paste products in Germany in 2006 in the amount of EUR 13.30 million, so that the resulting baseline amount is equal to EUR 2.26 million.

In the year 2006, the Unilever group generated total sales revenues of app. EUR 39.6 million. Given the size of the company that this demonstrates, the Rule-Making Department considers an increase of the baseline amount by 30% for purposes of deterrence to be appropriate (margin number 15 of the Guidelines for Regulatory Fines.)

There were no other aggravating or mitigating circumstances to be considered, so that the result is a regulatory fine of EUR 2.90 million.

The amount of this regulatory fine does not exceed 10% of the sales revenue of the Unilever group. The amount of the monetary fine is also appropriate when considering Accessory Respondent's financial resources.

Pursuant to § 81 subsection 5 GWB in conjunction with § 17 subsection 4 OWiG, the Rule-Making Department has decided at its discretion after due assessment of the circumstances not to siphon off potential financial gains in addition to the imposition of the regulatory fine of EUR 2.90 million that is intended solely as penalty for the regulatory violations. Given the limited effect of the coordinated conduct on prices, the amount of the financial gain could only have been determined with the required degree of certainty by expending a great deal of effort and expense.

Exchange of information about the status of the negotiations with retailers
According to the Guidelines for Regulatory Fines, the baseline amount may equal up to 30% of the sales revenues assumed to be relevant in terms of the violation for the entire duration of the violation.  The restraint of confidential competition in relation to changes in the discounts agreed with the retailers that is to be sanctioned in this instance is not included among the grave restraints of horizontal competition within the meaning of No. 9 of the Guidelines for Regulatory Fines (cartels based on prices, quotas, territories, sales quotes, etc.). Instead, it involves a less grave market information system with respect to the parameter "changes in the level of the discount."

In the determination of the applicable share of sales revenue relevant to the violation, it was taken into account that the leading brand name manufacturers in Germany participated in the exchange of information, that the exchange of information affected a change in a

- 28 -

- 28 -

significant component of the price and that this took place regularly at association meetings. A point in favor of Respondent was the circumstance that the information being exchanged was not very detailed and that the exchange, while occurring at regular intervals of approximately two months, nevertheless did not take place continuously during the annual discussions with retailers that extended frequently over numerous rounds negotiations. A baseline amount equal to at least 4% of the sales revenue relevant to the violation is thus appropriate. The revenues relevant to the violation used by the Rule-Making Department by application of margin number 10 of the Guidelines for Regulatory Fines for the period of participation by Respondent (until February 2006) were Accessory Respondent's sales revenues from those retailers in Germany whose discount negotiations were mainly referenced in the exchange of information between July 2005 and November of 2005 (Anton Schlecker as well as EDEKA, including the cooperative partners Budnikowsky, Kloppenburg and Globus) that were explicitly mentioned in the exchange of information. These sales revenues totaled approximately EUR 124 million, resulting in a baseline amount equal to EUR 4.96 million.

In light of the size of the Unilever group, this amount was also to be increased by 30% for the sake of deterrence. There were no other aggravating or mitigating circumstances to be considered, so that a regulatory fine of EUR 6.40 million is appropriate.

The amount of this regulatory fine does not exceed 10% of the sales revenue of the Unilever group. The amount of the monetary fine is also appropriate when considering Accessory Respondent's financial resources.

Pursuant to § 81 subsection 5 GWB in conjunction with § 17 subsection 4 OWiG, the Rule-Making Department has decided at its discretion after due assessment of the circumstances not to siphon off potential financial gains in addition to the imposition of the regulatory fine of EUR 6.40 million that is intended solely as penalty for the regulatory violations. Given the nature of the present anticompetitive violation, it would have been difficult to determine a financial gain with the required degree of certainty.

6.    <u>Fees and expenses</u>

According to § 107 subsection 1 OWiG, the fees are, respectively, five per cent of the monetary fines imposed on Accessory Respondent, but no more than EUR 7,500.00. The cost of business travel on the occasion of the search at Accessory Respondent in Hamburg on March 14, 2007 is applied as expenses (§ 107 subsection 3 OWiG).

- 29 -

- 29 -

**V.**

**<u>Instructions about rights of appeal</u>**

This Order and Notice of Regulatory Fine becomes effective and enforceable if no appeal is filed. An appeal may be filed within two weeks from service of the Order and Notice of Regulatory Fine either in writing or for the record with the Federal Cartel Office, Kaiser-Friedrich-Straße 16, 53113 Bonn. The deadline is only met if the appeal is received by this office before expiration of this deadline.

In case of an appeal, the Higher Regional Court in Düsseldorf shall rule on the charges on the basis of a trial, which ruling may also be more unfavorable to Accessory Respondent. However, it may also decide by court order if Accessory Respondent and the Public Prosecutor's Office do not object to such proceedings.

[Signature]                    [Signature]                    [Signature]
Dr. Wagemann               Dr. Bucher-Gorys             Hawerkamp

STATE OF NEW YORK    )
                      ) ss:
COUNTY OF NEW YORK  )

Leila F. Bose, being duly sworn, deposes and declares:

That she is employed as Translator by the firm of Cravath, Swaine &

Moore LLP, Worldwide Plaza, 825 Eighth Avenue, New York, New York 10019;

That she is fully conversant in the German and English languages;

That she reviewed the translation of the attached document:

BUSSGELDBESCHEID DATED 02/19/2008

from German into English;

and that the English translation is, to her best knowledge and belief, a true

and correct rendering of the original text in the German language.

Sworn to before me this
21th day of March of 2008.

_Doris Schuldt_
Notary Public

DORIS SCHULDT
Notary Public, State of New York
No. 31-4638498
Qualified in New York County
Commission Expires March 30, 2010

_Leila F. Bose_

Leila F. Bose
Member,
American Translators Association;
New York Circle of Translators;
Translation Studies Faculty, New York
University School of Continuing and
Professional Studies

Bundeskartellamt
11. Beschlussabteilung
B 11 – 17/06-5


### Bußgeldbescheid

in dem Kartellordnungswidrigkeitenverfahren

gegen


1.  Herrn Arne Kirchem,

    geboren am 06.07.1961 in Kiel,

    wohnhaft in Rudolf-Weissmann-Straße 26, 24534 Neumünster

- Betroffener -


2.  Unilever Deutschland GmbH,

    vertreten durch ihre Geschäftsführer Herrn Heinz Arnold, Hamburg u.a.


- Nebenbetroffene -


Verteidiger zu 1. und 2.:

Rechtsanwalt Dr. Börries Ahrens

Jungfernstieg 51

20354 Hamburg


hat die 11. Beschlussabteilung des Bundeskartellamtes am 19. Februar 2008 beschlossen:

- 2 -

I.

1. Dem Betroffenen wird zur Last gelegt, durch folgende Handlungen vorsätzlich gegen das Verbot des § 1 des Gesetzes gegen Wettbewerbsbeschränkungen (GWB) sowohl in der Fassung der Bekanntmachung vom 26. August 1998 als auch in der Fassung der Bekanntmachung vom 15. Juli 2005, zuletzt geändert durch Gesetz vom 18. Dezember 2007, sowie das Verbot des Art. 81 des Vertrages zur Gründung der Europäischen Gemeinschaft (EG) verstoßen gehandelt zu haben:

   a) Abgestimmte Preiserhöhung für Zahncreme:

      Mit dem Vertriebsleiter der Colgate-Palmolive GmbH, Herrn Wilfried Hadick, bei Kontakten Mitte 2005 abgestimmte Anhebung der Listenpreise für die Zahncreme-Produkte der Marken „Signal" (Lever Fabergé Deutschland GmbH / Unilever Deutschland GmbH) sowie „Dentagard" und „Colgate" (Colgate-Palmolive GmbH) zum 01. Januar 2006 in einem bei Preiserhöhungen in diesem Bereich üblichen Rahmen von etwa 5%.

   b) Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

      Teilnahme an dem regelmäßigen Austausch von Informationen über die Verhandlungen mit Einzelhändlern, insbesondere über die Veränderungen der mit den Einzelhändlern vereinbarten Rabatte, unter den Mitgliedern des Arbeitskreises „Körperpflege-, Wasch- und Reinigungsmittel" (KWR) des Markenverbandes e.V. zumindest im Zeitraum zwischen dem 31. März 2004 und dem 17. Februar 2006.

2. Gegen den Betroffenen werden nach § 81 Abs. 4 GWB, § 9 Abs. 1 Nr. 1 des Gesetzes über Ordnungswidrigkeiten (OWiG) wegen der oben bezeichneten Ordnungswidrigkeiten folgende Geldbußen festgesetzt:

   -  wegen der abgestimmten Preiserhöhung für Zahncreme eine Geldbuße in Höhe von

### 30.000,-- EUR
### (in Worten: Dreißigtausend EURO),

   -  wegen des Austausches von Informationen über den Stand der Verhandlungen mit Einzelhändlern eine Geldbuße in Höhe von

### 30.000,-- EUR
### (in Worten: Dreißigtausend EURO),

- 3 -

- 3 -

insgesamt somit in Höhe von

### 60.000,-- EUR

**(in Worten: Sechzigtausend EURO).**

3. Gegen die Nebenbetroffene werden nach § 81 Abs. 4, Abs. 5 und Abs. 7 i.V.m. den Bußgeldleitlinien des Bundeskartellamtes[1], § 30 Abs. 1 Nr. 1 i.V.m. § 9 Abs. 1 Nr. 1 OWiG als Nebenfolge der von dem Betroffenen begangenen Ordnungswidrigkeiten folgende Geldbußen festgesetzt:

- wegen der abgestimmten Preiserhöhung für Zahncreme eine Geldbuße in Höhe von

### 2.900.000,-- EUR

**(in Worten: Zweimillionen Neunhunderttausend EURO),**

- wegen des Austausches von Informationen über den Stand der Verhandlungen mit Einzelhändlern eine Geldbuße in Höhe von

### 6.400.000,-- EUR

**(in Worten: Sechsmillionen Vierhunderttausend EURO),**

insgesamt somit in Höhe von

### 9.300.000,-- EUR

**(in Worten: Neunmillionen Dreihunderttausend EURO).**

4. Der Betroffene und die Nebenbetroffene haben Kosten des Verfahrens (Gebühren und Auslagen) zu tragen (§ 105 Abs. 1 OWiG i.V.m. §§ 464 Abs. 1, 464 a Abs. 1, 465 Abs. 1 der Strafprozessordnung – StPO).

Die Gebühren betragen nach § 107 Abs. 1 OWiG für den Betroffenen

- wegen der Geldbuße für die abgestimmte Preiserhöhung für Zahncreme

---

[1] Bekanntmachung Nr. 38/2006 über die Festsetzung von Geldbußen nach § 81 Abs. 4 Satz 2 GWB gegen Unternehmen und Unternehmensvereinigungen vom 15. September 2006

- 4 -

- 4 -

**1.500,-- EUR**

**(in Worten: Eintausendfünfhundert EURO),**

- wegen der Geldbuße für den Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

**1.500,-- EUR**

**(in Worten: Eintausendfünfhundert EURO),**

insgesamt somit in Höhe von

**3.000,-- EUR**

**(in Worten: Dreitausend EURO).**

Die Gebühren betragen nach § 107 Abs. 1 OWiG für die <u>Nebenbetroffene</u>

- wegen der Geldbuße für die abgestimmte Preiserhöhung für Zahncreme

**7.500,-- EUR**

**(in Worten: Siebentausendfünfhundert EURO),**

- wegen der Geldbuße für den Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

**7.500,-- EUR**

**(in Worten: Siebentausendfünfhundert EURO),**

insgesamt somit in Höhe von

**15.000,-- EUR**

**(in Worten: Fünfzehntausend EURO).**

Die Auslagen betragen insgesamt

**1.037,15 EUR**

**(in Worten: Eintausendsiebenunddreißig fünfzehn /100 EURO).**

- 5 -

- 5 -

II.

Der Betroffene und die Nebenbetroffene werden aufgefordert, die Geldbußen sowie die Gebühren, für den Betroffenen somit insgesamt 63.000,-- EUR und für die Nebenbetroffene insgesamt 9.315.000,-- EUR, spätestens bis zwei Wochen nach Rechtskraft dieses Bußgeldbescheides unter Angabe des Verwendungszwecks „BKartA-Titel 11201, B11-17/06-5" und unter Verwendung des **Kassenzeichens**

**810600164668**

auf das Konto

      Bundeskasse Trier

      bei der

      Deutsche Bundesbank, Filiale Saarbrücken

      Bankleitzahl: 590 000 00

      Konto-Nr.: 590 010 20

      IBAN: DE81 5900 0000 0059 0010 20

      BIC: MARKDEF 1590

zu zahlen.

Die Auslagen in Höhe von 1.037,15 EUR, für die der Betroffene und die Nebenbetroffene gesamtschuldnerisch haften, sind ebenfalls bis spätestens zwei Wochen nach Rechtskraft dieses Bußgeldbescheides unter Angabe des Verwendungszwecks und des Kassenzeichens zu zahlen.

Im Fall der Zahlungsunfähigkeit haben der Betroffene bzw. die Nebenbetroffene schriftlich oder zur Niederschrift darzutun, warum ihnen die fristgerechte Zahlung nach den wirtschaftlichen Verhältnissen nicht zumutbar ist (§ 66 Abs. 2 Nr. 2b OWiG).

Wenn dieser Verpflichtung nicht nachgekommen wird, kann das Oberlandesgericht in Düsseldorf nach Ablauf einer Frist von zwei Wochen nach Eintritt der Fälligkeit auf Antrag des Bundeskartellamtes Erzwingungshaft anordnen (§§ 95 Abs. 1, 96 Abs. 1, 99 OWiG; §§ 83, 86 GWB).

- 6 -

- 6 -

### III.

### Beweismittel

1. Antrag der Colgate-Palmolive GmbH (im Folgenden: CP) auf Anwendung der Bonus-regelung vom 28.11.2006 (Verfahrensakte Bl. 97-98, 102f.).

2. Niederschrift über die Anhörung von Herrn Wilfried Hadick, Vertriebsleiter der Colgate-Palmolive GmbH, am 28.02.2007 (Verfahrensakte Bl. 172-176).

3. Niederschrift über die Anhörung von Herrn Wilfried Hadick, Vertriebsleiter der Colgate-Palmolive GmbH, am 19.09.2007 (Verfahrensakte Bl. 228-233).

4. Übersicht „Entwicklung der Einzelhandelspreise lt. AC Nielsen" (Unternehmensakte Nr. 1 Bl. 76).

5. Antrag der Fa. Sara Lee auf Anwendung der Bonusregelung vom 03.09.2007 (Verfah-rensakte Bl. 210-218).

6. Von Herrn Thomas Wieker, Vertriebsdirektor der Fa. Sara Lee, am 06.09.2007 über-gebene Mitschriften von KWR-Sitzungen (Anlage 1 zur Beweismittelakte).

7. Niederschrift über die Anhörung von Herrn Thomas Wieker, Vertriebsdirektor der Fa. Sara Lee, am 06.09.2007 (Verfahrensakte Bl. 219-223).

8. Urkunden, die während der Durchsuchungsaktion des Bundeskartellamtes am 14.03.2007 sichergestellt worden sind (Zitierweise: Unternehmensnummer-Asservatennummer-Blattnummer):
   5-8-1, 5-18-16; 5-19-7ff.; 5-22-10; 5-22-13; 5-22-18; 5-22-32; 5-22-33; 5-22-35; 5-22-47; 5-21-79; 5-22-126.

9. KWR-Mitgliederübersicht, Verfahrensakte, Bl. 234.

10. KWR-Treffen- und Teilnehmerübersicht, Verfahrensakte, Bl. 235.

11. Einlassungen des Betroffenen und der Nebenbetroffenen vom 13.08.2007 und 26.11.2007 sowie vom 15. Januar 2008 (Unternehmensakte Nr. 5, Bl. 150-192, 227-277 und 278-280).

12. Handelsregisterauszug der Nebenbetroffenen (Unternehmensakte Nr. 5, Bl. 3-21).

- 7 -

## IV.

## Begründung

### A.

1. Der Betroffene und die Nebenbetroffene

Der Betroffene war seit mindestens Anfang des Jahres 2004 bis Mitte des Jahres 2005 Geschäftsführer der - mit Wirkung zum 1. August 2005 (Datum der Handelsregister-Eintragung) auf die Nebenbetroffene verschmolzenen - Lever Fabergé Deutschland GmbH. Im Anschluss war er als Customer Marketing Director (Vertriebsdirektor, Kunden) der Nebenbetroffenen tätig. Zumindest seit Anfang 2004 und bis einschließlich zur Sitzung am 17. Februar 2006 gehörte er zusammen mit 16 weiteren Vertriebsverantwortlichen von Markenartikelherstellern dem Arbeitskreis „Körperpflege-, Wasch- und Reinigungsmittel" (KWR) des Markenverbandes an. Der Betroffene bezog im Jahre 2006 ein Gehalt von insgesamt rd. 222.000 EUR (vgl. Ass. 5-8-1).

Die Nebenbetroffene ist die deutsche Tochtergesellschaft des niederländischen Unileverkonzerns und in Deutschland Anbieter von Markenartikeln in den Bereichen Nahrungsmittel (u.a. Marken „Rama", „SB", „Sanella", „Lipton", „Knorr", „Bi-Fi", „Langnese"), Körperpflege (u.a. Marken „Signal", „Dove", „Axe", "Rexona"), Reinigungsmittel (u.a. Marken „Domestos", „Viss") und Waschmittel (u.a. Marken „Coral", „Sunil", „Omo"). Die Nebenbetroffene erzielte mit den Produkten aus den Bereichen Haushalt & Körperpflege in Deutschland im Jahre 2006 Umsatzerlöse von ca. 500 Mio. EUR. (darunter ca. 13 Mio. EUR mit Zahncreme der Marke „Signal"). Der Unileverkonzern erwirtschaftete im Jahre 2006 weltweit ca. 40 Mrd. EUR Umsatz.

2. Preisbildung bei Drogerieartikeln

Die Hersteller von Markenartikeln in den Produktbereichen „Körperpflege-, Wasch- und Reinigungsmittel" (im folgenden als „Drogerieartikel" bezeichnet)[2], vertreiben ihre Produkte in Deutschland sowohl über Drogeriemarktketten wie Schlecker, dm, Rossmann oder Müller als auch über Lebensmitteleinzelhändler wie insbesondere Edeka und Rewe. Der vom Einzelhändler effektiv zu zahlende Preis ergibt sich dabei aus dem Listenpreis des Herstellers (auch als Herstellerabgabepreis oder Bruttopreis bezeichnet) abzüglich der mit dem jeweiligen Einzelhändler vereinbarten Rabatte. In Deutschland

---

[2] Branchenbezeichnung: Fast moving consumer goods – "schnelldrehende Konsumgüter".

- 8 -

ist es Praxis, dass Hersteller und Einzelhändler einmal jährlich in einem umfassenden Kaufvertrag (Jahresvereinbarung) sämtliche anzuwendenden Rabatte festlegen. Dabei handelt es sich zum einen um Rabatte, die nur für bestimmte Produkte gelten (Artikelrabatte), und zum anderen um zusätzlich rückwirkend am Ende des Jahres abzuziehende sog. „Werbekostenzuschüsse". Im Ergebnis kann der vom Einzelhändler tatsächlich an den Hersteller zu zahlende Nettopreis um bis zum 60 % unter dem Listenpreis liegen.

Änderungen dieser Nettopreise haben sich in der jüngeren Vergangenheit entweder durch Erhöhungen der Listenpreise von Seiten der Hersteller oder durch die Gewährung von zusätzlichen, von Einzelhändlern geforderten Rabatten ergeben, wobei grundsätzlich eine Listenpreiserhöhung für alle Einzelhändler gilt, höhere Rabatte aber nur das bilaterale Verhältnis zwischen dem Hersteller und einem Einzelhändler betreffen.

3. Abgestimmte Preiserhöhung für Zahncreme

Zwischen Herrn Arne Kirchem und dem Vertriebsleiter der CP, Herrn Wilfried Hadick, kam es im Jahr 2005 vor dem Hintergrund der Kostensteigerung im Rohstoffbereich und einer möglicherweise anstehenden Mehrwertsteuer-Erhöhung zu Gesprächen über Preiserhöhungen im Produktbereich Zahncreme. Diese Gespräche wurden in dem Zeitraum Juni bis September 2005 sowohl am Rande von Tagungen des Arbeitskreises „Körperpflege-, Wasch- und Reinigungsmittel" (KWR) des Markenverbandes e.V. (wie insbesondere der Klausurtagung des KWR in Santa Magherita Ligure/Italien vom 9.-12. Juni 2005) als auch telefonisch geführt. Im Rahmen dieser Gespräche haben sich Herr Kirchem und Herr Hadick ihr gegenseitiges Interesse mitgeteilt, die Preise für Zahncreme der Marken Signal (Unilever) bzw. Colgate und Dentagard (CP) zum 1. Januar 2006 zu erhöhen. Dieser Informationsaustausch verdichtete sich schließlich zu einem gemeinsamen Einvernehmen von Herrn Kirchem und Herrn Hadick darüber, die genannten Zahncremeprodukte zum 1. Januar 2006 um etwa 5% und damit in dem bei Preiserhöhungen in diesem Bereich üblichen Rahmen zu erhöhen.

Unilever erhöhte daraufhin seine Herstellerabgabepreise (Bruttopreise) für Zahncreme der Marke Signal zum 01. Januar 2006 um 5,6% (von 0,90 EUR auf 0,95 EUR) (Anlage 8 zur Verfahrensakte, S. 84 und 98). CP erhöhte seine Bruttopreise für Zahncreme der Marken Colgate (Basisprodukte) und Dentagard zum 1. Januar 2006 um jeweils 5,2% (von jeweils 0,96 EUR auf 1,01 EUR) (Anlage 1 zur Verfahrensakte, Doc. 1).

- 9 -

- 9 -

Die genannten Erhöhungen stellen die übliche Größenordnung für Bruttopreiserhöhungen dar. In diesem Rahmen bietet sich auch für die Einzelhandelsunternehmen die Möglichkeit, die Steigerungen durch eine Erhöhung der Verkaufspreise in einem akzeptablen Rahmen an den Endverbraucher weiterzugeben. Entsprechend wurden die Bruttopreiserhöhungen mit einer Erhöhung der empfohlenen Einzelhandelsverkaufspreise um 0,10 EUR verbunden (5-22-10; 5-22-35; 5-22-47; Anlage 8 zur Verfahrensakte, S. 15). In einer internen Präsentation des Unternehmens Unilever vom September 2005 zu dem Thema „Preiserhöhungen 01.01.2006" wird die gleichzeitige Erhöhung der empfohlenen Verkaufspreise als eine „win/win-Situation für den Handel" bezeichnet, die man diesem anbieten müsse (5-22-13).

Mit Zahncreme wurden in Deutschland im Jahr 2006 auf Einzelhandelsebene Umsätze von etwa 495 Mio. EUR erzielt (zu Endverkaufspreisen lt. AC Nielsen, vgl. Verfahrensakte Bl. 177). Der Markt ist gekennzeichnet von einer Vielzahl von Marken, die sich auf ca. 10 verschiedene Markenfamilien verteilen. Die volumenstärksten dieser Markenfamilien partizipierten im vergangenen Jahr folgendermaßen an dem genannten Gesamtmarktvolumen: [3]

| | |
|---|---|
| Colgate (CP) | 9,2 % |
| - davon **Colgate Basis** Produkte (CP) | **1,8%** |
| **Dentagard** (CP) | **4,3 %** |
| **Signal** (Unilever) | **5,3 %** |
| Elmex (Gaba/Wybert) | 10,3 % |
| Aronal (Gaba/Wybert) | 2,0 % |
| Aronal & Elmex (Gaba/Wybert) | 5,0 % |
| Meridol (Gaba/Wybert) | 5,5 % |
| Odol Med 3 (GSK) | 20,3 % |
| Sensodyne (GSK) | 8,0 % |
| Blend-a-med (Procter & Gamble) | 10,2 % |
| Theramed (Henkel) | 5,8 % |
| Perlweiss (Murnauer) | 3,0 % |

In diesem relativ zersplitterten Markt bilden die von der Vereinbarung betroffenen Marken Signal, Dentagard sowie die sog. Basis-Produkte der Markenfamilie Colgate ein eigenes Niedrigpreis-Segment, in welchem die Unternehmen Unilever und CP direkte

---

[3] Auch die Hersteller stützen ihre Marktanteilsanalysen auf die von Marktforschungsinstituten bei den Einzelhändlern erhobenen Umsatzdaten.

- 10 -

Wettbewerber sind. Die Produkte werden im Handel mit Regalpreisen von durchschnittlich 0,80 EUR bis 0,85 EUR und Aktionspreisen von durchschnittlich 0,55 EUR bis 0,60 EUR ähnlich positioniert, während die überwiegende Zahl der o.g. Marken ein deutlich höheres Preisniveau aufweist (durchschnittlicher Regalpreis ca. 1,50 EUR und durchschnittlicher Aktionspreis ca. 1,20 EUR) (lt. AC Nielsen, siehe 5-19-7ff.). In einer internen Unilever-Präsentation werden dementsprechend in einer marktanalysierenden Darstellung zwei verschiedene Preiscluster bezeichnet, nämlich eines für Produkte, mit einem Verkaufspreis von unter 1 EUR sowie eines für Produkte mit einem Verkaufspreis von über 2 EUR (5-18-16).

Die besondere wettbewerbliche Beziehung zwischen den genannten Marken geht auch aus verschiedenen, die Preiserhöhungen vorbereitenden, internen Unterlagen von Unilever hervor. Es soll demnach „keine Veränderung der Preispositionierung zu Colgate Rot & Dentagard, d.h. keine isolierte Preiserhöhung" geben (5-22-18). Laut handschriftlicher Notiz soll die Preiserhöhung für Signal nur erfolgen, „wenn Competitor anheben" (5-22-32) bzw. laut interner Präsentation „nur wenn Wettbe. sich bewegt" (5-22-35) und dies erst dann, wenn ein „move im Markt sichtbar" ist (5-22-33). Unter der Überschrift „Preisstellung vs. Wettbewerb" zu einem die Preiserhöhung für Signal betreffenden internen Papier heißt es: „Gleichpreisig zu Colgate rot & Dentagard" (5-22-126). Zusammenfassend werden als Ziele der Preiserhöhung für die Marke Signal ausgegeben: „- eine Verbesserung der Profitsituation, - Nicht teurer als Colgate, Dentagard," zu sein und "- unter 1,00 €" zu kosten. Dabei wird Bezug genommen auf die momentan identischen Regalpreise (0,89 EUR) von Colgate und Dentagard (5-22-47 und 5-22-126). Die aus der ähnlichen Markenpositionierung resultierende Austauschbarkeit zwischen den Marken sowie die hohe Preissensibilität der Nachfrage haben zur Folge, dass im Verhältnis der Marken Signal einerseits und Colgate sowie Dentagard andererseits das Preisniveau der jeweiligen Hauptwettbewerbermarken eine besonders hohe Bedeutung für den eigenen Markterfolg hat.

Unilever hat im Jahre 2006 einen Umsatz von 13,305 Mio. EUR mit Signal Zahncreme erzielt (5-21-79).

4. Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

Unter dem Tagesordnungspunkt „Beziehungen Industrie/Handel" haben die Mitglieder des KWR in ihren Sitzungen regelmäßig im Rahmen von so genannten „Round-Table-Abfragen" durch den Vorsitzenden über den Stand der Verhandlungen mit ausgewähl-

- 11 -

- 11 -

ten großen Einzelhändlern berichtet. Dabei wurden Informationen darüber ausgetauscht,

- mit welchen zusätzlichen Rabattforderungen die jeweiligen Einzelhändler im Rahmen der Jahresgespräche oder auch im Rahmen von unterjährigen Verhandlungen an die KWR-Mitgliedsunternehmen herangetreten waren,

- welche zusätzlichen Rabattangebote die KWR-Mitgliedsunternehmen daraufhin den Einzelhändlern unterbreitet haben,

- in welchem Stadium sich die Verhandlungen befanden (z.B. bereits begonnen, Einigung wahrscheinlich/nicht wahrscheinlich, abgeschlossen)

- und auf welche zusätzlich zu gewährenden Rabatte man sich voraussichtlich verständigen werde bzw. bereits verständigt hatte.

Dem KWR gehörten in den Jahren 2004 bis 2006 die Vertriebsleiter von 17 Markenartikelherstellern an.[4] Zwischen dem 31.03.2004 und dem 23.11.2006 fanden - jeweils im Abstand von 2 bis 3 Monaten - insgesamt 13 KWR-Sitzungen statt. Das KWR-Mitglied Thomas Wieker, Vertriebsleiter der Fa. Sara Lee, nahm an 12 Sitzungen teil.[5] Aus seinen handschriftlichen Sitzungsmitschriften, die er dem Bundeskartellamt im Rahmen eines Antrages auf Anwendung der Bonusregelung am 06.09.2007 übergeben hat[6], sind Einzelheiten des regelmäßigen Informationsaustausches auf den KWR-Sitzungen über den Stand der Verhandlungen mit Einzelhändlern zu entnehmen. Die folgenden wörtlichen Auszüge aus den Aufzeichnungen belegen den o.g. Umfang der ausgetauschten Informationen. Informationen über das eigene Verhandlungsverhalten der Markenartikelhersteller („Angebote") sowie die Verhandlungsergebnisse („Abschlüsse") sind in Fettschrift hervorgehoben:

(1)  KWR-Sitzung 31.03.2004 (Anlage 1 zur BA, Bl. 70-72):

- Thema: Jahresgespräche mit Fa. Anton Schlecker (AS)

Gilette:          **Ang** (*gebot*)[7]. **0.5 (%), offen** ...

CP[8]:          AS $\Rightarrow$ 5.9 Ford(*erung*). z.Zt., offen. **Ang. < 1.0, Gesch. läuft**

BDF:          **Seit Dez. durch, auf Basis von vor 3 Jahren**

---

[4] vgl. Mitgliederübersicht, Verfahrensakte Bl. 234
[5] vgl. Treffen- und Teilnehmerübersicht, Verfahrensakte, Bl. 235
[6] vgl. Anlage 1 zur Beweismittelakte (BA) Bl. 14-84
[7] Die in Klammern gesetzten Hinzufügungen in kursiver Schrift dienen dem leichteren Verständnis. Sie sind nicht Bestandteil der handschriftlichen Aufzeichnungen von Herrn Wieker.
[8] Die Bedeutung der von Herrn Wieker gewählten Firmenabkürzungen kann der o.g. Mitgliederübersicht (Verfahrensakte, Bl. 234) entnommen werden.

- 12 -

- 12 -

| | |
|---|---|
| **SKB:** | offen, Gesch. läuft, **0,6 % angeboten**, Ford. wes. höher. |
| **DPN:** | **Ang +0.4, Ford. wes. höher, Gesch. läuft** |
| **Guhl:** | 2,8 % Ford., **0.8 Angeb.** |
| **Reckitt:** | **knapp über 1.0 angeboten, +0,2 werden noch angeboten…** |
| **Lever:** | **1.0 % angeb, Ford.= 7.5 %, 7.4 next T.,** **wird wohl nicht mehr als 1.0 anbieten** |

**(2)  KWR-Sitzung 14.05.2004 (Anlage 1 zur BA, Bl. 67-69):**

- Thema: Jahresgespräche mit Fa. Schlecker

| | |
|---|---|
| **Gilette:** | durch, **SPI** (*Sales Price Increase/Preiserhöhung*) **durch** |
| **Lever F:** | offen, **SPI durch** |
| **DPN:** | **offen, 0,5 % angeboten** |

**(3)  KWR-Sitzung 24./25.11.2004 (Anlage 1 zur BA, Bl. 60-64):**

- Thema: „AS (Anton Schlecker) 30 Jahre"

| | |
|---|---|
| **Henkel WPR:** | Grundsatzgespräch geführt. **Sondergrößen angeboten** → abgelehnt, will Geld haben. JG (*Jahresgespräche*) vorerst auf Eis gelegt. Ford. 0.9 -1.0 % |

- Thema „Rewe":

| | |
|---|---|
| **Guhl:** | 5-6 % gefordert, **Angebot: max 1 %** |
| **GSK:** | - urspr. 17-18 % + Vergütung auf best. SKU´s (*Shelf Keeping Units/Artikel*) , $\Sigma$ = 34 % <br> - nach erstem Gespr. Ford. = 5 % <br> - **schriftl. A**(*ngebot*) **(0.45 %) eingereicht**, Rückmeldung offen |
| **Henkel WPR:** | 36-38 %, Trauzettel im Gespräch: 3 % **schriftl. A**(*ngebot*) **eingereicht (~ 1%), 2. Termin kommt** |
| **LF:** | ~ 30 %, Trauzettel dann: ~ 8 %,  **1 % abgeben** jetzige F. 3 % durch Huber |
| **P+G:** | 26-30 % F. , A(*ngebot*).: **knapp unter 1 %,** **wird bei knapp 1 % abschließen** |

- 13 -

- 13 -

| | |
|---|---|
| <u>CP:</u> | ...F. jetzt:~ 4 %, A(*ngebot*).: 1,4 % (aus Kundenbetrachtung).. |
| <u>DPN:</u> | F.: 5 %, A(*ngebot*): ~ 1 % ... |
| <u>SCJ:</u> | ...**Bietet nichts an z.Zt., max 0.5**; F. 18%, zum Schluss: 2.5 % |
| <u>BDF:</u> | F. 7-8 %, gutes Gespräch mit Trauzettel. → **Null Runde !** ... |
| <u>SH:</u> | F. 8,75 %, **wird keine Weiterentwicklung anbieten.** |

- Thema „Kaufland":

  Ford. überall zw. 1-2 % o. 100-200k€  ⇒ jeder kämpft für sich

- Thema „Edeka":

| | |
|---|---|
| *(LF)*: | Arne (*Kirchem/Lever Faberge*) **ist durch, leicht über 2 %** ohne regional + Budni/Kloppi .... |
| <u>P+G:</u> | **durch 2-3 %** |


<u>(4)  KWR-Sitzung 21.01.2005 (Anlage 1 zur BA, Bl. 54-59):</u>

- Thema „Rewe":

| | |
|---|---|
| <u>ER:</u> | F: 5.98% + 25 SAV (Service Ausgleichsvergütung) **knapp über 2 % abgeschl.** Während der Gespräche wurden B Artikel ausgelistet → **keine zusätzlichen Gegenleistungen** |
| <u>LF:</u> | **durch bei knapp unter  2 %** |
| <u>L'O:</u> | **A: 1,5 % im qualitativen Bereich, werden abschließen** |
| <u>GSK:</u> | **A: knapp unter 1 %, alles artikelbezogen ...** |
| <u>DPN:</u> | SPI: + 3 %, abgeschlossen bei 2 %, kein COKS (*COnditio nen für ein zuführendes KernSortiment*)! |
| <u>SCJ:</u> | **Durch, 1,1 % ...** |
| <u>CP:</u> | F jetzt 4-5, 1. Gespräch mit Schmitz, **A: bei 2-2.5.** noch offen ... |
| <u>Henkel WPR:</u> | ... **Abschluss bei knapp unter 2 %; davon COKS 0,5.** → **Teil der Kondition an Umsatz festgemacht** |
| <u>JJ:</u> | F: jetzt 3 % **A: ″   0,7** |

- 14 -

(5)  KWR-Sitzung 14.04.2005 (Anlage 1 zur BA, Bl. 50-53, 3-2-8):

- Thema „Edeka":

| | |
|---|---|
| (o.A.) | **0,25    alle lehnen ab** |
| | **- keine generelle % Leistung** |
| | **- nur auf eigene Umsätze (ex Budni, Kloppi, Globus?)** |
| | **- nur, wenn Gegenleistungen kommen** |
| ERI: | Hat 0,25 % gezahlt, dafür Knülleraktion |
| Henkel WPR: | Edeka bietet an, bestehende Knülleraktion „aufzupeppen"⇒ **Auf keinen Fall akzeptieren.** |

(6)  KWR-Sitzung 17.11.2005 (Anl. 1 zur BA, Bl. 43-45, 3-3-20R-25, UA 3 Bl. 330ff.):

- Thema „Agenor"[9]:

| | |
|---|---|
| BDF: | 1. Gespräch = + 0,7% Ford. → **versuchen, zu regionalisieren um zu verhindern, dass Edeka on top kommt. ⇒ Hauptziel.** |
| Henkel: | Ford: + 1,0 %, Gegenleistung: 50 % Europromo **Ziel: Bei Edeka Regio konditionen gegenrechnen** |
| L'O: | **Hat Agenor für 2005 gekündigt...** |
| Gilette: | **... Strategie: lokale Ford. gegenrechnen (Edeka)** |
| GSK: | + 0,8, ohne Gegenleistung, Reconaissance Alidis, → wird **auf keinen Fall** das an Edeka weitergeben, was Agenor heute schon hat |
| → (Fazit:) | 1. **Versuch, existierende Konditionen nicht auf Edeka anzuwenden.** |
| | 2. **Reconnaissance → verstehen wir schon gar nicht** |
| | 3. **Budni, Kloppi: raushalten** |
| | Budni, Kloppi, Globus: **NICHT mit in Agnor einbeziehen** ⇒ **Ziel. dann würde das gleiche mit z.B. Rewe + dm passieren.** |

---

[9] Alidis/Agenor ist ein europäischer Einkaufsverbund mit Sitz in Genf, an dem sich EDEKA im Zusammenhang mit der Übernahme von SPAR im Jahre 2005 mit einem Drittel beteiligte.

- 15 -

- Thema „Edeka":

  (o.A.):               Grundsätze der ZA (*Zusammenarbeit*) von Edeka:
                        **Werden nicht akzeptiert!**


**(7)  KWR-Sitzung 25.01.2006 (Anl. 1 zur BA, Bl. 35-41, 3-1 Bl. 3-4R, UA 3 Bl. 163f.):**

- Thema „Agenor":

  (*o.A.*)              **wird fast überall für Edeka abgelehnt...**

- Thema „Edeka":

  RB:                   **Abgeschlossen ~1,5 %. ..Hochzeitsbonus: Für 2 Listungen**
                        **angeboten. SPI ist komplett akzeptiert.**

  ER:                   **...abgschl. knapp 2 % incl. 3 neue nat. Listungen!**

  LF:                   **- Spar Kond. ab 1.9. angeb.**
                        **- Boni - no !.**
                        **- abgschl. → Investment wie 2005. incl. Neulistg. + Umsatzziel**

  SH:                   **JG abgeschl., ohne Boni. Hochzeitsbonus ⇒ Einmalbetrag**
                        **für Listungen bezahlt !...**

  (o.A.):               **Grundsätze der ZA (*Zusammenarbeit*): Generell abgelehnt.**

- Thema „Rewe":

  LF:                   **Rewe: JG: abgschl. knapp > 1%**

- Thema „Müller":

  SH:                   **Freitag abgeschlossen: 1 %**

- Thema „Anton Schlecker (AS)":

  ER:                   **Jetzt > 2 % abgschl., Umsatzziel > 20 % seitens AS      zu-**
                        **gesagt.**

  CP:                   **...knapp über 1 % abgschl., SPI durch**

  GSK:                  **Angebot < 0,5. Staffeln bleiben**

- 16 -

- 16 -

### (8) KWR-Sitzung 17.02.2006 (Anl.1 zur BA, Bl. 32-34, 3-1 Bl. 8R-9R, UA 3 Bl. 164f.):

- Thema „Edeka":

| | |
|---|---|
| RB: | JG abgschl., kein Synergieb(*onus*) bezahlt |
| SH: | JG durch (wie vor 3 Wochen), aber Gegenleistungen offen. Hatten 5 Knülleraktionen in 05. ⇒ E will aber Geld dafür, verhandeln derzeit neue Aktivitäten. |
| Henkel WPR: | JG durch, haben 0.5 für Alidis in HH angeboten. Dann in Genf neu verhandelt. A: Wollte 2 %, dann 1 % ⇒ haben 2 Euro Promos angeboten, **Henkel abgelehnt**. |
| LF: | JG durch, für Spar nix gezahlt, außer Konditionenabgleich |

- Thema „AS":

| | |
|---|---|
| RB, BDF | SPI (*Sales Price Increase/Preiserhöhung*) **durch** |
| SH,LF, Gilette, Coty | **nicht** |

### (9) KWR-Sitzung 06.04.2006 (Anlage 1 zur BA, Bl. 28-31):

- Thema „Edeka":

| | |
|---|---|
| SCJ: | Durch, faires Angebot – faire Gegenleistungen. Agenor noch offen |
| ER: | durch, guten Deal gemacht, Agenor kein Thema... |
| Coty: | Durch, sind von reg. auf national befördert ⇒ war teuer ... |
| JJ: | durch, aber Gegenleistg. werden zurückgezogen Agenor: Kurz vor Abschluss – gegen adäquate Gegenleistung |
| L'O: | durch. Jetzt werden Gegenleistungen nach + nach zurückgezogen |
| GSK: | durch; Alidis: durch, 2 Jahres-Vertrag |
| P&G: | durch, dann Leistungen zurückgezogen -> wieder offen |
| SH: | seit Dez. durch, Gegenleistungen zurück -> hin + her, offen |
| BDF: | Durch, moderat. ⇒ Rickers nicht mehr verhandlungsfähig. |

- 17 -

- 17 -

A: **durch, ohne zusätzliche Gelder (ex Budni, Kloppi, Glo-bus)**

**(10) KWR-Sitzung 16.06.2006 (Anl. 1 zur BA, Bl. 23-27, 3-1- Bl. 31-32, UA 3 Bl. 334):**

- Thema „Edeka: Agenor-Alidis":

| | |
|---|---|
| CP: | abgeschlossen, **incl.** Budni etc. |
| BDF: | abgeschl. (**ohne** Budni etc.) |
| | hat Summe von ITM gleichmäßig auf neue Gruppe verteilt keinen Mehrkosten |

Müller soll angeblich zur Edeka gehen, zur Verrechnung
-> hätte zur Folge, dass Mü dann auch Agenor-Konditionen bekommt.

- Thema „100 Jahre Edeka":[10]

(o.A.):        Forderung 1,2 % auf Umsatz 2007, zus. Aktivitäten je 500.000 €

Nicht on top Aktivitäten, von Procter 5 Aktivitäten erwartet,

**1,2 % auf jeden Fall ablehnen,**

Schreiben vom Markenverband bzgl. der 1, 2 %

**(11) KWR-Sitzung 21.09.2006 (Anl.1 zur BA, Bl.18-22, 3-1 Bl. 42R-44R, UA 3 Bl. 335f.):**

- Thema „Edeka 100 Jahre":

| | |
|---|---|
| ER: | Zahlt pro Vertrag 0,8 % pro Jubiläum. |
| | - nat. Aktion, 2 Artikel, Festmarge |
| | - plus einen Sonderartikel (overfill) für Edeka |
| DPN: | 1,2 % gefordert, runter auf 0,5 % auf 2005er Umsatz, nat. Festabnahmemenge f. einen Sonderartikel (nur f. Edeka) |
| GSK: | 2-3 Gespräche. 1.2 + 2 Aktionen. Überfüllungsangebot. No. Verbindung mit JG -> No. Nächstes Gespräch Rickers-Klaus 4.10. Klaus eher unbeweglich. Gegenleistung bisher seitens Edeka nicht definiert. |
| Henkel WPR: | 1.2 -> 0,5 % , + 2 x 500 k€. Offen. |

---

[10] Der Wortlaut zu diesem Abschnitt ist den Aufzeichnungen von Herrn Hepe entnommen (3-1- Bl. 31R).

- 18 -

| | |
|---|---|
| <u>RB:</u> | Alidis + 100 J + JG 2006 (ein Pkt) noch offen. |
| | Edk macht Druck. RB hat **Aktion, Sondergröße angeboten**, aber **Kosten** der Sonderproduktion **gegengerechnet**. F: 1.2 % + 2 x 500k€ |
| <u>SCJ:</u> | ABGESCHLOSSEN: **0,9 für Listungen! keine Aktion.** |
| <u>BDF:</u> | 1.2 % + 3 x 500k. Aktion angeboten, weit entfernt von E. Alles offen |
| <u>SH:</u> | 1,2 % + 3 x 500. **2 Aktionen angeboten, Gegenrechnen d. Aktionskosten!!!** |

**- Gegenrechnung der Aktionskosten scheint akzeptiert zu werden.**

- Thema „Schlecker":

Forderungen wegen erhöhter Frachtkosten für .....:
<u>GSK</u> e.g.: Vertrag wurde bereits geschlossen, daher keine Verhandlung.
⇒ **HART Bleiben!**

<u>(12) KWR-Sitzung 23.11.2006 (Anl. 1 zur BA, Bl. 14-17, 3-4 Bl. 2R-4, UA 3 Bl. 165f.):</u>

- Thema: Forderungen der EDEKA anlässlich des 100 Jahre-Jubiläums

| | |
|---|---|
| <u>SCJ:</u> | ...100 J. ⇒ **liegt jetzt <u>unter</u> 1 % mit Gegenleistung (wird von Edeka akzeptiert)** |
| <u>SH:</u> | 100 J..: Aktivitäten verplant, Konditionen allerdings noch nicht endgültig durch. **Forderung liegt bei <u>0.5</u> % !! <u>Mehrere</u> nat. Aktivitäten sind dafür verhandelt.** |
| <u>Henkel:</u> | **0,5 gezahlt, → kriegen <u>5</u> zus.**(ätzliche) nat.(ionale) **Aktionen, durch!** JG offen. |
| <u>ER:</u> | **Jubi durch, aus 1 nat Aktion sind jetzt sogar 2 geworden. Kond. < 1.0%, JG ~1 %, wird so wohl nächste Woche abgeschlossen** |

Herr Kirchem hat bis zu seinem Ausscheiden aus dem KWR gegen Ende Februar/Anfang März 2006, das durch die mit der Verschmelzung der Lever Fabergé Deutschland GmbH auf die Nebenbetroffene verbundenen Funktions- und Organisati-

- 19 -

- 19 -

onsveränderungen bedingt war, an mindestens acht der 13 Sitzungen in dem o.g. Zeit-
raum teilgenommen. Die in den oben auszugsweise wiedergegebenen Aufzeichnungen
von Herrn Wieker unter „Lever", „LeverF" sowie „LF" aufgeführten Informationen wur-
den von Herrn Kirchem in die Sitzungen eingebracht.

## B.

Belegt werden diese Feststellungen in Bezug auf die abgestimmte Preiserhöhung für
Zahncreme durch den Antrag der CP auf Anwendung der Bonusregelung vom 28.11.2006
sowie durch die Aussagen von Herrn Wilfried Hadick, Vertriebsleiter der CP, in Anhörun-
gen im Bundeskartellamt am 28.02.2007 und 19.09.2007. Diese Erklärungen, mit denen
sich die CP sowie Herr Hadick selbst bezichtigen, sind nach Einschätzung der Beschluss-
abteilung glaubhaft. Für deren Richtigkeit spricht auch, dass deren Angaben auch im Fall
der abgestimmten Preiserhöhung bei Handgeschirrspülmittel von dem anderen Beteiligen
vollständig und im Fall der abgestimmten Preiserhöhung bei Duschgel von den anderen
Beteiligen überwiegend bestätigt wurden.[11] Die Feststellungen zur Verbindung der Brutto-
preiserhöhungen mit einer Erhöhung der empfohlenen Verkaufspreise, zu den Marktantei-
len und zum Produktumsatz der Nebenbetroffenen sowie zu dem besonderen Wettbe-
werbsverhältnis zwischen der Nebenbetroffenen und Colgate im Bereich Zahncreme er-
geben sich aus Urkunden, die am 14.03.2007 in den Geschäftsräumen der Nebenbetrof-
fenen sichergestellt worden sind.

Die Richtigkeit der Feststellungen in Bezug auf den Austausch von Informationen über
den Stand der Verhandlungen mit Einzelhändlern ergibt sich aus dem Antrag der CP auf
Anwendung der Bonusregelung vom 28.11.2006 sowie aus dem Antrag der Sara Lee
Household & Body Care, Zweigniederlassung der Sara Lee Deutschland GmbH (im fol-
genden: Sara Lee) auf Anwendung der Bonusregelung vom 06.09.2007 und hier insbe-
sondere aus den mit dem Bonusantrag übergebenen handschriftlichen KWR-
Sitzungsmitschriften des Vertriebsleiters von Sara Lee, Herrn Thomas Wieker. Aus diesen
Aufzeichnungen sind Einzelheiten des regelmäßigen Informationsaustausches auf den
KWR-Sitzungen über den Stand der Verhandlungen mit Einzelhändlern zu entnehmen.
Bestätigt wird der Inhalt dieser Aufzeichnungen durch die am 14.03.2007 im Büro des
Vertriebsdirektors der Schwarzkopf & Henkel GmbH, Herrn Jörg Hepe, sichergestellten

---

[11] Vgl. Unternehmensakten Nr. 2, Bl. 82f., und Nr. 3, Bl. 70, 154ff., sowie Verfahrensakte, Bl. 216 ff.

- 20 -

handschriftlichen Sitzungsnotizen, die dieser mit Schreiben vom 26.11.2007 und 18.12.2007 in Klarschrift übertragen hat.[12]

## C.

Der Betroffene und die Nebenbetroffene hatten Gelegenheit, sich zu den gegen sie erhobenen Vorwürfen zu äußern. Bezüglich der Listenpreiserhöhung für Zahncreme haben sie die Kontakte des Betroffenen mit Herrn Hadick zum Teil eingeräumt bzw. im einzelnen erläutert. Über anstehende Preiserhöhungen sei aber nicht gesprochen worden. Die Preiserhöhung zum 1. Januar 2006 sei im Hause der Nebenbetroffenen ohne Rücksicht auf die Wettbewerber beschlossen worden.

Der Austausch von Informationen über den Inhalt und Stand der Verhandlungen mit Einzelhändlern im Rahmen des KWR wurde von dem Betroffenen und der Nebenbetroffenen eingeräumt, jedoch diesbezüglich Verstöße gegen § 1 GWB bzw. Art. 81 Abs. 1 EG bestritten.

## D.

### 1. Verstöße gegen § 1 GWB und Art. 81 EG

Die oben dargestellten Handlungen verstoßen gegen das Kartellverbot des § 1 GWB. Zu Beginn der oben dargestellten wettbewerbswidrigen Handlungen galt das GWB in der ab 01.01.1999 geltenden Fassung der Bekanntmachung vom 26. August 1998. Soweit sie über Juli 2005 hinaus fortgesetzt wurden, unterlagen sie dem GWB in der Fassung der Bekanntmachung vom 15. Juli 2005.

Darüber hinaus sind sie geeignet, den zwischenstaatlichen Handel zu beeinträchtigen, und verstoßen damit auch gegen das Verbot des Art. 81 Abs. 1 EG. Sie wurden von international tätigen Unternehmen durchgeführt, die ihre Markenprodukte zumeist auch europaweit vertreiben, und erstrecken sich auf das gesamte Bundesgebiet. Wenn sie sich auch jeweils ausschließlich auf das Inland beziehen, haben sie im Ergebnis die Wirkung, die Aufteilung der Märkte entlang nationaler Grenzen zu verfestigen.[13]

---

[12] vgl. Asservate 3-1 bis 3-4 und Unternehmensakte (UA) Nr. 3 Bl. 163ff., 327ff.

[13] Leitlinien der Kommission über den Begriff der Beeinträchtigung des zwischenstaatlichen Handels in den Artikeln 81 und 82 des EU-Vertrages, ABl. 2004 C 101/81, Rdnr. 78.

- 21 -

- 21 -

Abgestimmte Preiserhöhung für Zahncreme

Der oben bezeichnete Informationsaustausch zwischen Unilever und seinem Wettbe-
werber CP hat vor der Benachrichtigung des Einzelhandels durch Unilever bzw. CP
über die beabsichtigte Preiserhöhung sowie mehrere Monate vor dem Inkrafttreten der
Preiserhöhung stattgefunden. Durch die Weitergabe der Informationen über die ge-
plante Preiserhöhung bei Unilever an Herrn Hadick, bezweckte und bewirkte Herr Kir-
chem eine wesentliche Beeinflussung des Marktverhaltens des Wettbewerbers CP, da
er davon ausgehen konnte, dass CP in seiner internen Preiserhöhungs-Planung auch
das Verhalten des unmittelbaren Wettbewerbers Unilever berücksichtigen werde und
die Kenntnis um die Preiserhöhungsabsichten Unilevers, die Entscheidungsfindung
CPs, ebenfalls zu erhöhen, zumindest erleichtern würde. Auf der anderen Seite war
auch die Information von Herrn Hadick, dass auch CP eine Preiserhöhung plane, für
Unilever von Bedeutung. Selbst wenn Unilever zu diesem Zeitpunkt (Mitte 2005) die
Preiserhöhung zum 1. Januar 2006 bereits intern beschlossen gehabt hätte - wie von
der Nebenbetroffenen vorgetragen -, wäre eine Änderung oder Rücknahme dieses
Beschlusses bei einer gegenteiligen Auskunft von Herrn Hadick auch zeitlich durchaus
noch möglich gewesen. Durch die Informationen von Herrn Hadick wurde jedenfalls
ein eventuell bereits vorliegender interner Beschluss von Unilever bestärkt, da sich die
Risiken für die eigene Preiserhöhung durch die Erwartung, dass auch der Konkurrent
„mitziehen" werde, wesentlich reduzierten.

Dabei kommt es nicht darauf an, dass konkrete Angaben über die genaue Höhe der
geplanten Preiserhöhung ausgetauscht wurden. Entscheidend war, so auch die Aus-
sage von Herrn Hadick, die Information, dass überhaupt eine Preiserhöhung durchge-
führt werden sollte, wobei beiderseitig von einem für Preiserhöhungen in diesem Be-
reich üblichen Rahmen von etwa 5 % ausgegangen wurde.

Die Beschlussabteilung wertet daher das vorgeworfene Verhalten des Betroffenen und
Herrn Hadick zumindest als aufeinander abgestimmte Verhaltensweise zwischen
Wettbewerbern, die nach § 1 GWB, Art. 81 EG verboten ist (vgl. Urteil des OLG Düs-
seldorf v. 13.09.2006, VI-Kart 2/06 (OWi)).

Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

Der regelmäßige Austausch von Informationen über die Verhandlungen mit Einzel-
händlern im Rahmen der KWR-Sitzungen stellt nach § 1 GWB und Art. 81 Abs. 1 EG
eine Vereinbarung zwischen Wettbewerbern dar, die eine Beschränkung des Geheim-

- 22 -

- 22 -

wettbewerbs in Bezug auf die Veränderungen (nicht die Gesamthöhe) der mit den Einzelhändlern vereinbarten Rabatte bezweckt und bewirkt.

Zwar lag es grundsätzlich im Ermessen eines jeden KWR-Mitgliedes, in welchem Umfang er in den KWR-Sitzungen über die Verhandlungen mit Einzelhändlern berichten wollte, doch geht aus den o.g. Aufzeichnungen von Herrn Wieker hervor, dass annähernd in jeder Sitzung zahlreiche KWR-Mitglieder hinsichtlich der Rabattveränderungen Informationen über ihr Angebotsverhalten bzw. über die Vertragsabschlüsse offen legten. Da in den Aufzeichnungen zudem sämtliche KWR-Mitglieder mindestens einmal mit entsprechenden Informationen aufgeführt sind, ist von einem Grundkonsens unter den KWR-Mitgliedern auszugehen, derartige Informationen in den Sitzungen auszutauschen.

Der gegenseitige Austausch der KWR-Mitglieder über den Stand der Verhandlungen mit Einzelhändlern bezüglich der gewährten zusätzlichen Rabatte unter Offenlegung beider Verhandlungsparteien, des eigenen Angebotsverhaltens sowie der Vertragsabschlüsse beschränkt als identifizierendes Marktinformationsverfahren den Geheimwettbewerb in Bezug auf einen wesentlichen Preisbestandteil[14]. Zwar wurden keine Informationen über die absolute Höhe der Rabatte ausgetauscht, doch stehen gerade die zusätzlich zu gewährenden Rabatte im Zentrum der Verhandlungen mit Einzelhändlern. Die Information, in welchem Umfang Wettbewerber den zusätzlichen Forderungen des Einzelhandels nachgeben, ist für jedes KWR-Mitglied für die Bestimmung der eigenen Verhandlungsstrategie von großem Interesse. Darüber hinaus entstand durch den Informationsaustausch zumindest die Gefahr der Koordinierung des Marktverhaltens unter den Markenartikelherstellern, wie die Notizen von Herrn Wieker in den Sitzungen am 14.05.2005 zum Thema „Edeka" („0,25 alle lehnen ab..."), am 17.11.2005 zum Thema „Agenor" („Fazit") und „Edeka" („Grundsätze...: Werden nicht akzeptiert!"), am 16.06.2006 zum Thema „100 Jahre Edeka" („1,2 % auf jeden Fall ablehnen") und zum 21.09.2006 zum Thema „Schlecker" („HART bleiben") belegen.

## 2.  Ordnungswidrigkeiten nach § 81 Abs. 1 Nr. 1, Abs. 2 Nr. 1 GWB

Verstöße gegen die Kartellverbote des § 1 GWB bzw. Art. 81 Abs. 1 EG stellen Ordnungswidrigkeiten nach § 81 Abs. 2 Nr. 1 bzw. Abs. 1 Nr. 1 GWB dar.

---

[14] Zur Wettbewerbsbeschränkung nach § 1 GWB durch Verzicht auf Geheimwettbewerb vgl. grundlegend BGH, 29.01.1975 „Aluminium Halbzeug" WuW/E BGH 1337, 1341 f., OLG Düsseldorf, 26.07.2002 „Transportbeton Sachsen" WuW/E DE-R 949, 950; zu § 81 EG vgl. zuletzt EuGH, 02.10.2003 „Thyssen Stahl/Kommission" Rs. C-194/99 Rn. 81-86.

- 23 -

3. Vorsätzliche Beteiligung

Der Betroffene hat sich an den Ordnungswidrigkeiten beteiligt. Er handelte vorsätzlich.
Er befand sich weder in einem Tatbestands- noch in einem unvermeidbaren Verbots-
irrtum.

Als langjährig in führender Vertriebsposition tätiger Kaufmann wusste er, dass nicht öf-
fentlich bekannte Informationen über das preisliche Verhalten von Wettbewerbern von
erheblicher Bedeutung für das eigene Marktverhalten und somit deren gegenseitiger
Austausch auch „marktrelevant" bzw. „spürbar" ist. Die am Informationsaustausch be-
teiligten KWR-Mitglieder Thomas Wieker und Jörg Hepe haben in jeder KWR-Sitzung
über mehrere Seiten handschriftlich Notizen über die Informationen der übrigen KWR-
Mitglieder über deren Verhandlungen mit Einzelhändlern angefertigt. Das hätten sie
nicht getan, wenn diese Informationen für sie keine Relevanz gehabt hätten.

Der Betroffene hätte auch erkennen müssen, dass ein derartiger Austausch gegen das
Kartellgesetz verstößt. Auffällig ist, dass die hier relevanten Informationen laut der ge-
nannten Sitzungsniederschriften nur den Tagesordnungspunkt „Beziehungen Indust-
rie/Handel" betrafen, sämtliche weitere Tagesordnungspunkte jedoch ausführlich im of-
fiziellen Protokoll, welches bezeichnenderweise von einem anwesenden Verbandsju-
risten angefertigt wurde, behandelt wurden. Insoweit hatte der Informationsaustausch
im KWR durchaus konspirativen Charakter, auch weil die Aufnahme in den KWR von
der persönliche Eignung der jeweiligen Vertriebsleiter abhängig gemacht wurde.[15] An-
zuführen ist ferner, dass in den handschriftlichen Aufzeichnungen von Herrn Wieker
auf der KWR-Sitzung am 17.02.2006 vermerkt ist, dass bei der Schwarzkopf & Henkel
GmbH und bei Reckitt Benckiser eine Durchsuchung der französischen Wettbewerbs-
behörde stattgefunden habe. Gegenstand des französischen Verfahrens ist u.a. der In-
formationsaustausch unter Wettbewerbern über die Rabattvereinbarungen mit dem
Einzelhandel. Offenbar wurde über dieses Verfahren im KWR berichtet. Es ist davon
auszugehen, dass Betroffene dessen kartellrechtlichen Hintergrund kannte.

Schließlich folgt aus der Anwesenheit der Verbandsjuristen weder, dass der Betroffene
einem Verbotsirrtum unterlag noch, dass dieser unvermeidbar gewesen wäre. Zum ei-
nen ist schon nicht zu erkennen, dass die Verbandsjuristen überhaupt ausdrücklich um
Auskunft gebeten wurden, ob der Informationsaustausch über die jeweiligen Verhand-

---

[15] Vgl. Verfahrensakte, Bl. 87; KWR-Protokoll vom 17.11.2005: „Vorstandsgespräch mit ..., die beide seit ei-
niger Zeit auf der Warteliste für die Aufnahme in den Arbeitskreises KWR stehen. In beiden Fällen hat der
Vorstand den Eindruck gewonnen, dass eine gute und gedeihliche Zusammenarbeit möglich sein wird, und
schlägt die Aufnahme vor".

- 24 -

lungen mit den Einzelhändlern kartellrechtlich zulässig ist. Die Hauptaufgabe der Juristen des Markenverbandes bestand auch eher darin, die Markenhersteller vor kartellrechtlich missbräuchlichen Handlungen von Einzelhändlern zu schützen (Stichworte: „Verkauf unter Einstandspreis", „Anzapfversuche"), nicht jedoch zu prüfen, ob die Markenhersteller ihrerseits gegen das Kartellverbot verstoßen. Eine solche Rechtsauskunft kann nur von einem unabhängigen Anwalt erwartet werden.[16] Zudem zeigte auch die Tatsache, dass die Verbandsjuristen den hier zur Last gelegten Informationsaustausch nicht in das offizielle Protokoll aufnahmen, dass Bedenken gegen eine Dokumentation dieser Gespräche bestanden. Schon deshalb hätte die Pflicht bestanden, eine Auskunft von dritter Seite einzuholen.

4. Unternehmensbuße nach § 30 Abs. 1 und 2 OWiG

Herr Arne Kirchem war bis Mitte des Jahres 2005 als Geschäftsführer der Lever Fabergé tätig. Als Geschäftsführer gehörte Herr Kirchem zu dem Personenkreis möglicher Täter i. S. d. § 30 Abs. 1 Nr. 4 i.V.m. § 9 Abs. 1 Nr. 1 OWiG. Im Anschluss an die Verschmelzung der Lever Fabergé auf die Nebenbetroffene mit Wirkung vom 1. August 2005 (Datum der Handelsregister-Eintragung) wurde Herr Kirchem in leitender Position in der Vertriebsorganisation der Nebenbetroffenen – als Customer Development Director (Vertriebsdirektor, Kunden) – weiter beschäftigt und ist damit für diesen Zeitraum jedenfalls als Handlungsbevollmächtigter i. S. d. § 30 Abs. 1 Nr. 4 OWiG anzusehen. Durch die von Herrn Kirchem begangenen Ordnungswidrigkeiten wurden betriebsbezogene Pflichten des jeweiligen Unternehmens verletzt. Nach § 30 Abs. 1 und 2 OWiG kann daher auch gegen das Unternehmen eine Geldbuße festgesetzt werden. Als Gesamtrechtsnachfolgerin der Lever Fabergé gilt dies für die Nebenbetroffene auch hinsichtlich der Ordnungswidrigkeiten, die von H. Kirchem als Geschäftsführer von Lever Fabergé begangen wurden.

5. Bußgeldbemessung

Die Höhe der Geldbuße bestimmt sich nach dem Gesetz, das zur Zeit der ordnungswidrigen Handlung gilt. Wird die Bußgelddrohung während der Handlung geändert, so ist das Gesetz anzuwenden, das bei Beendigung der Handlung gilt (§ 4 Abs. 1 u. 2 OWiG). Sowohl die abgestimmte Preiserhöhung für Zahncreme als auch der Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern wur-

---

[16] Die Nebenbetroffene hat denn auch am 20.11.2007 gegenüber dem Markenverband angekündigt, nur noch dann an KWR-Sitzungen teilzunehmen, wenn ein unabhängiger Anwalt anwesend sei (Unternehmensakte Nr. 3, Bl. 302).

- 25 -

den erst nach der Neufassung des § 81 GWB im Juli 2005 beendet. Die Geldbußen gegen den Betroffenen und die Nebenbetroffene sind daher aufgrund des Bußgeldrahmens des § 81 Abs. 4 GWB festgesetzt worden. Bei der Bußgeldbemessung wurde hinsichtlich der Dauer der Zuwiderhandlungen nur der Zeitraum seit der Gesetzesänderung im Juli 2005 zugrunde gelegt.

5.1 Bußgeldbemessung für den Betroffenen

Die Geldbußen gegen Betroffenen sind aufgrund des Bußgeldrahmens des § 81 Abs. 4 Satz 1 GWB unter Beachtung von § 17 Abs. 1 bis 3 OWiG festgesetzt worden. Die Ordnungswidrigkeiten können danach jeweils mit einer Geldbuße von bis zu einer Million Euro geahndet werden. Bei der Festsetzung ist sowohl die Schwere der Zuwiderhandlung als auch deren Dauer zu berücksichtigen. Zudem fielen die guten wirtschaftlichen Verhältnisse des Betroffenen als langjähriger Geschäftsführer bzw. leitender Angestellter ins Gewicht.

Abgestimmte Preiserhöhung für Zahncreme

Bezüglich der abgestimmten Preiserhöhung war zu Lasten des Betroffenen zu berücksichtigen, dass die Abstimmung zwischen den beiden Hauptkonkurrenten im Niedrigpreissegment erfolgte, deren Marken somit in ihrer jeweiligen Preissetzung in hohem Maße voneinander abhängig sind. Zudem resultierten aus der Abstimmung tatsächlich Preisanhebungen der beteiligten Unternehmen. Zugunsten des Betroffenen wirkte die Tatsache, dass von den Maßnahmen lediglich ca. 11% der Marktanteile im Bereich Zahncreme betroffen waren. Zugunsten des Betroffenen konnte ebenso berücksichtigt werden, dass die wettbewerbswidrigen Kontakte nur während eines kurzen Zeitraumes stattfanden.

Insgesamt ist eine Geldbuße in Höhe von 30.000 EUR angemessen.

Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern

Bezüglich des Austausches von Informationen über den Stand der Verhandlungen mit Einzelhändlern war zu Lasten des Betroffenen zu berücksichtigen, dass sich an dem Informationsaustausch die in Deutschland führenden Markenartikelhersteller beteiligt haben, der Informationsaustausch die Veränderung eines wesentlichen Preisbestandteils betraf und dieser regelmäßig auf Verbandssitzungen stattfand. Zugunsten des Betroffenen wirkte der Umstand, dass der Detaillierungsgrad der ausgetauschten Informationen gering war und der Austausch zwar in einem etwa zweimonatigen Turnus,

- 26 -

nicht jedoch kontinuierlich während der sich oft über zahlreiche Verhandlungsrunden erstreckenden Jahresgespräche mit den Einzelhändlern stattfand.

Insgesamt ist eine Geldbuße in Höhe von 30.000 EUR angemessen.

Die Beschlussabteilung hat gemäß § 81 Abs. 5 GWB i.V.m. § 17 Abs. 4 OWiG nach pflichtgemäßem Ermessen entschieden, dass neben der Verhängung der allein der Ahndung der Zuwiderhandlung dienenden Bußgelder in Höhe von jeweils 30.000 EUR ein etwaiger wirtschaftlicher Vorteil nicht abgeschöpft wird. Aufgrund der begrenzten Preiswirkung des abgestimmten Verhaltens und der Art des minderschweren Verstoßes „Beschränkung des Geheimwettbewerbs" hätte die Höhe eines wirtschaftlichen Vorteils für die Nebenbetroffene sowie dessen Auswirkung auf das Einkommen des Betroffenen nur mit hohem Aufwand mit der hierfür erforderlichen Sicherheit bestimmt werden können.

### 5.2  Bußgeldbemessung für die Nebenbetroffene

Die Geldbußen gegen die Nebenbetroffene sind aufgrund des Bußgeldrahmens des § 81 Abs. 4 Satz 2 GWB, wonach die Geldbuße gegen Unternehmen über den Betrag von 1 Mio. EUR hinaus 10 % seines im vorausgegangenen Geschäftsjahr erzielten Gesamtumsatzes nicht übersteigen darf, und unter Anwendung der Bußgeldleitlinien des Bundeskartellamtes (§ 81 Abs. 7 GWB) festgesetzt worden.

Nach den Bußgeldleitlinien des Bundeskartellamtes ist zur Ahndung von Wettbewerbsverstößen zunächst ein sog. Grundbetrag zu ermitteln, der die Schwere und die Dauer des Verstoßes widerspiegelt (Rn. 4-11). Anschließend wird der Grundbetrag unter Berücksichtigung von erschwerenden bzw. mildernden Umständen nach oben bzw. unten angepasst (Rn. 14-17).

### Abgestimmte Preiserhöhung für Zahncreme

Gemäß der Bußgeldleitlinien kann der Grundbetrag bis zu 30% des für die gesamte Dauer der Zuwiderhandlung zugrunde gelegten tatbezogenen Umsatzes betragen. Bei Preisabsprachen liegt der Grundbetrag in der Regel im oberen Bereich des höchstmöglichen Betrages (Rn. 9). Bei der Bestimmung des anzuwendenden Anteils am tatbezogenen Umsatz fand Berücksichtigung, dass es sich bei der abgestimmten Erhöhung der Listenpreise um eine Beschränkung des Preiswettbewerbs zwischen den beiden Hauptwettbewerbern im Niedrigpreissegment für Zahncreme handelte und das abgestimmte Verhalten auch tatsächlich von beiden beteiligen Unternehmen durchge-

- 27 -

- 27 -

führt wurde. Danach ist ein Grundbetrag in Höhe von zumindest 17 % des tatbezoge-
nen Umsatzes angemessen. Als tatbezogenen Umsatz hat die Beschlussabteilung den
Umsatz der Nebenbetroffenen mit den Zahncremeprodukten der Marke Signal in
Deutschland im Jahre 2006 in Höhe von 13,30 Mio. EUR herangezogen, so dass sich
ein Grundbetrag in Höhe von 2,26 Mio. EUR ergibt.

Der Unilever-Konzern hat im Jahre 2006 einen Gesamtumsatz von ca. 39,6 Mrd. EUR
erwirtschaftet. Aufgrund der daraus ersichtlichen Größe des Unternehmens hält die
Beschlussabteilung eine Erhöhung des Grundbetrages um 30% zum Zwecke der Ab-
schreckung für angemessen (Rn. 15 der Bußgeldleitlinien).

Weitere erschwerende oder mildernde Umstände waren nicht zu berücksichtigen, so
dass sich ein Bußgeld von 2,90 Mio. EUR ergibt.

Dieser Bußgeldbetrag übersteigt nicht 10 % des Umsatzes des Unilever-Konzerns. Die
Höhe der Geldbuße ist auch unter Berücksichtigung der wirtschaftlichen Leistungsfä-
higkeit der Nebenbetroffenen angemessen.

Die Beschlussabteilung hat gemäß § 81 Abs. 5 GWB i.V.m. § 17 Abs. 4 OWiG nach
pflichtgemäßem Ermessen entschieden, dass neben der Verhängung des allein der
Ahndung der Zuwiderhandlung dienenden Bußgeldes in Höhe von 2,90 Mio. EUR ein
etwaiger wirtschaftlicher Vorteil nicht abgeschöpft wird. Auch aufgrund der begrenzten
Preiswirkung des abgestimmten Verhaltens hätte die Höhe eines wirtschaftlichen Vor-
teils nur mit hohem Aufwand mit der hierfür erforderlichen Sicherheit bestimmt werden
können.

<u>Austausch von Informationen über den Stand der Verhandlungen mit Einzelhändlern</u>

Gemäß der Bußgeldleitlinien kann der Grundbetrag bis zu 30% des für die gesamte
Dauer der Zuwiderhandlung zugrunde gelegten tatbezogenen Umsatzes betragen. Die
hier zu ahnende Beschränkung des Geheimwettbewerbs in Bezug auf die Verände-
rungen der mit den Einzelhändlern vereinbarten Rabatte zählt nicht zu den schwerwie-
genden horizontalen Wettbewerbsbeschränkungen im Sinne der Ziffer 9 der Bußgeld-
leitlinien (u.a. Preis-, Quoten-, Gebietskartelle, Kundenabsprachen). Vielmehr handelt
es sich um ein minderschweres Marktinformationssystem in Bezug auf den Parameter
„Veränderungen der Rabatthöhe".

Bei der Bestimmung des anzuwendenden Anteils am tatbezogenen Umsatz fand Be-
rücksichtigung, dass sich an dem Informationsaustausch die in Deutschland führenden
Markenartikelhersteller beteiligt haben, der Informationsaustausch die Veränderung

- 28 -

- 28 -

eines wesentlichen Preisbestandteils betraf und dieser regelmäßig auf Verbandssit-
zungen stattfand. Zugunsten des Betroffenen wirkte der Umstand, dass der Detaillie-
rungsgrad der ausgetauschten Informationen gering war und der Austausch zwar in
einem etwa zweimonatigen Turnus, nicht jedoch kontinuierlich während der sich oft
über zahlreiche Verhandlungsrunden erstreckenden Jahresgespräche mit den Einzel-
händlern stattfand. Danach ist ein Grundbetrag in Höhe von zumindest 4 % des tatbe-
zogenen Umsatzes angemessen. Als tatbezogenen Umsatz hat die Beschlussabtei-
lung in Anwendung von Rn. 10 der Bußgeldleitlinien für den Zeitraum der Beteiligung
des Betroffenen (bis Februar 2006) einen Jahresumsatz der Nebenbetroffenen mit
denjenigen Einzelhändlern in Deutschland herangezogen, auf deren Rabattverhand-
lungen sich der Informationsaustausch zwischen Juli 2005 und November 2006 im
Wesentlichen bezog (Anton Schlecker sowie EDEKA einschließlich der explizit im In-
formationssautausch erwähnten Kooperationspartner Budnikowsky, Kloppenburg und
Globus). Dieser Umsatz belief sich auf rd. 124 Mio. EUR, so dass sich ein Grundbe-
trag in Höhe von 4,96 Mio. EUR ergibt.

Dieser Betrag war ebenfalls aufgrund der Größe des Unilever-Konzerns zum Zwecke
der Abschreckung um 30% zu erhöhen. Weitere erschwerende oder mildernde Um-
stände waren nicht zu berücksichtigen, so dass ein Bußgeld von 6,40 Mio. EUR an-
gemessen ist.

Dieser Bußgeldbetrag übersteigt nicht 10 % des Umsatzes des Unilever-Konzerns. Die
Höhe der Geldbuße ist auch unter Berücksichtigung der wirtschaftlichen Leistungsfä-
higkeit der Nebenbetroffenen angemessen.

Die Beschlussabteilung hat gemäß § 81 Abs. 5 GWB i.V.m. § 17 Abs. 4 OWiG nach
pflichtgemäßem Ermessen entschieden, dass neben der Verhängung des allein der
Ahndung der Zuwiderhandlung dienenden Bußgeldes in Höhe von 6,40 Mio. EUR ein
etwaiger wirtschaftlicher Vorteil nicht abgeschöpft wird. Nach Art des vorliegenden
Wettbewerbsverstoßes hätte ein wirtschaftlicher Vorteil nur sehr schwer mit der hierfür
erforderlichen Sicherheit bestimmt werden können.

6. Gebühren und Auslagen

Die Gebühren betragen nach § 107 Abs. 1 OWiG jeweils fünf v.H. der gegen die Ne-
benbetroffene festgesetzten Geldbußen, jedoch höchstens 7.500,– EUR. Als Auslagen
werden die Dienstreisekosten anlässlich der Durchsuchung der Nebenbetroffenen am
14. März 2007 in Hamburg erhoben (§ 107 Abs. 3 OWiG).

- 29 -

- 29 -

**V.**

**Rechtsbehelfsbelehrung**

Dieser Bußgeldbescheid wird rechtskräftig und vollstreckbar, wenn kein Einspruch einge-
legt wird. Der Einspruch kann innerhalb von zwei Wochen nach Zustellung des Bußgeld-
bescheides schriftlich oder zur Niederschrift beim Bundeskartellamt, Kaiser-Friedrich-
Straße 16, 53113 Bonn, eingelegt werden. Die Frist ist nur gewahrt, wenn der Einspruch
vor Fristablauf dort eingeht.

Bei einem Einspruch entscheidet das Oberlandesgericht in Düsseldorf aufgrund einer
Hauptverhandlung über die Beschuldigung, wobei auch eine für die Nebenbetroffene
nachteiligere Entscheidung getroffen werden kann. Es kann jedoch auch durch Beschluss
entscheiden, wenn die Nebenbetroffene und die Staatsanwaltschaft diesem Verfahren
nicht widersprechen.

Dr. Wagemann                Dr. Bucher-Gorys                Häwerkamp