IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| COMMERCIAL STREET EXPRESS LLC, *et al.*,    ) | |
|     Plaintiffs,    ) | |
|     v.    ) | Case No. 08 C 1179 |
| SARA LEE CORPORATION, *et al.*,    ) | Judge Virginia M. Kendall |
|     Defendants.    ) | |
|     ) | |

### PLAINTIFFS' RESPONSE TO UNILEVER'S MOTION TO DISMISS

Unilever participated in a conspiracy to fix the prices of oral, personal and home care products. Indeed, after the German Federal Cartel Office received and evaluated evidence, it determined that a conspiracy existed to fix the price of oral, personal care and home products and imposed a fine on Unilever to punish it for its criminal actions. Despite this overwhelming evidence of illegal conduct, Unilever argues in its motion to dismiss that because the German prosecutors focused on sales of particular products in Germany, Unilever did not conspire to fix any other prices in any other countries.

Unilever can only argue this by improperly relying on facts not pled in the complaint, misreading the German decision which it relies upon, and by ignoring other information which has come to light since the filing of the complaint.[1] Nowhere in the German ruling is Unilever exculpated of any conduct alleged in the Plaintiffs' complaint. Rather, Unilever makes the specious argument that since the German prosecutors focused on particular crimes in Germany, Unilever must be innocent of any crime not mentioned in the German ruling. Moreover, although it is not alleged in the complaint, and cannot be considered on this motion as a result, news stories since the filing of the complaint have indicated that the French antitrust authorities are investigating how this price-fixing conspiracy has injured French consumers after a co-

---

[1] Unilever asks the Court to take judicial notice of several documents attached to its motion to dismiss that are outside of the four corners of Plaintiffs' complaint. Under Rule 12(b)(6), the court should not look beyond the four corners of the complaint in determining whether plaintiff has stated a claim. *Palda v. General Dynamics Corp.*, 47 F.3d 872, 875 (7th Cir. 1995). Moreover, because the substance of Unilever's proffered documents are subject to reasonable dispute and are not within the territorial knowledge of the Court, the Court should not take judicial notice of them. FRE 201(b); *Unity House Inc. v. First Commercial Fin. Group*, No. 96 C 1716, 1997 WL 282725 (N.D. Ill. May 19, 1997). Since Plaintiffs do not know how the Court will treat those improper assertions, they respond to them and direct the Court's attention to matters learned about Defendant and its co-conspirators post filing of the Amended Complaint.

conspirator (Colgate-Palmolive) named Unilever as a participant in price fixing in the French oral, personal, and home care products markets.[2]

Plaintiffs have alleged a broad, multinational conspiracy which injured American consumers, allegations wholly consistent with the findings of the German Federal Cartel Office. Unilever's motion should be denied.

## ALLEGATIONS OF THE COMPLAINT

This case seeks injunctive relief, pursuant to §1 of the Sherman Act (15 U.S.C. § 1) and §16 of the Clayton Act, and damages for Defendants' price-fixing conspiracy regarding oral, personal and home care products, including toothpaste, toothbrushes, mouth rinses, dental floss, hand soaps (including liquid hand soaps), shower gels, shampoos, conditioners, and deodorants, anti-perspirants, dishwashing liquids, laundry detergents, household cleaners and fabric conditioner.

### The Parties

Plaintiffs, Commercial Street Express LLC, Nicole Vander Muelen, Shasta Burzynski, and Kathleen Coullard, are residents of Wisconsin and Michigan. They seek injunctive relief under Section 1 of the Sherman Act (15 U.S.C. § 1), and also seek to recover damages under state antitrust and consumer protection laws relief on behalf of themselves and a class of all others similarly situated. Am. Complt. ¶¶ 7-10.

The Defendants, Sara Lee, Colgate-Palmolive, Henkel/Dial, and Unilever, are multinational consumer products manufacturers which do substantial business in both Europe and the United States. These companies dominate the oral, personal, and home care products markets.

Sara Lee Corporation ("Sara Lee") conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Sara Lee's Household and Body Care business includes sales of soaps, shampoos, bath and shower products, deodorants, shaving creams, toothpastes, air fresheners, shoe polishes and cleaners, and insecticides.   Am. Complt. ¶ 11.

---

[2] While Plaintiffs strongly believe that their current complaint should easily survive the instant motion to dismiss, they have learned additional facts such as those surrounding the French antitrust investigation, and that Defendants increased their United States prices on the goods which were the subjects of the conspiracy during the conspiracy period. While these additional facts cannot be considered on the instant motion, if the Court so desires, Plaintiffs are prepared to amend their complaint with additional strong allegations which they have subsequently learned.

Colgate-Palmolive Company also conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Colgate's Oral, Personal and Home Care business is described in its Annual Report as follows:

> Colgate is a global leader in Oral Care with the leading toothpaste brand throughout many parts of the world, including the U.S., according to value share data provided by ACNielsen. Colgate's Oral Care products include toothpaste, toothbrushes, mouth rinses, dental floss and pharmaceutical products for dentists and other oral health professionals. . . .
> Colgate is a leader in many product categories of the Personal Care market. The Personal Care market includes shower gels, shampoos, conditioners, and deodorants and antiperspirants, as well as liquid hand soaps in which Colgate is the market leader in the U.S. . . .
> \*\*\*
> Colgate manufactures and markets a wide array of products for Home Care, including Palmolive and Ajax dishwashing liquids, Fabuloso and Ajax household cleaners and Murphy's Oil Soap.  Am. Complt. ¶ 12.

Henkel Chemie Verwaltungsgesellschaft mbH ("Henkel") is a business entity organized under the laws of Germany which conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Familiar Henkel brands sold in the United States include Purex, Soft Scrub, Coast, Dial, Dry Idea, Right Guard, Soft & Dri, and Tone. Henkel Corp. ("Henkel Corp.") is a United States subsidiary of Henkel.  Am. Complt. ¶¶ 13-14.

Unilever N.V. ("Unilever NV") is a business entity organized under the laws of The Netherlands with its principal place in Rotterdam, The Netherlands, while Unilever PLC ("Unilever PLC") is a business entity organized under the laws of England with its principal place of business located in London, England. Together Unilever NV and Unilever PLC operate as a single economic entity: Unilever Group ("Unilever"). Unilever conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Unilever's Home and Personal Care products include such familiar brand names as Dove, Lux, Surf, Snuggle, Pond's, Rexona, Sunsilk, Suave, Clear, Lifebuoy and Vaseline, the Signal and Close Up toothpaste brands, and Calvin Klein fragrances such as cK one, Eternity and Obsession. Unilever United States, Inc. ("Unilever US") is a United States subsidiary of Unilever. Am. Complt. ¶¶ 15-16.

### The Conspiracy

At some time prior to the beginning of 2006, Defendants and their co-conspirators entered into an agreement in restraint of trade to artificially raise, fix, maintain, and/or stabilize

prices of oral, personal and home care products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1). Am. Complt. ¶ 35.

After disclosure by Colgate-Palmolive, which sought amnesty, of the conspiracy and the agreement among the Defendants to fix the prices of the classification of products at issue in this class action, on February 20, 2008, the German Federal Cartel Office issued a press release stating that it found that these Defendants had engaged in price fixing, specifically citing agreements to set prices of shower gel, toothpaste and dishwashing liquid. Am. Complt. ¶¶ 25-26. The Cartel Office imposed substantial fines on the Defendants, including Unilever, for their price fixing agreements. In addition, the Cartel Office said that it penalized the Defendants for exchanging information about ongoing price talks with retailers in an attempt to influence the market behavior of competitors and remove the uncertainty of competitive conditions. The Cartel Office further indicated that proceedings would be commenced against other unnamed companies which were involved in the conspiracy. Am. Complt. ¶¶ 25-26.

> A Cosmeticsdesign-Europe.com article provided the following additional details:
>
> The Federal Cartel Office in Germany fined Sara Lee, Unilever and two units of Henkel after finding the companies guilty of price fixing at the start of 2006.
> The multinationals colluded to increase the prices of shower gel, toothpaste and dishwashing liquid by 5 per cent.
> To sidestep the attempts by retail chains to prevent the price hikes, they kept each other informed about their actions and the moves made by retailers.
> Of the total €37m fine, €19m was imposed for price fixing and the other €18m was added for sharing information about their pricing discussions with retailers.
> Am. Complt. ¶ 26.

It has been reported that a spokesperson for Henkel has stated that "We made mistakes. We accept the fine of €21.6 [million]." Am. Complt. ¶ 27.

Colgate-Palmolive, as a member of the conspiracy, has cooperated with the investigation and will likely not be fined by the Cartel Office. Am. Complt. ¶ 28.

Defendants' conspiracy dramatically increased their profitability, which included the United States market. For example, even with rising operation costs, in its annual report for 2006, Henkel reported record revenues and profits in its Home Care business of more than €4.1 billion and operating profit of €449 million, a 3.7% increase compared to 2005. Am. Complt. ¶ 29. Henkel explained the record revenues and profits as follows:

> The world market for laundry and home care products underwent further dynamic expansion, with the markets of relevance for us growing by more than 3 percent.

> *Market growth was more price-driven than in previous years because— unlike in 2005—it became possible to pass on raw material cost increases by raising products prices.* As a consequence, the decline of the last few years encountered in our largest market, Western Europe, was reversed to product gratifying growth. *In North America, too, there was a tangible price-driven upswing in the market dynamics, with a considerable expansion in sales.* [***]
> *In North America, the successfully implemented price increases and good performance of our air freshener business contributed to strong growth in organic sales.* [Emphasis added.]    Am. Complt. ¶ 29.

The oral, personal and home care products market is large, with Unilever's 2006 global sales at €18.297 billion, and sales in the United States of more than €3 billion, Henkel's 2006 sales in the United States of more than €1 billion, Sara Lee's global sales for fiscal year ended July 2007 of more than $2 billion, and Colgate's 2006 sales in the United States of $2.211 billion. Am. Complt. ¶ 30.

Defendants' combinations, conspiracies and agreements have had the following effects, among others: (a) price competition in the oral, personal and home care industry has been suppressed, restrained and eliminated; (b) the prices of oral, personal and home care products have been raised, fixed, maintained and stabilized at artificial and non-competitive levels; and (c) consumers of oral, personal and home care products were deprived of free and open competition.   Am. Complt. ¶ 31.

As a result of the conspiracy, the complaint alleges that Plaintiffs and the other members of the Class paid inflated prices for oral care products, personal care products and home care products.  By reason of the alleged violations of the antitrust laws, Plaintiffs and the other members of the Class paid higher prices for oral care products, personal care products and home care products than they would have paid in the absence of the illegal contract, combination or conspiracy, and, as a result, have been injured.  Am. Complt. ¶ 32.

## ARGUMENT

### I. THE COMPLAINT ADEQUATELY STATES CLAIMS UPON WHICH RELIEF MAY BE GRANTED

Plaintiffs' factual allegations easily satisfy *Twombly's* requirement of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007).  No inferences from "parallel conduct" need be made here.  The "specific time, place, or person involved in the alleged conspiracies" are set forth.  *Id*. at 1971, n. 10.

The global conspiracy has already been exposed in Germany (and France) where one of the defendants has admitted mistakes and accepted a substantial fine and another defendant has sought immunity.[3]

Under *Twombly*, a complaint need plead only "enough factual matter (taken as true) to suggest that an agreement was made," which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly,* 127 S. Ct. at 1965. Plaintiffs' factual allegations here do more than raise a "reasonable expectation." Plaintiffs' factual allegations identify an admitted conspiracy for which substantial fines have been imposed in Germany and which extended to the United States by demonstrating that Defendants implemented price increases in both Europe and the United States.

Therefore, Plaintiffs are not alleging simply that "if it happened there, it could have happened here." *In re Elevator Antitrust Litigation*, 502 F. 3d 47, 52 (2d Cir. 2007). Plaintiffs provide factual allegation that Defendants benefited from the conspiracy, not only in Germany, where a part of the conspiracy has been exposed, but also in the United States, where Henkel boasted that it was able to increase its prices. Am. Complt. ¶ 29.

This is the factual basis precisely called for by the Second Circuit in *Elevator,* where that court held that a complaint only citing violations of European Commission rules cannot survive a motion to dismiss if there are "no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct." *Id*. at 52. In *Elevator*, the plaintiffs defended their Second Amended Complaint by the following argument (as summarized by the Second Circuit): "The European misconduct is alleged to reflect the existence of a worldwide conspiracy; and even if the misconduct took place only in Europe, it is alleged that the market in elevators is a "global market, such that prices charged in the European market affect the prices in the United States and vice versa." *Id*. at 51.

---

[3] Allegations that one or more of the participants have confessed to the conspiracy go far beyond establishing that the conspiracy is "plausible." Because an amnesty applicant must admit the existence of the conspiracy and its participation in the conspiracy, allegations that there is an amnesty applicant constitute *direct* evidence of the violation, equivalent to a confession or a video recording. Where there is direct evidence of conspiracy, *Twombly's* concerns that the Plaintiffs are relying on ambiguous circumstantial evidence, such as parallel conduct, to prove agreement are not as relevant. Based on Henkel's admissions and Colgate-Palmolive's amnesty application, alone, the Court must deny Defendants' motion.

In this case, Plaintiffs' allegations are more specific. Plaintiffs point to Defendants' own statements that pricing increases were imposed in both Europe and the United States during the period of the conspiracy. Am. Cmplt. ¶ 29.[4] As the Second Circuit noted in *Elevator*, "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *Id*. at 50. Plaintiffs allegations easily satisfy that requirement.

Similarly, this case is distinct from the other decision Unilever cites, *American Copper & Brass, Inc. v. Halcor S.A., et al.*, 494 F. Supp. 2d 873 (W.D. Tenn. 2007). In that case, plaintiff objected to dismissal of their Amended Complaint by arguing that (as summarized by the District Court):

> "[C]opper tubing is imported into the United States from European and other countries and exported to Europe and other countries from the United States." Largely based on this observation, Dr. Tollison concludes, reiterating the conclusory language of the complaint nearly verbatim, that the "market for copper plumbing tube is global in nature"; that "European and United States copper tube markets are interrelated and that pricing of copper plumbing tube in Europe affects the pricing of copper plumbing tubes in the United States and vice versa." He further concludes that "[b]ecause of the interrelationships of pricing and markets for copper plumbing tube in the U.S. and abroad, a price-fixing conspiracy in the copper plumbing tube market would need to be effectuated in both the U.S. and foreign markets in order to be effective." (Citations omitted.)

Id. at 879.

The District Court was unimpressed:

> Perhaps more than anything else in the record, Dr. Tollison's statement persuades the Court that it was correct in determining that Plaintiffs complaint is without substance. The assertion that copper tubing is "global" in the sense that both U.S. and European producers compete in each other's markets is unobjectionable. However, it is entirely irrelevant to Plaintiffs' task of demonstrating that a conspiracy existed to fix copper tubing prices in the U.S. Only if the products sold in both markets are interchangeable would there be any necessity of extending the European price-fixing scheme to producers for the U.S. market. Defendants have

---

[4] Indeed, since the filing of the Amended Complaint, Plaintiffs have gathered additional data that the Defendants raised their prices in the United States on products which are the subject of this case during the conspiracy period, much as Henkel stated in its Annual Report currently cited in the complaint. Consistent with the German Cartel Office findings, this data shows that soap and detergent prices rose 6.6% and 5.5% respectively in 2006 after years of primarily stagnant prices. While these facts cannot be used in evaluating this motion, Plaintiffs do want the Court to be aware that they have developed additional facts which support their allegations beyond those currently pled.

> argued persuasively that the two markets have distinct standards and that their products are not interchangeable, undermining Plaintiffs assertion that "Defendants needed to ... collude in both regions in order to effectively collude in either region," (Consol. Am. Class Action Compl. ¶ 60). This contention is unaddressed in Dr. Tollison's affidavit.
>
> A price-fixing scheme is workable only when the market for the product at issue is effectively controlled by participants in the scheme and the cartel members remain strictly adhere to the agreed-upon price structure. Thus, for the price-fixing scheme addressed in the EC Decision to succeed, as it apparently did, it required the participation of all the major copper tubing producers for the European market, regardless of physical location. However, since European buyers are precluded from using U.S.-standard tubing, producers of U.S.-standard tubing were irrelevant to this scheme. Similarly, in order to establish an effective cartel in the U.S. market, producers for that market would have to collude in maintaining prices of U.S.-standard tubing. The actions of producers of products unusable in the U.S. would be of no consequence to this price-fixing effort.

*Id.* at 879-80.

In this case, setting aside that Plaintiffs allege the conspiracy involved such global consumer products as Unilever's Dove soaps and Pond's creams, among many others, products which do not face the apparently stringent geographic standards and exclusions applied to "major copper tubing," Plaintiffs allege that the conspiracy to fix the prices of the products at issue were first disclosed by the German Cartel Office, not that Germany was the sole country affected. Plaintiffs allege that, whatever its locus, and there are likely more than one, the conspiracy extended to the United States as well, and that the pricing increases made possible by the conspiracy were not limited to Germany or Europe because at least one of the defendants has boasted of United States price increases which coincide with the period of the conspiracy. Am. Cmplt. ¶ 29.

*Twombly* did not change the normal pleading rules. *Twombly*, 127 S. Ct. at 1964-65 ("We do not require heightened fact pleading of specifics . . .") Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give a defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* Although a complaint needs more than labels and conclusions, the court, in ruling upon a motion to dismiss must accept as true all of the factual allegations of the complaint and draw all reasonable inferences in plaintiffs' favor. Fed. R. Civ. P. 12(b)(6). *Id.* In *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007), decided two weeks after *Twombly*, the Supreme Court stated that

"Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the … claim is and the grounds upon which it rests.'" (quoting *Twombly*, 127 S. Ct. at 1964). Our Circuit, in *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007), adopted the concept that to withstand a Rule 12(b)(6) motion, the complaint must be more than "sketchy." The Court said that, "[t]aking *Erickson* and *Twombly* together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8*." Id.* at 667. *See also, Killingsworth v. HSBC Bank Nevada, N.A.,* 507 F.3d 614 (7th Cir. 2007).

Therefore, courts construing *Twombly* have determined that antitrust complaints should be liberally construed in view of the fact that proof of an illegal and criminal conspiracy is largely in the hands of the alleged conspirators. *In re Hypodermic Products Antitrust Litigation,* 2007 WL 1959224 (D.N.J., June 29, 2007).

Contrary to Unilever's view, many complaints have survived post-*Twombly*. The allegations in Plaintiffs' complaint are more analogous to those in the post-*Twombly* decision *Hyland v. Homeservices of America,* 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007). Plaintiffs there alleged that the defendants conspired to fix the prices of brokerage fees, and included:

> [R]eferences to the enforcement actions brought by the Department of Justice; alleged admissions of price-fixing by real estate brokers; an exchange of price-information and catalogues between the parties; price increases while the Defendants' costs and non-real estate broker fees declined; allegations of improper franchising; and references to Kentucky regulations that the Defendants helped to implement through the Kentucky Real Estate Commission (the anti-rebate rule).

2007 WL 2407233, at *3. The court found that the plaintiffs alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* (quoting *Twombly).* Importantly, the overriding question is whether a complaint alleges enough to make the claims "plausible" and not "speculative." *See Hyland,* 2007 WL 2407233, at *3 ("*Twombly* does not require a 'heightened' pleading standard, but instead looks at *what* information is provided by a plaintiff, not the *amount*.").

The Plaintiffs' allegations here also go well beyond those held to satisfy *Twombly* in *In re OSB Antitrust Litigation,* 2007 WL 2253419, at *3-4 (ED. Pa. Aug. 3, 2007) ("OSB"), where

9

the plaintiffs alleged that the defendants - nine major manufacturers of oriented strand board ("OSB") - "tacitly agreed to raise OSB prices and so revitalize the stagnating OSB market":

> Defendants took the following concerted actions to reduce the supply of OSB (and so drive up the price): (1) kept OSB from the market through mill shutdowns; (2) delayed or canceled the construction of new OSB mills; (3) bought OSB from competitors instead of manufacturing it themselves (which they could have done at a lower cost); and (4) maintained low operating rates at mills.

These allegations were sufficient because the plaintiffs "set out in some detail an alleged nationwide scheme," and *Twombly* "does not . . . require Plaintiffs to prove their allegations before taking discovery." *Id.* at *5.

Similarly, in *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007), the court held that allegations of parallel pricing which included that certain people were present at trade shows and discussed how to fix prices were sufficient to allege a conspiracy.

Also, the court in *In re Static Access Memory Antitrust Litig.*, 2008 WL 426522, at *6 (N.D. Cal. Feb. 14, 2008) denied defendants' 12(b)(6) motion and held that plaintiffs pleaded "sufficient facts plausibly to suggest a § 1 price-fixing conspiracy," where the complaint alleged "that Defendants had an ongoing agreement to exchange price information and intended that this exchange would lead to price stabilization or increases," and that the "SRAM market was one in which such information exchanges would lead to price stabilization or increases."[5]

### II. This Court Has Subject Matter Jurisdiction For Sherman Act Violations That Affect Prices In The United States

Defendant's jurisdictional argument is a red herring because it relies on a misreading of the Plaintiffs' complaint. Plaintiffs are not challenging the foreign effects of Defendants' conspiracy, but rather the domestic effects of that conspiracy. The mere fact that a conspiracy was hatched abroad does not deprive this Court of jurisdiction over domestic effects of that conspiracy.

---

[5] Unilever also argues that Plaintiffs fail to "give the defendant fair notice of what plaintiff's claim is and the ground upon which it rests" by not connecting "oral, personal and home care products" with any particular defendant. Paragraph 15 of the Plaintiffs' complaint, however, does exactly that by listing the Oral Care Products, Personal Care Products and Home Care Products subject to the conspiracy directly from Unilever's Annual Report.

Count I alleges that Defendants entered into "a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices of oral, personal and home care products in the United States." Am. Cmplt,¶ 35.

Paragraph 17 of the Amended Complaint, incorporated into Count I, defines the plaintiff class as "all persons or entities who acquired in the United States oral, personal and home care products (as defined below) manufactured and/or distributed by one or more of the Defendants."

The four class representatives are identified in paragraphs 7-10 of the Amended Complaint incorporated into Count I as American consumers who made their purchases of the subject products in the United States.

In *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993), the Supreme Court held that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." *See also*, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986); *United States v. Aluminum Co. of America*, 148 F.2d 416, 443-44 (2d Cir. 1945); FTAIA, 15 U.S.C. § 6a (1982)[This Act endorsed the "effects test," H.R. Rep. No. 97-686 at 5]; *F. Hoffman-Laroche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).

The Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, was intended to provide a more objective test than some of the earlier cases. The notion of intent to affect prices or output in the domestic market discussed in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), and *Timberland Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976), was "replaced by a more objective inquiry into the nature, extent, and foreseeability of the impact on U.S. foreign and domestic trade" in the Act. H.R. Rep. 686, 97th Cong., 2d Sess. 9 (1982), 1982 U.S. Code Cong. & Adm. News 2487, 2491 (indicating that Congress intended the standard to be "an objective one . . . [designed] to avoid – at least at the jurisdictional stage – inquiries into the actual, subjective motives of defendants."). *See*, Holmes, *Antitrust Law Handbook 2007-2008 Edition* 863-4.

The Complaint clearly alleges Sherman Act violations that caused damages in the United States to American consumers. As a result, Unilever's jurisdictional argument should be rejected.

## III.  INDIRECT PURCHASERS HAVE STANDING TO SEEK INJUNCTIVE RELIEF UNDER § 1 OF THE SHERMAN ACT

Count I seeks injunctive relief, not damages, for violations of §1 of the Sherman Act, 15 U.S.C. §1, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.  Am. Cmplt. ¶¶ 1, 39.  Section 16 of the Clayton Act provides in part:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, …15 U.S.C. § 26

It is well-settled that *Illinois Brick* will not bar suits by indirect purchaser plaintiffs seeking injunctive relief.  *U.S. Gypsum v. Ind. Gas*, 350 F.3d 623, 627 (7th Cir. 2003)("direct purchaser doctrine does not foreclose equitable relief"). *Accord, Mid-West Paper Products v. Continental Group*, 596 F.2d 573, 593 (3rd Cir. 1979)( refused to dismiss indirect purchasers' antitrust claims seeking injunctive relief under *Illinois Brick* noting that "[t]he concerns that motivated the Supreme Court to bar offensive use of pass-on centered on problems created by the treble damages recovery." )  The Fourth, Fifth, Eighth, Ninth and Eleventh Circuits have ruled similarly. *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 n. 24 (4th Cir. 2002)("*Illinois Brick's* indirect purchaser rule, when applicable, bars only compensatory damages relief and does not apply to injunctive relief."); *In re Beef Indus. Antitrust Litig.,* 600 F.2d 1148, 1167 (5th Cir. 1979) *citing Mid-West Paper Products*, 596 F.2d 573 (3rd Cir. 1979) ("the policy considerations underlying pass-on rule are not implicated in claims for injunctive relief"); *Campos v. Ticketmaster Corp.*, 140 F.3d 1166, 1172 (8th Cir. 1998)(the concerns of the direct purchaser rule have mainly to do with the complexities of incidence analysis, complexities that do not arise when the courts must consider the propriety of injunctive relief"); *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234-1235 (9th Cir. 1998); *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 238 (5th Cir. 1982).

In *In re Warfarin Sodium Antitrust Litigation*, 214 F.3d 395, 401 (3d Cir. 2000), the Third Circuit held that consumers of the excessively priced product which was the subject of the price fixing agreement "clearly suffer antitrust injury" and accordingly have standing to seek injunctive relief under Section 16.  Consumers of the product subject to the antitrust pricing agreement are the targets of the antitrust violation and the most natural persons to have standing.

In *Nelson v. Monroe Regional Medical Center*, 925 F.2d 1555, 1564 (7th Cir.), *cert. denied*, 502 U.S. 903 (1991), this circuit held that antitrust injury means injury from higher prices or lower output and that consumers were the best champions of vigorous competition and the most appropriate persons to enforce the antitrust laws. *See also*, *O.K. Sand & Gravel, Inc. v. Martin Marietta Technologies*, 36 F.3d 565, 573 (7th Cir. 1994)(a consumer complaining of "higher prices or restrictions in output due to an unlawful combination would be the 'type' of injury the antitrust laws [are] intend[ed] to prevent.")

Defendant's deliberate misreading of Count I of the Amended Complaint, and its intentional misrepresentation to this Court about the relief sought by Plaintiffs and the Class, borders on the frivolous. Plaintiffs have properly plead a claim to obtain injunctive relief for violations of §1 of the Sherman Act under §16 of the Clayton Act. Defendant's motion in this regard should be denied summarily.

### IV. PLAINTIFFS' STATUTORY STATE LAW CLAIMS SHOULD NOT BE DISMISSED ON STANDING GROUNDS

Defendant contends that the claims under the antitrust and unfair competition laws of certain states and that the entire count brought under consumer protection statutes should be dismissed on standing grounds because the Amended Complaint does not identify class representatives from those states. The applicable case law in this circuit does not impose such a requirement. Defendant's motion which addresses this point should be denied.

The United States Supreme Court has instructed that in evaluating consumer class action cases involving multiple states, it is not necessary to have a class representative from every state to assert ancillary state claims as long as the class representatives are adequate for the case as a whole. *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999). Courts have repeatedly refused to dismiss complaints for lack of standing where named plaintiffs in class action litigation have brought state law claims on behalf of plaintiffs in states other than those in which the named plaintiffs resided. *See, e.g., In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. 2006). Relying on *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999), both decisions held that, in these circumstances, class certification issues should be resolved before standing issues. *Id.*

The Seventh Circuit similarly has ruled in *Payton v. County of Kane*, 308 F.3d 673 (7th

Cir. 2002) concluding that the plaintiffs – arrestees charged a bond fee, above and beyond their set bail amount, as condition of their release –who brought an action against county jails, may be entitled to represent a class suing all 19 defendant counties.  "We have begun our analysis with the question of class certification, mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing." See *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999): "the class certification issues are ... logically antecedent to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first." *Id.* at 831 (citations omitted).  The court noted further, "If the defendants with whom the named representative did not interact directly are following a common statute (and this common factor assures that the representative has the same legal claim as the unnamed parties-or, to use the terminology other courts have adopted, the defendants are "juridically linked"), we see nothing in either standing doctrine or Rule 23 that automatically precludes use of the class action device." *Payton*, 308 F.3d at 682.[6]

*In re GPU Antitrust Litig.*, 527 F.Supp.2d 1011 (N.D. Ca. 2007), and *In re Ditropan XL Antitrust Litig.*, 529 F.Supp.2d 1098 (N.D. Ca. 2007), the two Northern District of California opinions cited by Defendant, are not controlling on this Court under any circumstances. Moreover, their reasoning has been criticized in *Jepson v. Ticor Title Co.*, from the same circuit. *Jepson v. Ticor Title Co.*, 2007 WL 2060856 (W.D. Wash. May 1, 2007). *Jepson* held that while a court may consider standing as an initial issue depending on the facts, generally it is more appropriate to consider standing in the context of class certification in order to determine if the named class representatives meet the overall requirements to represent the purported class members.  Here it is obvious that the products at issue are sold throughout the United States and the price-fixing conspiracy applied everywhere.  Accordingly, it would only make the complaint unwieldy to have a separate class representative from every state.

Like the *Jepson* plaintiffs, Plaintiffs here allege injuries from this Defendant and its co-conspirators and purport to represent a class of those similarly injured under analogous laws in

---

[6] Defendant's reliance on *Weit v. Continental Illinois Nat'l Bank and Trust Company of Chicago*, 641 F.2d 457, 469 (7th Cir. 1980), is inapposite.  The cited portion of *Weit* found that the antitrust plaintiffs there could not challenge a separate, ancillary conspiracy where none of those plaintiffs had been injured by that separate conspiracy.  Here, in contrast, all of the Plaintiffs, as well as all of the absent class members, were injured by the same conspiracy.

14

other states.  *See also*, *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002), *supra*. Defendant's assertions as to count II and III in this regard should be rejected.[7]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Defendant's motion to dismiss be denied.

Dated: April 22, 2008                    Respectfully submitted,

By: */s/ Marvin A. Miller*
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400

Guri Ademi
Shpetim Ademi
David Syrios
Corey M. Mather
ADEMI & O'REILLY, LLP
3620 E. Layton
Cudahy, WI 53110
Telephone: (414) 482-8000

---

[7] In addition, because Unilever has failed to articulate any reasons why Count IV of the complaint should be dismissed, it has waived any argument for dismissing Count IV, and this count should also be upheld.

other states.  *See also*, *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002), *supra*. Defendant's assertions as to count II and III in this regard should be rejected.[7]

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Defendant's motion to dismiss be denied.

Dated: April 22, 2008                    Respectfully submitted,


By: */s/ Marvin A. Miller*
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
Telephone: (312) 332-3400

Guri Ademi
Shpetim Ademi
David Syrios
Corey M. Mather
ADEMI & O'REILLY, LLP
3620 E. Layton
Cudahy, WI 53110
Telephone: (414) 482-8000

---

[7] In addition, because Unilever has failed to articulate any reasons why Count IV of the complaint should be dismissed, it has waived any argument for dismissing Count IV, and this count should also be upheld.

**CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

    I, Marvin A. Miller, one of the attorneys for plaintiffs, hereby certify that on April 22, 2008 service of the foregoing ***Plaintiffs' Response to Unilever's Motion to Dismiss*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.


                                                   /s/   *Marvin A. Miller*
                                                 Marvin A. Miller