**Exhibit A**

NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARK ARZOOMANIAN, | : |
| | : |
| Plaintiff, | : |
| | : Civil Action No.: 03-374 (JLL) |
| v. | : |
| | : OPINION & ORDER |
| BRITISH TELECOMMUNICATIONS, | : |
| PLC, as a wholly owned subsidiary of BT | : |
| GROUP PLC, and UNILEVER PLC, | : |
| | : |
| Defendants. | : |
| | : |

APPEARANCES:

CHRISTOPHER A. SEEGER, ESQ.
SEEGER WEISS LLP
550 Broad Street, Suite 920
Newark, NJ 07102-4573

STEPHEN A. WEISS, ESQ.
ERIC T. CHAFFIN, ESQ.
SEEGER WEISS LLP
One William Street
New York, NY 10004
(Counsel for Plaintiff)

RONALD J. LEVINE, ESQ.
HERRICK, FEINSTEIN LLP
104 Carnegie Center
Princeton NJ 08540
(Counsel for Defendant Unilever PLC)

DEVORA L. LINDEMAN, ESQ.
PROSKAUER ROSE LLP
One Newark Center, 18th Floor

Newark, NJ 07102

GREGG M. MASHBERG, ESQ.
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8288
(Counsel for Defendant British Telecommunications, PLC)

      This matter comes before the Court on the motion of Defendant Unilever PLC to dismiss this action for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and in the alternative, to dismiss under the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u>, as well as the motion of Defendant British Telecommunications, PLC ("BTPLC") to dismiss due to <u>forum</u> <u>non</u> <u>conveniens</u>.[1] Plaintiff Mark Arzoomanian commenced suit against Defendant Unilever PLC and Defendant BTPLC for various contract-related claims. The Court decides this motion without oral argument. Fed.R.Civ.P. 78. For the reasons stated below, Defendant Unilever PLC's motion to dismiss this action for lack of personal jurisdiction is granted. Defendant BTPLC's motion to dismiss this action under the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> is denied.

## STATEMENT OF THE CASE

I. <u>Jurisdictional Facts</u>

      A. <u>Corporate Structure of Unilever PLC</u>

      Defendant Unilever PLC is a London-based holding company organized under the laws of England. (Williams Decl., ¶ 4.) Unilever PLC, together with a Dutch corporation, Unilever N.V., has investments in various companies that manufacture and sell food, home and personal

---

      [1]BTPLC had originally also asserted a motion to dismiss for lack of personal jurisdiction, but has since withdrawn that portion of its pending motion.

care products. (Id. ¶ 6.) Unilever PLC does not manufacture or distribute any products itself. It derives almost all of its income from dividends, service fees, and royalties. (Id. ¶ 8.) Unilever PLC does not have an office, place of business, postal address or telephone listing in New Jersey, and it is not licensed and has not applied for a license to do business in New Jersey. (Id. ¶¶ 10-11.) It does not advertise, sell, or contract to supply goods or services in New Jersey. (Id. ¶ 13.) It does not have any employees in New Jersey. (Id. ¶ 14.) It does not maintain a bank account or have any other property in New Jersey. (Id. ¶ 15.)

Unilever PLC does have a minority ownership interest in Unilever United States, Inc., a Delaware holding company whose principal place of business is New York. (Strickland Aff., ¶ 3.) Unilever United States has a New York subsidiary, Conopco, Inc. ("Conopco"), which manufactures and distributes food, home and personal care products throughout the United States. (Id.) Both Unilever United States and Conopco generate income, keep financial records, pay taxes and maintain bank accounts separately from Unilever PLC. Unilever PLC alleges that it does not involve itself in the management of, nor subsidizes, the daily operations of Unilever United States or Conopco. (Williams Decl., ¶ 17; Strickland Aff., ¶ 4.)

Plaintiff points out that Unilever PLC is affiliated with various business groups, including Unilever Bestfoods North America and Unilever Home and Personal Care North America. (Seeger Aff., ¶ 12, Ex. 5.) Unilever Bestfoods North America is headquartered in New Jersey. In 2000, when Unilever PLC acquired Bestfoods, Bestfoods sales totaled $8 billion and its earnings totaled $717 million. Unilever Bestfoods employs 8,800 employees in fifty cities throughout the United States. (Id. ¶¶ 12-14). Unilever Research, United States is another affiliated company located in New Jersey. (Id. ¶ 19.)

B. Corporate Structure of British Telecommunications, PLC

BTPLC is a British corporation with its principal place of business in England. (Ashton

Decl., ¶ 3.) It has no office, place of business, postal address, bank account or telephone listing

in New Jersey; it does not own, lease or possess any property in New Jersey; it has no employees

in New Jersey; and it has not designated an agent for service of process in New Jersey. BTPLC

does not contract to supply goods or services in the New Jersey and does not advertise in or

solicit business from New Jersey residents. (Id. ¶¶ 4-12.)

C. Events Leading up to Present Dispute

Plaintiff Mark Arzoomanian is a New Jersey resident. Among his numerous business

enterprises, he acts as a "technology solutions" consultant in the telecommunications industry.

(Compl., ¶ 2.) At the time in dispute, Arzoomanian also worked non-exclusively for a New York

corporation, Starpoint Solutions, Inc. ("Starpoint"), where he sold information technology

staffing to various companies. (Id. ¶ 3.)

In late 2001, Arzoomanian, acting on behalf of Starpoint, approached Conopco about

providing consulting work. (Goodmaster Decl., ¶ 6.) Arzoomanian apparently represented that

he was the Executive Vice President and Director of Starpoint, and that his office was

headquartered in New York City. In June 2002, Conopco entered into a consulting agreement

with Starpoint. This agreement, governed by New York law, does not relate to the alleged

telecommunications agreement in the case at bar. (Id. ¶ 6.)

On or about April 24, 2002, Plaintiff met in Connecticut with Gene Goodmaster, who is

employed by Conopco as Vice President of a division of the Global Infrastructure Organization

("GIO") known as Global Infrastructure Organization-North America ("GIO-NA"). The GIO

manages information technology and global communications. GIO-NA is separate from Unilever PLC's GIO division, and each entity has its own budget, financial plan and business targets. Although GIO-NA and Unilever PLC's GIO division may use common vendors, such as BTPLC, the GIO-NA maintains separate accounts for its dealings with those vendors. (Hopley Decl., ¶ 5.)

At the April 24th meeting, Goodmaster allegedly informed Plaintiff that Unilever was soon to sign a global telecommunications agreement that would provide the company with a 10% savings on the cost of its telecommunications system. Plaintiff informed Goodmaster that he had contacts with telecommunications companies that would be able to provide Unilever with savings greater than the 10% described by Goodmaster. (Compl., ¶ 8.) Goodmaster supposedly agreed that if Arzoomanian could find a telecommunications company to provide substantially greater savings for the same services, Unilever would contract with that company. (Id. ¶ 9.) Despite these allegations, Goodmaster adamantly denies ever having entered into any such agreement with Arzoomanian on behalf of Unilever PLC. (Goodmaster Decl., ¶ 5.)

Soon thereafter, Plaintiff, doing business from his New Jersey residence, contacted Defendant BTPLC, a company Plaintiff believed would be capable of providing the type of global telecommunications service required by Unilever. (Compl., ¶ 10.) Plaintiff allegedly spoke to Anthony Maras, a senior BTPLC executive, and explained the potential benefits to BTPLC resulting from a worldwide contract with Unilever. Consequently, Maras spoke with his superiors at BTPLC about the contract, including but not limited to Roger Kitchen and David Disley, who apparently are employed as senior level management at BTPLC. (Id.)

On or about April 25, 2002, Goodmaster purportedly called Plaintiff at his New Jersey

residence. Plaintiff explained to Goodmaster that he had located a potential telecommunications

provider as discussed in their earlier meeting. In particular, Plaintiff outlined his discussions

with BTPLC and his plan to pursue the best possible deal for Unilever. Plaintiff also explained

that BTPLC would compensate Plaintiff for his services, and that the fee would be based on a

percentage of Unilever's savings from its communications costs. (Compl., ¶ 11.) At the

conclusion of the telephone call, Goodmaster allegedly indicated that he had spoken to

Unilever's highest management and orally agreed that Plaintiff would act as Unilever's agent in

procuring a global telecommunications provider. (Id. ¶ 12.)

During Conopco's dealings with Starpoint, Goodmaster states that Arzoomanian

discussed with him the possibility of an alternative telecommunications provider in

Goodmaster's Connecticut office. However, he asserts that he never entered into a contract with

Starpoint or Arzoomanian regarding the procurement of a telecommunications provider for

Unilever PLC. (Goodmaster Decl., ¶ 7.) Moreover, Goodmaster declares that he never met with

Arzoomanian in New Jersey, never corresponded with him there, and did not know that

Arzoomanian was doing business from New Jersey. (Id. ¶¶ 8-9.)

Pursuant to the conversation with Goodmaster, Plaintiff apparently engaged in extensive

discussions with Maras between April 25 and May 10, 2002. During this period, Maras

consulted with BTPLC executives regarding Unilever and the potential agreement for discounted

telecommunications services. Plaintiff allegedly convinced Maras and other BTPLC executives

that the Unilever agreement would have extrinsic benefits in the telecommunications

marketplace and that the agreement would become a profitable model for future customers.

(Compl., ¶ 13.) On April 30, 2002, BTPLC e-mailed a Statement of Intent ("SI") to Plaintiff at

his New Jersey residence, which stated that "BT [British Telecommunications] has a significant interest in developing a formal partnership with Unilever that would entail the consumption of the complete operations of Unilever's Global Voice and Data network." (Id. ¶ 14.) Allegedly on behalf of Unilever, Plaintiff agreed to a 60-day due diligence period on the deal and agreed to sign the contract in good faith upon completion of the due diligence. (Id. ¶ 15.)

On May 3, 2002, after Plaintiff's extensive negotiations with BTPLC, Disley requested that Plaintiff provide a letter from Unilever confirming his authority to act as Unilever's agent. Disley also requested that a meeting be convened between Plaintiff, Unilever's management and BTPLC. (Compl., ¶ 16.) On May 4, 2002, Philip Hopley, another senior Unilever executive, called Plaintiff and apparently reaffirmed the authority previously granted to Plaintiff by Goodmaster, as well Unilever's interest in procuring the cost-saving agreement that Plaintiff had negotiated. Additionally, Hopley allegedly reaffirmed Unilever's understanding and agreement with Plaintiff's mode of compensation. (Id. ¶ 17.) Hopley admits that he returned Arzoomanian's message left for him in his office in England, but denies having entered into an agreement with Arzoomanian on behalf of Unilever PLC that Arzoomanian would act as its agent in procuring a global telecommunications provider. (Hopley Decl., ¶¶ 4-5.) Moreover, Hopley notes that he did not know Arzoomanian was working from New Jersey and that Arzoomanian never indicated as such. (Id. ¶ 6.) On May 1, 2002, Hopley received an email from an employee of Starpoint. Hopley did not respond to the email or have any other correspondence with Starpoint or Arzoomanian thereafter. (Id. ¶ 7.)

Between May 4, 2002 and May 10, 2002, various high-level employees of BTPLC and Unilever communicated with each other directly regarding a telecommunications agreement.

During this period, Plaintiff attempted to speak with his contacts at Unilever in order to obtain a written confirmation of his authority.  However, these contacts informed him that Unilever could not issue said letter. (Compl., ¶¶ 18-19.)  On May 10, 2002, Roger Kitchen of BTPLC allegedly told Plaintiff that he had been in direct contact with Unilever and had been advised that "the only people with any authority, in the area you approached us about are in the UK [United Kingdom] and that any company with an interest whatsoever in this opportunity should work through the specified channel." (Id. ¶ 20.)

Between May 10, 2002 and November 4, 2002, BTPLC and Unilever continued to negotiate the terms of the telecommunications agreement.  Finally, on November 4, 2002, Unilever publicly announced an agreement with BTPLC for the provision of telecommunications services.  This agreement was reported to be worth one billion British pounds. (Id. ¶¶ 21-22.)  According to Unilever PLC, the agreement reached between Unilever and BTPLC was not the result of any actions or activities by Arzoomanian. (Hopley Decl., ¶ 9.)  More than 15 people were involved in the dealings between the two companies during 2002, and the work largely took place in England.  None of the negotiations occurred in New Jersey. (Id. ¶ 10.)

II. Procedural History

On January 27, 2003, Plaintiff filed the present Complaint asserting breach of contract against Defendant Unilever (Count One), and tortious interference with contractual relations (Count Two) and tortious interference with economic advantage (Count Three) against Defendant BTPLC.  Plaintiff also makes a quasi-contract and quantum meruit claim against both Defendants (Count Four).  Plaintiff asks for punitive damages against Defendant BTPLC.

(Count Five).  Thereafter, Defendant Unilever PLC filed a motion to dismiss this action for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) and in the alternative, to dismiss under the doctrine of forum non conveniens.  Defendant British Telecommunications, PLC filed a motion to dismiss for lack of personal jurisdiction, which has since been withdrawn, and a motion to dismiss due to forum non conveniens.

LEGAL ANALYSIS

I. Motion to Dismiss for Lack of Personal Jurisdiction

    A. Standard Pursuant to Fed.R.Civ.P. 12(b)(2)

Federal Rule of Civil Procedure 4(k) (formerly 4(e)) authorizes a district court to exercise personal jurisdiction over a non-resident defendant to the extent allowed by the long-arm statute of the state in which the court sits. See Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 31 (3d Cir. 1993).  New Jersey's long-arm statute allows the exercise of personal jurisdiction over a non-resident defendant to the full extent permitted by the United States Constitution, subject only to due process limitations. See N.J. Sup. Ct. R. 4:4-4(c)(1); Weber v. Jolly Hotels, 977 F. Supp. 327, 334 (D.N.J. 1997).  Pursuant to the Due Process Clause of the Fourteenth Amendment, a non-resident defendant is amenable to suit in a particular forum only when it has constitutionally sufficient "minimum contacts" with the forum such that subjecting defendant to the court's jurisdiction comports with "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); Rodi v. Southern New England School of Law, 255 F.Supp.2d 346, 349 (D.N.J. 2003).  Such contacts must be sufficient to provide defendant with a "fair warning" that it may be "haled into court in the forum state." World-Wide

Page 9 of  40

<u>Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).

As Defendant Unilever PLC has raised the defense of the Court's lack of personal jurisdiction, the burden falls upon Plaintiff Arzoomanian to come forward with sufficient facts to establish that jurisdiction is proper. <u>Mellon Bank (East) P.S.F.S. v. Farino</u>, 960 F.2d 1217, 1223 (3d Cir. 1992). In ruling on a motion to dismiss, a Court must accept as true the well-pleaded, material allegations contained in Plaintiff's complaint and give Plaintiff the benefit of all reasonable inferences which can be drawn therefrom. <u>See</u> <u>Carteret Savings Bank, FA v. Shushan</u>, 954 F.2d 141, 142 n. 1 (3d Cir. 1992). Although Plaintiff will ultimately have to establish jurisdiction by a preponderance of the evidence, at this point, he need only make a <u>prima</u> <u>facie</u> showing that the Court has personal jurisdiction over Defendants. A <u>prima</u> <u>facie</u> showing is made if Plaintiff shows "with reasonable particularity, sufficient contacts between the defendant and the forum state." <u>Mellon Bank</u>, 960 F.2d at 1223. Plaintiff can sustain its burden through "sworn affidavits or other competent evidence." <u>North Penn Gas Co. v. Corning Natural Gas Corp.</u>, 897 F.2d 687, 692 (3d Cir. 1990) (quoting <u>Stranahan Gear Co. v. N L Indust.</u>, 800 F.2d 53, 58 (3d Cir. 1986)). <u>See also</u> <u>Time Share Vacation Club v. Atlantic Resorts, Ltd.</u>, 735 F.2d 61, 67, n. 9 (3d Cir.1984) ("[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction. Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.")

Plaintiff must establish that this Court has either "general" or "specific" jurisdiction over Defendant Unilever PLC. General jurisdiction is based upon a defendant's "continuous and systematic" contacts with the forum state. In contrast, specific jurisdiction arises only when a

plaintiff's claim is related to, or arises out of, a defendant's contacts with the forum. <u>Helicopteros</u>

<u>Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414, 416 (1984); <u>Pinker v. Roche Holdings</u>

<u>Ltd.</u>, 292 F.3d 361, 368 (3d Cir. 2002); <u>Lebel v. Everglades Marina, Inc.</u>, 115 N.J. 317, 322-23

(1989). Under either general or specific jurisdiction, a plaintiff must show that the defendant

"purposefully availed" itself of the forum's benefits such that litigation there is reasonably

foreseeable. <u>See</u> <u>World-Wide Volkswagen Corp.</u>, 444 U.S. at 297 ("When a corporation

purposefully avails itself of the privilege of conducting activities within the forum state, it has

clear notice that it is subject to the suit there....") (internal quotation marks omitted); <u>Hanson v.</u>

<u>Denckla</u>, 357 U.S. 235, 253 (1958) (there must be "some act by which the defendant purposefully

avails itself of the privilege of conducting activities within the forum State, thus invoking the

benefits and protections of its laws.") Without this level of association with the forum state, it

would contradict due process norms to haul a nonresident defendant into court there. <u>World-</u>

<u>Wide Volkswagen Corp.</u>, 444 U.S. at 296. As such, the jurisdictional nexus cannot be the result

of merely "random or fortuitous acts or the unilateral acts of others (including the plaintiff)."

<u>Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.</u>, 6 F.Supp.2d 349, 353 (D.N.J. 1998)

(citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 473 (1985)). <u>See also</u> <u>Hanson</u>, 357 U.S.

at 253 (stating that the "unilateral activity of those who claim some relationship with a

nonresident defendant cannot satisfy the requirement of contact with the forum.")

   B. <u>Assertion of General Jurisdiction over Unilever PLC</u>

   To establish general jurisdiction, a plaintiff must demonstrate substantially more than

"minimum contacts." <u>See</u> <u>Provident Nat'l Bank v. California Fed. Sav. & Loan Assoc.</u>, 819 F.2d

434, 437 (3d Cir. 1987). A plaintiff must satisfy the "rigorous" burden of establishing that the defendant's contacts are continuous and substantial. Osteotech, 6 F.Supp.2d at 353; Exton v. Our Farm, Inc., 943 F.Supp. 432, 437 (D.N.J. 1996). When general jurisdiction exists, a defendant will be subject to the court's jurisdiction regardless of whether there is any specific connection between its forum-related contacts and the events or conduct which gave rise to plaintiff's claims and the resulting litigation. Provident Nat'l Bank, 819 F.2d at 438.

It is apparent that Unilever PLC does not itself have the "continuous and systematic" contacts with New Jersey necessary to finding general jurisdiction. Unilever PLC does not own, rent, use or possess any real property in New Jersey. It does not maintain an office, place of business, postal address, telephone listing, bank account or any real property in New Jersey. Unilever PLC does not advertise, sell or contract to supply goods or services in New Jersey. Furthermore, Unilever PLC has no license and has never applied for a license to conduct business in the forum. There are no Unilever PLC employees in New Jersey and there is no designated agent for service of process in New Jersey. (Williams Decl., ¶¶ 9-17.) Unilever PLC's general connection with the forum may fairly be characterized as "far too attenuated to constitute continuous and systematic contracts" to satisfy this form of jurisdiction. Ins. Data Processing, Inc. v. Old Charleston Ins. Cos., Ltd. 1989 WL157138 at *5 (E.D.Pa. Dec. 28, 1989).

Plaintiff asserts that New Jersey has general jurisdiction over Defendant because of the presence of its "business groups" in the state. Plaintiff argues that Defendant corporation functions as a "single, multinational entity" under two parent companies: Unilever N.V. and Unilever PLC. (Pl.'s Opp'n Br., 20-21.) Plaintiff adds that these companies have the same board of directors, the same management team, and submit a single annual report to shareholders.

(Seeger Aff., ¶ 3.)

However, the jurisdiction over a parent corporation should not be automatically conflated with jurisdiction over a subsidiary. <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 781 n.13 (1984); <u>Rush v. Savchuk</u>, 444 U.S. 320, 332 (1980). Whether jurisdiction exists over a non-resident parent company based on the acts of a subsidiary is a matter governed by state law. <u>Alexander v. Cigna Corp.</u>, 991 F.Supp. 427, 444, n. 25 (D.N.J. 1998) (internal citations omitted). Under New Jersey law, courts are "extremely reluctant to pierce the corporate veil between the two absent compelling circumstances." <u>Id.</u> at 443 (citing <u>Ricoh Co. Ltd. v. Honeywell, Inc.</u>, 817 F.Supp. 473, 481 (D.N.J. 1993)). As such, it is "well-established that the forum contacts of a subsidiary corporation will not be imputed to a parent corporation for jurisdictional purposes without a showing of something more than mere ownership." <u>Pfundstein v. Omnicom Group Inc.</u>, 285 N.J. Super. 245, 252 (App.Div. 1995) (citing cases). <u>See also</u> <u>Leo v. Kerr-McGee</u>, 1996 WL 254054, at *5 (D.N.J. May 10, 1996). In order to find jurisdiction, courts in this Circuit will generally consider "whether the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded." <u>Lucas v. Gulf & Western Indus., Inc.</u>, 666 F.2d 800, 806 (3d Cir. 1981); <u>In re Latex Gloves Prods. Liab. Litig.</u>, 2001 WL 964105, at *3 (E.D.Pa. Aug. 22, 2001). <u>See also</u> <u>Cannon Mfg. Co. v. Cuhady Co.</u>, 267 U.S. 333, 336-37 (1925) (finding that although a Maine corporation dominated and controlled a wholly-owned corporation with offices in North Carolina, the two corporations were distinct corporate entities so that the Maine corporation was not amenable to suit in North Carolina). As New Jersey law allows personal jurisdiction on a nonresident parent company when the subsidiary acts as its "agent" or "alter ego" within the forum, whether the acts of

Unilever Best Foods, Unilever, USA or Unilever N.V. may be attributed to Unilever PLC for jurisdictional purposes hinges on an inquiry of both possibilities.[2]  See, e.g., Patent Incentives, Inc. v. Seiko Epson Corp., 1988 WL 92460, at *4 (D.N.J. Sept. 6, 1988).

    1. Agent

    An agency relationship arises "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." Sears Mortgage Corp. v. Rose, 634 A.2d 74, 79 (N.J. 1993).  In the corporate context, the subsidiary may be acting as an agent of the parent in a forum so as to subject the parent to personal jurisdiction when the subsidiary is "totally under the control and dominion of the parent." Ames v. Whitman's Chocolates, 1991 WL 281798, at *7 (E.D.Pa. Dec. 30, 1991).  See also Mylan Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 62 (4th Cir. 1993) (defining standard as when parent exercises "considerable control" over the subsidiary corporation).  Courts have at times formulated the inquiry as whether the subsidiary's business in the forum would have to be done by the parent "but for" the subsidiary. Leo, 1996 WL 254054 at *6.  In Tsegaye v. Impol Aluminum Corp., for example, the district court concluded that an agency relationship did not exist between a parent and a subsidiary because the subsidiary did not have "any power to sign contracts on behalf of [the parent] or to bind it in any way," and the subsidiary did "not place or accept orders on behalf of" the parent.  2003 WL 221743, *5 (S.D.N.Y. Jan. 30, 2003).

---

    [2]Although not dispositive, the Court notes that there have been similar suits brought in the United States against Unilever PLC where the plaintiffs have alleged jurisdiction because the litigation involved United States subsidiaries.  These courts have found that they lack personal jurisdiction over Unilever PLC.  See Patterson v. Conopco, Inc., 1997 U.S. Dist. LEXIS 22267 *8 (D. Kan. Aug. 27, 1997) (finding no personal jurisdiction); see also Gilbert v. Slim-Fast Foods Co., Sup. Ct., N.Y. Co. 119239/02, June 20, 2003 (dismissing complaint against Unilever PLC's affiliate Unilever N.V. for lack of personal jurisdiction).

Applying the relevant jurisprudence to this matter, the Court finds no such agency relationship between Unilever PLC and any other corporate entities. Plaintiff presents no evidence that Unilever PLC would be conducting the business of its subsidiaries in New Jersey if they did not exist. Nor has Plaintiff demonstrated that any subsidiary had the power to sign contracts on behalf of Unilever PLC or place or accept orders on behalf of Unilever PLC. Unilever Bestfoods is a distinct legal entity and functions as an independent, wholly-owned subsidiary. As will be discussed, any cooperation between, or any commonalities that may exist among, the directors of the two entities should not suggest otherwise. Unilever PLC simply has not exercised the "total control and dominion" over Unilever Bestfoods or any other subsidiary necessary to establish an agency relationship. (See id. at 9.)

2. Alter Ego

In addition, Plaintiff has not met his burden of establishing jurisdiction over Unilever PLC based on the possibility that its subsidiaries acted as "alter egos" of the parent company. Plaintiff argues that Unilever Bestfoods is the alter ego of Unilever PLC, and consequently, that Unilever PLC has "systematic and continuous" contacts with New Jersey through Unilever Bestfoods. Unilever Bestfoods is a New Jersey business, which shares certain business designs with Unilever PLC. However, Unilever Bestfoods was actually acquired by Conopco, Inc., a United States corporation and it is Conopco that operates it. Unilever Bestfoods is a division of Conopco and its President/CEO is an employee of Conopco, not Unilever PLC. Unilever Bestfoods maintains individual boards of directors, management personnel, business plans, and revenues from Unilever PLC. Furthermore, its financial records, taxes, and bank accounts are entirely separate from those of Unilever PLC.

"Judicial jurisdiction over a subsidiary corporation will give the state judicial jurisdiction over the parent corporation if the parent so controls and dominates the subsidiary as in effect to disregard the latter's independent corporate existence." RESTATEMENT (SECOND) OF CONFLICTS OF LAWS, § 52 Comment b (1969). In New Jersey, a subsidiary will be deemed the "alter ego" of its parents if "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." New Jersey Dep't of Env. Protection v. Ventron Corp., 94 N.J. 473, 501 (1983) (citations omitted). See also Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145, 150 (3d Cir. 1988) ("It is patently clear since Ventron that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.") Liability generally requires a showing that the parent corporation abused the privilege of incorporation by using the subsidiary to "perpetuate a fraud or injustice, or otherwise to circumvent the law." Patent Incentives, 1988 WL 92460 at *6 (citing Ventron, 94 N.J. at 501).

Plaintiff claims an alter ego relationship based in part on the fact that both Unilever Bestfoods and Unilever PLC have members of their respective board of directors in common. However, overlapping boards of directors and officers are not sufficient to demonstrate a parent's domination or control over its subsidiaries so as to be deemed an "alter ego." See United States v. Bestfoods, 524 U.S. 51, 69 (1998). See also Insolia v. Philip Morris, Inc., 31 F.Supp.2d 660, 669 (W.D.Wisc. 1998) ("100% stock ownership and commonality of [officers and directors] are not alone sufficient to establish an alter ego relationship between two corporations."); Leo, 1996 WL 254054 at *6 ("A significant degree of overlap between directors and officers of a parent and its subsidiary does not establish an alter ego relationship.")

Moreover, directors and officers that hold positions within both a parent company and its

Page 16 of 40

subsidiary can and do "change hats" to represent the two corporations separately, despite their common ownership. Leo 1996 WL 254054 at *6. Dual office-holding alone is not enough to establish liability as there is a general presumption "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." Bestfoods, 524 U.S. at 69 (quoting P. Blumberg, Law of Corporate Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations ¶ 1.02.1, 12 (1983)). This presumption is strongest when the officers' dual activities are "perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." Id. at 70, n.13. In the case at bar, there is no reason to believe that the officers for Bestfoods were acting on behalf of the parent rather than the subsidiary. Nor has Plaintiff presented any evidence that the officers acted "plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." Id.

In Ventron, the New Jersey Supreme Court concluded that although the parent's "personnel, directors, and officers were constantly involved in day to day business," the parent's intrusion into the subsidiary's affairs had not reached "the point of dominance." 94 N.J. at 501. The Court believed this to be especially so since the parent incorporated the subsidiary for a legitimate business purpose. Id. Likewise, in Patent Incentives, the district court concluded that it could not assert personal jurisdiction over a foreign parent, even though there was significant overlap in directors and involvement of the parent's officers in the affairs of the subsidiary. The court reasoned that because "[p]laintiffs have simply failed to come forward with any evidence to suggest that the relationship between [the Japanese parent and its American subsidiary] is

anything other than a bona fide parent/subsidiary business relationship which legitimately insulates one [from] the liabilities of the other." 1988 WL 92460 at *8 (quoting <u>Smith v. Dainichi Kinzoku Kogyo Co., Ltd.</u>, 680 F.Supp. 847, 855 (W.D. Tex. 1988)).  Finally, in <u>Pfundstein</u>, all of the parent's subsidiaries (a) kept their own books and bank accounts; (b) filed their own income tax returns; (c) were managed by their own boards of directors; (d) made their own personnel, marketing and management decisions; (e) directed  their own day-to-day operations; and (f) otherwise operated as independent companies.  666 A.2d at 1017.  Although the parent managed the subsidiaries' operations, they were given fairly broad discretion to meet profitability targets set by the parent.  <u>Id.</u>  The court concluded that the parent "simply does not exercise unusual hegemony over its subsidiaries, or dominate and control them so as to, in effect, disregard their independent corporate existence."  <u>Id.</u>  As such, the contacts of the subsidiaries could not be imputed to the parent and no general jurisdiction theory was viable.

In the case at bar, Unilever Bestfoods is structured as a division of Conopco, which generates income, keeps financial records and books, pays taxes, and maintains bank accounts separately from Unilever PLC.  Unilever PLC is not involved in the day-to-day management of Conopco, and Conopco develops its business plans and targets independently.  There is no reason to suspect that this corporate structure was created for an illegitimate business purpose.  The fact that these entities may have a common website or profess similar overall statements of corporate policy does not change this calculation, nor does the fact that they submit a consolidated annual report.  <u>See, e.g.</u>, <u>Rose v. Continental Aktiengesellschaft</u>, 2001 WL 236738, at *3 (E.D.Pa. Mar. 2, 2001).  Plaintiff has therefore not met the high burden of proving that the subsidiaries of Unilever, PLC act as its "alter ego."

Plaintiff also questions the relationship between Unilever PLC and various American

subsidiary corporations based on the similarity in the corporate names. Similarity in trade names

is not, however, dispositive of corporate structure. Even though Unilever Bestfoods and

Unilever N.V. share the word "Unilever" in their trade names with Unilever PLC, they remain

legally separate and distinct from Unilever PLC. See, e.g., S&S Dundalk Eng'g Works, Ltd.'s,

139 F.Supp.2d 610, 619 (D.N.J. 2001) (holding that the use of the trade name "Royal & Sun

Alliance" by American companies does not mean that Royal Sun UK is not separate and

distinct). Entities may use the Unilever trade name without a finding that Unilever PLC itself is

doing business in New Jersey.

To support his jurisdictional claim, Plaintiff also refers to a business card given to him by

Goodmaster upon their introduction. This card states that Goodmaster is the Vice President of

the Global Infrastructure Organization - North America, but uses the Unilever logo and a

Unilever email address. (Arzoomanian Aff., ¶ 6.) These ambiguous details on the card may

mean that Plaintiff's mistaken belief that Goodmaster was an employee of Unilever PLC was a

reasonable mistake. However, for purposes of jurisdiction, the Court will look to the actual

circumstances which exist rather than Plaintiff's perception of these facts. Goodmaster was

clearly an employee of Conopco, not Unilever PLC. His title as a Vice President of GIO

illustrates that he is an employee at the GIO - North America division of Conopco, Inc. and not at

Unilever. Any unintentional blurring of the corporate structure that may have incidentally arose

based on Goodmaster's business card does not change the actual underlying corporate structure

and does not rise to the formation of an alter ego relationship in light of the substantial evidence

to the contrary.

As this forum lacks personal jurisdiction generally over Unilever, PLC based on its own activity, and there has been insufficient evidence presented to indicate that Unilever PLC's subsidiaries were acting as its "agents" or "alter egos," the Court finds that it cannot assert general jurisdiction over Unilever, PLC.

C. Assertion of Specific Jurisdiction over Unilever PLC

Specific personal jurisdiction over a non-resident defendant exists when a plaintiff's cause of action arises directly from the defendant's actions in the forum state. See Osteotech, 6 F.Supp.2d at 354 (citing Giangola v. Walt Disney World Co., 753 F.Supp. 148, 154 (D.N.J. 1990)). In making this determination, a court must examine the relationship among the defendant, the forum state, and the cause of action to determine whether the defendant had "fair warning" that suit could be brought in that state. Helicopteros Nacionales de Colombia, S.A., 466 U.S. at 414, n. 8 (citing Shaffer v. Heitner, 433 U.S. 186, 204 (1977)). The connection between a defendant and the forum "must be more than random, serendipitous or attenuated." Leo, 1996 WL 254054 at *5. Defendant must have established "minimum contacts" within the forum to be subject to personal jurisdiction. Furthermore, defendant must have "purposefully availed" itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. World-Wide Volkswagen Corp., 444 U.S. at 297. To resolve personal jurisdiction questions, New Jersey courts will undertake a fact-specific analysis of defendant's interaction with the forum. Charles Gendler & Co. v. Telecom Equip. Corp., 102 N.J. 460, 470 (1986). See generally Waste Mgmt., Inc. v. Admiral Ins. Co., 138 N.J. 106 (1994).

Although the existence of an agency agreement is hotly disputed by the parties, for

purposes of this jurisdictional motion, the Court will assume that Unilever, PLC and

Arzoomanian in fact entered into an oral agreement.  Any greater scrutiny of the merits of

Plaintiff's claims would be premature.  See Kultur Int'l Films Ltd. v. Covent Garden Pioneer,

860 F.Supp. 1055, 1058 (D.N.J. 1994) (assuming existence of oral agreement for purposes of

personal jurisdiction motion); Associated Bus. Tel. Sys. v. Danihels, 829 F.Supp. 707, 711

(D.N.J. 1993) (same).  Even upon making this assumption, after reviewing the relevant

jurisprudence and applying it to the facts set forth by Plaintiff, the Court finds that Unilever

PLC's contact with the forum is not sufficient to establish specific personal jurisdiction.

Plaintiff has demonstrated little more connection with New Jersey than the fact that he

resided in New Jersey, received two relevant telephone calls in New Jersey, and happened to

conduct some of the work in connection with this matter in New Jersey.  Arzoomanian's and

Unilever PLC's offices were located in New York and London, respectively.  The only alleged

meeting between the parties (which actually involved a Conopco employee and not a Unilever

PLC employee) took place in Connecticut.  Both Goodmaster and Hopley called Arzoomanian's

mobile phone while Arzoomanian happened to be working out of his New Jersey home.  Both

deny knowing that Arzoomanian would be working from New Jersey, and there has been

insufficient evidence presented to rebut that denial.  Moreover, there is little reason to believe

that they should have known that Arzoomanian would be working on obtaining a

telecommunications provider in New Jersey.  The contract did not require nor suggest that

Arzoomanian should work out of his New Jersey home.  Arzoomanian identified himself through

his New York company, Starpoint Solutions, Inc.  He only used the Starpoint email address and

business address to communicate with Defendant.  Furthermore, he performed work on the

matter out of his New York Starpoint office and employed other Starpoint employees to assist him.

When assessing minimum contacts based on contractual activity, the United States Supreme Court has endorsed a "highly realistic approach" to jurisdiction that recognizes that a contract is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." Burger King, 471 U.S. at 479; BP Chems., Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 260 (3d Cir. 2000). An individual's contract with an out-of-state party alone cannot automatically establish sufficient minimum contacts. Burger King, 471 U.S. at 478. In personam jurisdiction requires an inquiry into "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." Id. at 479.

An examination of the "totality of circumstances" surrounding the purported oral agreement in the case at bar supports a finding of lack of jurisdiction. The focus of the alleged agreement was to obtain a telecommunications provider for a British company. Any negotiations that may have incidentally occurred in New Jersey were the result of sheer fortuity, in that Arzoomanian happened to be using his mobile phone from his residence. As mentioned, no portion of the service agreement required Arzoomanian to undertake any activity in New Jersey or implied that he should or would proceed in New Jersey. Arzoomanian could have (and in fact often did) pursue his telecommunications contacts from other states. See, e.g., J.I. Kislak, Inc. v. Trumbull Shopping Park, Inc., 150 N.J. Super. 96, 101-02 (App.Div. 1977) (finding that the "mere circumstance that [plaintiff] saw fit to conduct some of its preliminary solicitation of prospective tenants through its New Jersey office rather than any other office or locale is too slim

Page 22 of 40

a reed to support the conclusion that defendant by its mere execution of the contract caused significant effects in this State.")[3]  In addition, this contract was never intended to create a long-term relationship between Unilever, PLC and any entity in the forum state; from the facts presented, this appeared to be a one-shot deal between the parties which lasted only several weeks that was to be paid in a single installment.

The purported oral agreement, as described by Plaintiff, is in marked contrast with that level of contractual activity deemed jurisdictionally sufficient in Burger King, where the out-of-state defendant negotiated with a Florida corporation to purchase a long-term franchise, thereby creating a 20 year relationship that would subject the out-of-state defendant to the continued regulation of business from Florida.  471 U.S. at 479-82.  Nor can it compare with the forum contacts in Associated Bus. Tel. Sys. Corp. v. Greater Capital Corp., 861 F.2d 793, 797 (3d Cir. 1988), where the court found specific jurisdiction over a California corporation that had entered into a ten-year contract with a New Jersey corporation and created continuing obligations between the companies.  See also Eaton v. Maslym Holding Co., 929 F.Supp. 792, 797-98 (D.N.J. 1996) (personal jurisdiction based on ten-year contractual commitment and weekly communications with in-state plaintiffs); Reynolds Publishers, Inc. v. Graphics Financial Group, Ltd., 938 F.Supp. 256, 260 (D.N.J. 1996) (personal jurisdiction existed over foreign lessor based

---

[3]The Court does not find persuasive Plaintiff's attempts to distinguish Kislak based on the existence in that case of a contractual provision containing a Connecticut choice of law clause. Although a choice of law provision may be relevant to a jurisdictional analysis, it is certainly not dispositive.  See, e.g. Bayway Refining Co. v. State Utils., Inc., 333 N.J.Super. 420, 432 (App.Div. 2000) ("[C]hoice of law is not forum selection and does not establish jurisdiction."); William Sternberg & Assocs., Inc. v. Litho Supply, Inc., 219 N.J. Super. 201 (Law Div. 1987) (dismissing case for lack of personal jurisdiction despite existence of New Jersey choice of law clause).

on contractual relationship with New Jersey plaintiff which spanned several years, several lease contracts, sixty monthly payments and ongoing commitment with customers in New Jersey).

Plaintiff points to several communications between himself and Goodmaster and Hopley in support of personal jurisdiction. It is true that the "[a]ctivities of a party's agent may count toward the minimum contacts necessary to support jurisdiction." Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 483 (3d Cir. 1993); Digiralomo v. Shop At Home, Inc., 2002 WL 576024, at *4 (D.N.J. Mar. 1, 2002) (noting that "contact by an agent is only one part of the minimum contacts equation.") At the outset, it is unclear whether Goodmaster was even acting on behalf of Unilever PLC when making these communications in light of statements and evidence to the contrary. (Goodmaster Decl., ¶¶ 3-5) (Hopley Decl., ¶ 6). Plaintiff has not, for example, presented specific facts stating that Goodmaster was entitled to act as an agent of Unilever PLC. See, e.g., Automated Salvage Transport, Inc. v. NV Koninklijke KNP BT, 1997 WL 576402, at *23 (D.N.J. Sept. 12, 1997) (plaintiff set forth specific facts with respect to agency relationship for purposes of personal jurisdiction).

Even if the Court were to accept the doubtful proposition that Goodmaster was acting as Unilever PLC's agent rather than as Conopco's, his actions that are related to New Jersey are insufficient to invoke this Court's jurisdiction. As discussed, Goodmaster allegedly entered into an agreement in Connecticut with Arzoomanian, who worked out of his office in New York and his New Jersey residence. This activities required by this agreement had no expected relationship with New Jersey. Goodmaster also made one phone call to Arzoomanian's mobile phone on April 24th discussing the contract, which was received at Arzoomanian's New Jersey residence. Arzoomanian could have answered his cellular phone in any state and it is fortuitous

Page 24 of 40

that he was in New Jersey when Hopley returned the call. Such random minimal contact with New Jersey does not point to the assertion of jurisdiction. Similarly, Hopley's alleged affirmation of the telecommunications agreement, in which he returned a message left by Arzoomanian to the New Jersey telephone number left by Arzoomanian, was a random and incidental contact with New Jersey. It was certainly not an act in which Hopley reached into New Jersey to conduct business there. In both instances, the contacts should not be equated with "purposeful availment" in New Jersey.

Furthermore, to the extent the communications by Goodmaster and Hopley were made in furtherance of the oral agreement, "informational communications in furtherance of [a contract between a resident and non-resident] does not establish the purposeful activity necessary for a valid assertion of personal jurisdiction." Sunbelt Corp. v. Noble, Denton & Assocs., Inc., 5 F.3d 28, 32 (3d Cir. 1993). Plaintiff's claims against Unilever, PLC consist of nothing more than minimal communications with New Jersey. Such communications are insufficient for jurisdictional purposes. See, e.g., Imo Indus., Inc. v. Kiekert AG, 155 F.3d 254, 260 n.3 (3d Cir. 1998) ("[M]inimal communication between the defendant and the plaintiff in the forum state, without more, will not subject the defendant to the jurisdiction of that state's court system."); See also Carteret Savings Bank, 954 F.2d 141, 149 (3d Cir. 1992) ("some minimal correspondence alone will not satisfy minimum contacts.")

Courts in this Circuit have dismissed cases for lack of personal jurisdiction even when the defendant had significantly greater contact with New Jersey than in the present case. See, e.g., BP Chems., Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 261 (3d Cir. 2000) (contract with local resident coupled with implementing correspondence was insufficient to find personal

jurisdiction despite prior agreement to arbitrate disputes in that forum); <u>Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.</u>, 75 F.3d 147 (3d Cir. 1996) (finding telephone calls and letters into forum state, in addition to contract with company in forum state, insufficient to find personal jurisdiction); <u>Telesis Mergers & Acquisitions, Inc. v. Atlis Federal Svcs., Inc.</u>, 918 F.Supp. 823, 832 (D.N.J. 1996) (rejecting personal jurisdiction over foreign corporation that had retained New Jersey plaintiff even though plaintiff was solicited by corporation in New Jersey and corporation knew that plaintiff would be performing agreement in New Jersey).

Conversely, those courts that have found personal jurisdiction in comparable contractual situations have only done so upon significantly greater contact with the forum state than that which existed in this case. In <u>Lebel</u>, 115 N.J. 317 (1989), for example, specific jurisdiction was established on the basis of two years of negotiations and over twenty phone calls with the New Jersey plaintiff. The foreign defendant allegedly "telephoned the buyer in New Jersey to iron out the details of the contract, mailed the contract to the buyer in New Jersey for signing in New Jersey, and received payment from the plaintiff, who defendant knew was a New Jersey resident." <u>Id.</u> at 324-25. Additionally, plaintiff's claim in <u>Lebel</u> stemmed directly from defendant's allegedly fraudulent communications into New Jersey. In contrast, in the case at bar, Goodmaster and Hopley assert that they did not know that Arzoomanian was a New Jersey resident, never sent anything into New Jersey and only telephoned there by happenstance. The suit in this case does not arise from fraudulent activity within the actual communications but from subsequent events in England.

The Court also finds instructive <u>Vetrotex Certainteed Corp.</u> in which the Third Circuit held that it lacked specific personal jurisdiction in the context of a contract with a foreign

defendant. The <u>Vetrotex</u> court reached its conclusion after distinguishing other cases in which courts have found jurisdiction. In those cases, either the defendant solicited the contract or initiated the business relationship leading up to the contract, the defendant sent payments to plaintiff in forum state, or the defendant engaged in extensive post-sale contacts in forum state. <u>Id.</u> at 152-53 (citations omitted). Similarly, the facts in the case at bar, whether related to Unilever, PLC or anyone allegedly acting on its behalf, do not fit within any of these situations.

Plaintiff relies on <u>Cook Assoc., Inc. v. Colonial Broach & Mach. Co.</u>, 304 N.E. 2d 27 (Ill.App. 1973) for support. In <u>Cook</u>, the court held that a single call into a forum state in which the caller entered into a contract was sufficient to find personal jurisdiction because the defendant should have known the contract would be performed in the forum state. First, the Court notes that the thirty-year old opinion of an Illinois state court does not carry dispositive weight in this forum. Furthermore, the continued validity of the holding in <u>Cook</u> has been called into doubt on numerous occasions. <u>See</u> <u>Weiser Group, Ltd. v. Arnett and Foster</u>, 1989 WL 84381, at *2, n.2 (N.D.Ill. July 18, 1989) (citing cases which "implicitly hold that <u>Cook v. Colonial</u> is dead when they state that mere phone calls are <u>per se</u> insufficient to constitute the transaction of business within Illinois even where plaintiffs are to perform in Illinois.") In any event, the case is easily distinguished on the facts. In <u>Cook</u>, it was clear that plaintiff, a private employment agency incorporated and doing business in Illinois, would be performing its services in Illinois and would be paid at its Illinois offices. 304 N.E. 2d at 31. In contrast, it was certainly not clear that Arzoomanian would be working out of New Jersey. Arzoomanian often worked out of an office in New York and had a meeting with Goodmaster in Connecticut. As already mentioned, there was no need for Arzoomanian to be working out of New Jersey when

attempting to find a telecommunications provider. Cook, therefore, does not affect the Court's decision in this case.

Overall, the "quality and nature" of defendant's activity in the forum state does not rise to level of minimum contacts necessary to find in personam jurisdiction. Max Daetwyler Corp. v. R. Meyer, 762 F.2d 290, 298 (3d Cir. 1985). Unilever PLC did not purposefully avail itself of the New Jersey forum in this case. As the relationship among Unilever PLC, the forum state, and the cause of action is too attenuated and fortuitous to establish jurisdiction, specific personal jurisdiction does not exist.[4] As this Court cannot assert either general or specific jurisdiction over Defendant Unilever PLC, its motion to dismiss for lack of personal jurisdiction is granted.[5]

---

[4]Because minimum contacts are not present, it is not necessary to proceed to the second prong of the personal jurisdiction test – whether asserting personal jurisdiction conforms to "traditional notions of fair play and substantial justice." Carlough v. Amchem Prods., Inc., 10 F.3d 189, 199 (3d Cir. 1993).

[5]Plaintiff makes an offhanded request for further jurisdictional discovery with respect to the corporate relationship between Unilever, PLC and Unilever Bestfoods. Courts will often grant jurisdictional discovery unless a plaintiff's claim is "clearly frivolous." Massachusetts School of Law at Andover, Inc. v. American Bar Ass'n, 107 F.3d 1026, 1042 (3d Cir. 1997). If a plaintiff presents factual allegations that suggest "with reasonable particularity" the possible existence of the requisite contact between the party and the forum state, plaintiff's right to conduct jurisdictional discovery should be sustained. Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 456 (3d Cir. 2003). Plaintiff has not provided any reason why it was unable to procure the information it needs, nor explained what information it wishes to discover, or how it would conduct such discovery. Therefore, his request is denied. This decision comports with the reluctance expressed in other courts to allow discovery over a foreign corporation based on vague allegations of jurisdiction. See, e.g. Jazini v. Nissan Mot. Co., 148 F.3d 181, 185-86 (2d Cir. 1998) ("We recognize that without discovery it may be extremely difficult . . . to make a prima facie showing of jurisdiction over a foreign corporation . . . . That, however, is the consequence of the problems inherent in attempting to sue a foreign corporation that has carefully structured its business so as to separate itself from the operation of its wholly-owned subsidiaries in the United States–as it properly may do.")

II. Forum Non Conveniens

Because Unilever PLC's motion to dismiss for lack of personal jurisdiction has been granted, its motion to dismiss under <u>forum</u> <u>non</u> <u>conveniens</u> needs not be addressed. However, Defendant British Telecommunications, PLC submits a motion to dismiss pursuant to the doctrine of <u>forum</u> <u>non</u> <u>conveniens</u>. For the reasons herein stated, the Court denies BTPLC's motion to dismiss under <u>forum</u> <u>non</u> <u>conveniens</u>.

The doctrine of <u>forum</u> <u>non</u> <u>conveniens</u> permits a court to dismiss an action "when an adequate alternative forum exists and when litigation in the chosen forum will cause 'oppression and vexation to the defendant out of all proportion to the plaintiff's convenience.'" <u>Burke v. Quartey</u>, 969 F.Supp. 921, 928 (D.N.J. 1997) (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. 235, 241 (1981)). It seeks to determine a proper forum that serves the interest of fair and efficient administration of justice but is not particularly inconvenient for defendant. The doctrine must be "sparingly applied" because its application "results in the dismissal of an action over which the court has jurisdiction and ordinarily would have a duty to resolve." <u>American Cyanamid Co. v. Picaso-Anstalt</u>, 741 F.Supp. 1150, 1155 (D.N.J. 1990) (citing <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. 501, 508 (1947)). In general, a court must give "substantial weight and deference" to a plaintiff's choice of forum, <u>Burke</u>, 969 F.Supp. at 928, especially when plaintiff resides in that forum, <u>Piper Aircraft</u>, 454 U.S. at 255-256. Yet, courts must keep in mind that a plaintiff's choice of forum expresses a preference and "not a right." <u>Ricoh Co., Ltd. v. Honeywell, Inc.</u>, 817 F. Supp. 473, 480 (D.N.J. 1993). The defendant has the burden of persuasion to show that the plaintiff's chosen forum is overwhelmingly oppressive and must establish a "strong preponderance in favor of dismissal." <u>Rodin Properties-Shore Mall, N.V. v. Cushman & Wakefield of Pa, Inc.</u>, 49

F.Supp.2d 709, 725 (D.N.J. 1999). See also Lacey v. Cessna Aircraft Co., 862 F.2d 38, 43-44

(3d Cir. 1988). Overall, "where Plaintiff resides in the forum state, if the private factors are at

equipoise, or are merely 'tipped' in favor of the defendant, the district court should retain

jurisdiction." Lony v. E.I. DuPont de Nemours & Co. 886 F.2d 628, 635 (3d Cir. 1989).

A forum non conveniens analysis requires the Court to make two determinations: (1)

whether an adequate alternative forum exists; and (2) whether a balancing of certain and private

and public interest factors points to a particular forum. Gulf Oil, 330 U.S. at 508. Defendant

BTPLC submits that the matter should be litigated in England instead of in New Jersey because

England is an adequate alternative forum for Plaintiff's action and because it satisfies the forum

non conveniens doctrine's private and public interest factors. Whereas England does provide an

adequate alternative forum to hear this dispute, the Court finds that an examination of the private

and public interest factors do not overcome the high level of deference afforded Plaintiff's

chosen forum.

A. Adequate Alternative Forum

To prove an adequate alternative forum, Defendant must establish that it is subject to

process in the foreign forum and that Plaintiff will be afforded the opportunity for appropriate

redress. Derensis v. Coopers & Lybrand Chartered Accountants, 930 F.Supp. 1003, 1006-07

(D.N.J. 1996). A forum does not become "inadequate" because it applies different laws or

provides different remedies, or even because it may lack certain causes of action and remedies

which exist in the original forum. DiRienzo v. Philip Servs., 232 F.3d 49, 57 (2d Cir. 2000). An

alternative forum is generally considered adequate as long as it "permits litigation of the subject

matter of the dispute, provides adequate procedural safeguards and the remedy available in the

alternative forum is not so inadequate as to amount to no remedy at all." Id.

There is no dispute that England would provide an adequate forum to decide

Arzoomanian's claims. Federal courts have routinely concluded that England is an adequate

forum for causes of action for breach of contract and tortious interference. See, e.g., Thomson

Information Servs., Inc. v. British Telecommunications, plc., 940 F.Supp. 20 (D.Mass. 1996);

Kultur Int'l Films Ltd. v. Covent Garden Pioneer, FSP., Ltd., 860 F.Supp. 1055, 1064-65

(D.N.J.1994); Banco Nominees Ltd. v. Iroquois Brands, Ltd., 748 F.Supp. 1070, 1073

(D.Del.1990). (See also Finkler Decl., ¶ 5.) The Court has no reason to doubt that the parties

would be treated fairly in England and have similar remedies available to them as they would in

this Court. As one court in this district has noted:

> English law provides mechanisms for determining consideration,
> assent and contract formation, and is equipped to handle the
> relevant questions of agency, authority, implied terms and oral
> agreements ... English law also provides for expectation or reliance
> damages ... [and] compensatory damages for, the tort of fraudulent
> misrepresentation in circumstances where the defendant knowingly
> or recklessly makes a false representation.

Kultur Int'l, 860 F.Supp. at 1064.

Overall, England can assert jurisdiction over the litigation, can litigate the causes of

action asserted in the Complaint, and can fairly adjudicate the matter. As the Court finds that

England provides an appropriate forum to hear this dispute, the Court must next consider which

forum is favored based on a weighing of the Gulf Oil public and private interest factors.

B. Private Interest Factors

The private interest factors that a court must consider to decide whether to dismiss a claim under the forum non conveniens doctrine include the:

1.  relative ease of access to sources of proof;
2.  availability of compulsory process for attendance of unwilling witnesses;
3.  costs of obtaining witnesses; and
4.  practical considerations that make the trial of a case easy, expeditious, and inexpensive.

Gulf Oil, 330 U.S. at 508.

Pursuant to Gulf Oil, the Court must first determine whether the relevant evidence is more accessible in New Jersey or in England. This analysis hinges upon what information the Court reasonably expects will be considered important at trial. Because no discovery has taken place, "in resolving a forum non conveniens motion, the district court must do no more than delineate the likely contours of the case by ascertaining, among other things, the nature of the plaintiff's action, the existence of any potential defenses, and the essential sources of proof." Lacey v. Cessna Aircraft Co., 932 F.2d 170, 181 (3d Cir. 1991). See also Van Cauwenberghe v. Biard, 486 U.S. 517, 528 (1988) (stating that a court must examine the "substance of the dispute between the parties to evaluate what proof is required, and determine whether the pieces of evidence cited by the parties are critical, or even relevant to, the plaintiff's cause of action and to any potential defenses in the action.")

Defendant's ability to present evidence is not so severely hindered by the continuance of this case in New Jersey so as to tip the scales in favor of dismissal. Important evidence will likely be located in both New Jersey and surrounding areas, where Plaintiff resides and conducts business, and also in England, where Defendant companies are located. Plaintiff asserts that

evidence in support of the existence of an oral agreement will come from offices and people in the United States. In addition to the documentary evidence present in New Jersey, Plaintiff refers to eleven critical witnesses who reside in New Jersey and the tri-state area. Because Arzoomanian works as an independent consultant, he would be forced to personally bear the cost of transporting these witnesses and documents to England, assisted only by a handful of support staff employees. (Arzoomanian Aff., ¶ 2, ¶ 11.)

In its attempts to disprove the existence of a contract with Arzoomanian and to prove that a telecommunications agreement arose independently between the British companies, BTPLC asserts that it must produce witnesses as well as voluminous evidence found in England. The geographical location of the witnesses should not be dispositive since the time and expense of bringing a foreign witness to the local forum are significantly reduced by modern technology, which facilitates long-distance communication and travel. Lehman v. Humphrey Cayman, Ltd., 713 F.2d 339, 343 (8th Cir. 1983). Moreover, "technological advances have minimized the burden of transporting documentary evidence." Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d 64, 75 (2d Cir. 2003). In addition, "there are no other considerations that would make bringing foreign documents to the U.S. inconvenient, such as requiring translation from a foreign language into English." Anglo American Ins. Group, P.L.C. v. KPMG Peat Marwick McLintock, 940 F.Supp. 554, 564 (S.D.N.Y. 1996). Although it may be costly to ship this information to New Jersey, the Court does not believe such transportation costs would be prohibitive, as BTPLC is a large corporation which is able to shoulder the financial burden of litigating outside its home forum. Defendant alleges that litigating abroad would require uprooting top executives from its British office and thereby causing great disruption to its business. However, as Plaintiff notes,

BTPLC has offices in the New Jersey area from which its witnesses may work.

Upon review of the available facts, the Court believes that the ease of access to sources of proof points slightly in Plaintiff's favor. At best, "[P]laintiff's inconvenience to litigate abroad is roughly equal to ... [D]efendant's inconvenience to litigate in New Jersey. The cost of litigation will be significant for each party, no matter which jurisdiction hears this case." Burke, 969 F.Supp. at 930 (quoting Kultur Int'l, 860 F.Supp. at 1066). Although adjudication abroad might be more convenient for the Defendant, it would not be "out of all proportion with the plaintiff's convenience." Piper, 454 U.S. at 241. For the same reasons, an examination of the third Gulf Oil private interest factor, which examines the costs of obtaining witnesses, provides no assistance to Defendant. Both parties enumerate witnesses present in their respective home forum, and the costs of obtaining them will not impose qualitatively different levels of financial burden on either party depending on the chosen forum.

Turning to the second Gulf Oil factor, Arzoomanian and BTPLC each contend that they have important witnesses in their forum who would be unavailable if the Court finds that the case should be adjudicated in the other party's preferred forum. The Third Circuit has recognized the difficulties that parties face when critical non-party witnesses are not willing to testify and are outside the reach of the court's compulsory process. Lacey II, 932 F.2d at 183. Moreover, the unavailability of a witness "threaten[s] 'serious unfairness' at any American trial." Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1356 (1st Cir. 1992). Presumably, Defendants themselves can compel the testimony of those witnesses which are employees of Unilever PLC and BTPLC. See e.g., In re Consolidated Parlodel Litig., 22 F.Supp.2d 320, 325 (D.N.J. 1998). The testimony of any other witnesses important to the defense can be obtained by the use of videotaped

depositions and letters rogatory. See, e.g., Lexington Ins. Co. v. Forrest, 263 F.Supp.2d 986,

1001 (E.D.Pa. 2003); In re Corel Corp. Inc. Sec. Litig., 147 F.Supp.2d 363, 366 (E.D.Pa. 2001).

See also DiRienzo v. Philip Services Corp., 294 F.3d 21, 30 (2d Cir. 2002) ("Despite the

preference for live testimony, we have recognized the availability of letters rogatory as relevant

in deciding whether plaintiffs' chosen forum is inconvenient.") The Court does not have the

same assurances that similar processes exist to compel testimony from Plaintiff's witnesses,

including three crucial witnesses, Maras, Landry and Peters, no longer employed by Defendants,

if the case were dismissed to another forum. Based on these considerations, it is evident that this

prong does not help Defendant overcome the high level of deference given Plaintiff's choice of

forum under the forum non conveniens doctrine. The fact that any New Jersey judgment may

eventually have to be enforced in England does not change the private interest balance. Unlike

the facts presented in Eaton Corp. v. Maslym Holding Co., 929 F.Supp.792 (D.N.J. 1996), a New

Jersey judgment is in fact enforceable in England. In light of the aforementioned discussion, the

Court sees no significant practical obstacles that favor dismissal under the forum non conveniens

doctrine.

C. Public Interest Factors

The Court must also examine the public interest factors set forth in Gulf Oil to determine

whether it should dismiss the action under forum non conveniens. These public interest factors

include the:

1.    administrative difficulties flowing from court congestion;
2.    interest in having local disputes resolved at home;
3.    interest in having a case tried in the district which is familiar with applicable laws;
4.    avoidance of unnecessary problems in conflicts of laws; and
5.    unfairness of imposing jury duty upon a community with no relationship to the

Page 35 of 40

litigation.

Gulf Oil, 330 U.S. at 508.

The first prong of the Gulf Oil test requires the Court to examine the level of court congestion in each forum. The Court does not believe that judicial congestion poses a considerable problem in either New Jersey or England. It is often difficult to make comparisons between international judicial systems where the underlying litigation process may fundamentally differ. See, e.g., Gibbons v. Udaras na Gaeltachtah, 549 F.Supp. 1094, 1122 (S.D.N.Y. 1982) (in forum non conveniens determination, refusing to compare level of court congestion in Ireland and the United States due to lack of information). The Court's independent research into the topic of court congestion indicates that in 2003, the median time interval in this District from the filing of a civil case to its final disposition was 7.9 months. FEDERAL COURT MANAGEMENT STATISTICS, *available at* http://www.uscourts.gov/cgi-bin/cmsd2003.pl. This duration does not seem unduly burdensome, and it is unlikely that an English court would resolve the case in a substantially shorter period. In addition, the Court has not been provided with any evidence to indicate that English courts are less congested than New Jersey courts or that Plaintiff's claim would reach the English courts substantially faster than in this Court. Consequently, this factor does not favor dismissal.

Second, the interest in having local disputes resolved at home tends to favor adjudication of the issue in New Jersey. In general, "public policy favors providing a forum in which United States citizens may seek to redress an alleged wrong." Derensis, 930 F.Supp. at 1011. Whereas England undoubtedly possesses a substantial interest in resolving a dispute involving two major British companies, New Jersey has an equally strong interest in protecting its citizens. See Piper

Aircraft, 454 U.S. at 255-256. Particularly with respect to breach of contract actions like that in

the instant case, New Jersey has "an interest in providing a forum for its residents with respect to

contractual obligations of parties who contract with New Jersey residents." Mediterranean Golf,

Inc. v. Hirsh, 783 F.Supp. 835, 850 (D.N.J. 1991) (quoting Koff v. Brighton Pharmaceutical,

Inc., 709 F.Supp. 520, 528 (D.N.J.1988)). Confronted with similar arguments to those made by

the present litigants, in Kultur Int'l the court stated that "England certainly has an interest in

ensuring that its corporations are not engaged in wrongful business practices ... Yet this interest

does not significantly override New Jersey's interest in providing a forum for its residents who

fall victim to the wrongful activities of nonresident corporations entering the state." 860 F.Supp.

at 1068. The Court agrees and will not deprive an American citizen the opportunity to sue for

alleged injuries in a federal forum so as to accommodate the interests of foreign parties that are

of no greater consequence.

The Court must also assess the interest in adjudicating the case in a forum that is familiar

with applicable laws and in avoiding any conflicts of law problem. Such an appraisal is

accomplished because an "action generally should be tried in a district familiar with the law

governing the case," Gulf Oil, 330 U.S. at 508, and to "to help courts avoid conducting complex

exercises in comparative law," Piper, 454 U.S. at 251.

It would be premature to make a definitive choice of law determination before the

underlying facts in this case have been fleshed out through discovery. See e.g., Telephone

Systems Int'l, Inc. v. Network Telecom PLC, 303 F.Supp.2d 377, 384 (S.D.N.Y. 2003) (finding

that it was too early in the litigation to determine the choice of law). However, a court should

assess generally "the impact of choice of law problems on the forum, particularly [because] the

need to apply foreign law points toward dismissal." Lacey I, 862 F.2d at 48.  In a case where

jurisdiction is based upon diversity of citizenship, a district court is required to utilize the choice

of law regime of the forum state to determine the applicable substantive law.  Klaxon v. Stentor

Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Shuder v. McDonald's Corp., 859 F.2d 266, 269 (3d

Cir.1988).  Therefore, if not dismissed due to forum non conveniens, the Court will applying

New Jersey choice of law principles to the instant case.

  Although neither party has fully briefed this issue, the Court expects that in all likelihood,

the litigation of this case will require the resolution of potentially complicated choice of law

questions.  Assuming there is an actual conflict between the applicable laws of potential fora, the

Court will have to apply New Jersey's "governmental interest test."  Under this test, the Court

must first identify the policies underlying the laws of each interested jurisdiction, and then

consider the contacts that each jurisdiction has with the parties. The determinative law is that of

the state with the greatest interest in governing the particular issues.  Henry v.

Richardson-Merrell, Inc., 508 F.2d 28, 30 (3d Cir. 1975); Ahlert v. Hasbro, Inc., 2004 WL

1588149, *2 (D.N.J. July 15, 2004).  The present dispute involves activity in Connecticut and

New York, as well as in New Jersey and England and a choice of law analysis could implicate

the laws of any of them.  The importance of these locations varies with the facts underlying each

of Plaintiff's claims.  The ultimate answers to these choice of law questions, however, remains

for another day.  Plaintiff does not, however, explain why the choice of law determination would

be made any easier by having this case brought in England.  The Court reminds the parties that

the focus of forum non conveniens doctrine is to avoid unnecessary conflict of law problems, and

not simply to pass off necessary ones to a different location.  See, e.g., Bank of Crete, S.A. v.

Page 38 of 40

Koskotas, 1991 WL 280714, *4 (S.D.N.Y., Dec. 20, 1991) (noting that choice of law problems that would arise in foreign court results in favoring neither forum).

Accepting Plaintiff's contentions as true, it is probable that an interpretation of familiar New Jersey law will play a substantial role in subsequent litigation. To the extent that British law may apply to aspects of this case, the application of foreign law would not require this Court to grant Defendant's motion to dismiss. The need to apply foreign law alone does not warrant dismissal. Kultur Int'l, 860 F.Supp. at 1069. See Hoffman v. Goberman, 420 F.2d 423, 427 (3d Cir. 1970) ("It is settled that the mere fact that the court is called upon to determine and apply foreign law does not present a legal problem of the sort which would justify the dismissal of a case otherwise properly before the court.") The Court is confident that should English law be applicable, the Court would not encounter significant difficulties, considering the shared common law heritage between the United States and England and the fact that no language translation is required. Moreover, no English statutes are involved in this case which may require greater local expertise. Finally, the Court does not believe that the continuance of this case in New Jersey would result in imposing a jury duty burden on "the people of a community which has no relation to the litigation." Gulf Oil 330 U.S. at 508-9. As discussed, the citizens of New Jersey have an interest in protecting the rights of a fellow resident whose rights have been allegedly violated.

Upon application of the Gulf Oil factors to the facts of this case, the Court denies BTPLC's motion to dismiss for forum non conveniens. BTPLC's arguments in support of dismissal, though not insubstantial, do not overcome the considerable deference given to Plaintiff's choice of forum. Although certain Gulf Oil factors suggest that litigation in England

would be more convenient for Defendant, these factors are not "out of all proportion with the plaintiff's convenience." Piper, 454 U.S. at 241.

Overall, this Court holds that it has no basis on which to assert jurisdiction over Unilever PLC. Additionally, this Court holds that dismissal under forum non conveniens is inappropriate.

## CONCLUSION

For the reasons set forth above, it is on this 17th day of Aug, 2004,

**ORDERED** that Defendant Unilever PLC's motion to dismiss this action for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) is hereby GRANTED.

**ORDERED** that Defendant BTPLC's motion to dismiss this action under the doctrine of forum non conveniens is hereby DENIED.

It is so ordered.

DATED: Aug 17th, 2004

_____
JOSE L. LINARES
UNITED STATES DISTRICT JUDGE

Copy: Hon. Ronald D. Hedges, U.S.M.J.