**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| COMMERCIAL STREET EXPRESS LLC, NICOLE VANDER MUELEN, SHASTA BURZYNSKI, KATHLEEN COULLARD on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) | No. 08 C 1179 |
|  | ) | JUDGE KENDALL |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| SARA LEE CORPORATION, COLGATE-PALMOLIVE COMPANY, HENKEL CHEMIE VERWALTUNGSGESELLSCHAFT MBH, HENKEL CORP., UNILEVER N.V., UNILEVER PLC, UNILEVER UNITED STATES INC. | ) ) ) ) ) ) ) |  |

**PLAINTIFFS' RESPONSE TO UNILEVER PLC**
**AND UNILEVER NV'S MOTIONS TO DISMISS**

Plaintiffs have alleged that Unilever PLC and Unilever NV intentionally violated the antitrust laws of the United States by agreeing to fix the prices of products sold in the United States. Plaintiffs have not alleged that they should recover because of a conspiracy to fix prices in Germany, but rather they should recover because of a conspiracy to fix the prices we all pay here in Chicago and throughout the United States.

Unilever PLC and Unilever NV have submitted substantially identical affidavits from one of their lawyers in Britain which state in wholly conclusory fashion, without citation to any admissible fact, that Unilever NV and Unilever PLC do nothing to control the business of Unilever United States. This lawyer also fails to cite the basis for this "knowledge," which

almost certainly is based on hearsay, and even may constitute an expert opinion which is being given without any qualifications.

The self-serving statements in these inadmissible affidavits contradict statements found on Unilever's own website.  Despite the form over substance separation into two parents, Unilever is in fact run as a single highly integrated multinational entity.  Unilever PLC and Unilever NV are required to have identical boards of directors, and are the sole shareholders of Unilever United States.  The single Unilever website (unilever.com) is shared between all the Unilever entities at issue here and does nothing to identify that Unilever United States has any different board of directors than Unilever NV or Unilever PLC.

Unilever PLC and Unilever NV have simply failed to raise sufficient admissible facts through those affidavits to contradict the allegations of personal jurisdiction found in Plaintiffs' complaint.  However, if the Court disagrees, Plaintiffs request that the Court lift the discovery stay which it imposed on May 13, 2008, before either of these motions were filed, so that Plaintiffs can be given a chance to probe the factual assertions made in these affidavits.

## Facts

Unilever NV and Unilever PLC dominate the business affairs of Unilever United States. They do not treat it as a wholly independent corporation, but rather as a division of a single corporate entity, the Unilever Group.  Unilever's 2007 Annual Report of Unilever, a copy of which is attached as Exhibit 1, makes this clear:

- " The two parent companies, NV and PLC, together with their group companies, operate as a <u>single economic entity</u> (the Unilever Group, also referred to as Unilever or the Group)."  P. 1.

- "NV and PLC and their group companies constitute a <u>single</u> reporting entity for the purposes of presenting consolidated accounts." P.1.

2

- "We will bring our wealth of knowledge and international expertise to the service of local consumers – a truly multi-local multinational." P. 2

- "Corporate governance in Unilever has undergone radical change in the period since 2004." P. 3.

- "In Europe we achieved growth . . . The benefits of all the structural changes we have made in this region over the past three years are now coming . . . " P. 4.

- "In 2007 we focused on bigger innovations and rolled them out faster around the world. *Clear*, a shampoo . . . , was launched simultaneously in several countries . . ." P. 4

- "Our One Unilever operating model is being implemented in every major country. We are now taking this a step further with the creation of new multi-country organizations – clusters of neighboring countries with one central management structure . . ." P. 4

- ". . . we have reorganized the business to simplify the organization and management structure and to improve capabilities in marketing, customer management, and research and development. The result is better allocation of resources, faster decision-making and a lower cost level. This transformation, known as the One Unilever programme, allows us to leverage our scale both globally and locally." P. 6.

- "These plans [restructuring plans] aim to deliver a reduction in our annual cost base . . . through the creation of multi-country organizations (MCOs), the closure or streamlining of 50-60 factories, and a further reduction in regional and global overheads." P. 6.

- "Two category teams – Foods and Home and Personal Care – are responsible for the development of category and brand strategies, the development of brand communication, and the delivery of relevant innovation." P. 8.

- "Five functional teams – Finance, HR, IT, Communications and Legal – are responsible for providing value-added business partnering, strategic support and competitive services to the whole business." P. 8.

- "In 2006 the French competition authorities commenced an inquiry into potential competition law infringements in France involving a number of consumer goods companies in the home and personal care sector, including Unilever France and Lever Faberge France, both subsidiaries of the Unilever Group. . . [T]he potential financial implications, if any, of this investigation cannot yet be assessed. . ." P. 1

- "On 14 March 2007 representatives from the German Federal Cartel Office carried out an inspection at the offices of Unilever Deutschland GmbH in Hamburg. The inspection was in relation to the home and personal care market in Germany. Statements of

objections have been received by and <u>fines have been imposed</u> on Unilever Deutschland, which currently intends to defend its position by way of appeal."  P. 11.

- "Our ambitions for our brands are underpinned by our Mission and Corporate Purpose and our Code of Business Principles.  These encapsulate the values and standards by which we expect our employees and our business to be judged.  We communicate <u>and monitor these standards actively</u> and any lapses are fully investigated.  In 2007 we dismissed 54 people for conduct that breached our Code of Business Principles."  P. 12.

- "The continuing restructuring of the business which is designed to simplify our operations and leverage our scale more effectively, includes . . . forming multi-country organizations and <u>converging regional processes and systems</u>."  P. 14.

- "Key to this is the establishment and maintenance of project management processes <u>to monitor progress</u> against milestones and targets together with appropriate communication programmes."  P. 14.

- "We faced significant increases in the cost of various commodities . . . We have been able to substantially mitigate these through a combination of price increases, supply chain savings and mix improvements."  P. 14.

- "Unilever N.V. and Unilever PLC are the two parent companies of the Unilever Group.  Together with the group companies, NV and PLC operate effectively as a <u>single economic entity</u>.  This is achieved by a series of agreements between NV and PLC . . . together with special provisions in the Articles of Association of NV and PLC.  NV and PLC have the same Directors and adopt the same accounting principles.  Shareholders of both companies receive dividends on an equalized basis.  NV and PLC and their group companies constitute <u>a single reporting entity</u> for the purposes of presenting consolidated accounts.  Accordingly, the accounts of the Unilever Group are presented by both NV and PLC as their respective consolidated accounts."  P. 33.

- "NV and PLC have agreed to co-operate in all areas <u>and ensure that all group companies act accordingly</u>.  NV and PLC are holding <u>and service companies</u>, and the business activity of Unilever is carried out by their subsidiaries around the world.  Shares in group companies may ultimately be held wholly by either NV or PLC, or jointly by the two companies, in varying proportions."  P. 33.

- "The Boards of NV and PLC comprise the same Directors and have the same Chairman.  This ensures <u>unity of governance and management</u> by ensuring that all matters are considered by the Boards as a single intellect. . . "  P. 33.

- "The Boards have ultimate responsibility <u>for the management</u>, general affairs, direction and performance <u>of the business as a whole</u>."  P. 33.

- "The Group Chief Executive has the authority to determine which duties regarding <u>operational management of the companies and their business enterprises will be carried out</u> under his responsibility <u>by one or more Executive Directors</u> or by one or more other persons.  This provides a basis for the Unilever Executive team (UEx) that is chaired by and reports to the Group Chief Executive."  P. 35.  "All Executive Directors are members of the UEx."  P. 35.  "The Executive Directors are full-time employees of Unilever."  P. 35.

- "The Deed of Mutual Covenants provides that <u>NV and PLC and their respective subsidiary companies shall co-operate in every way for the purpose of maintaining a common operating policy</u>.  They shall exchange all relevant information about their respective businesses – the intention being to create and maintain <u>a common operating platform</u> for the Unilever Group throughout the world.  . . . These provisions also allow <u>assets to be transferred between NV and PLC and their associated companies</u> . . . to ensure that assets are allocated in the most efficient manner."  P. 41.

- "Under the Agreement for Mutual Guarantees of Borrowing between NV and PLC, each company will . . . guarantee the borrowings of the other.  The two companies can also agree jointly to <u>guarantee the borrowings of their subsidiaries</u>.  These arrangements are used, as a matter of financial policy, for certain significant public borrowings.  They enable lenders to rely on our combined financial strength."  P. 41

- "We calculate earnings per share on a combined basis.  The calculation is based on the average amount of NV's and PLC's ordinary share capital in issue during the year.  In our combined earnings per share calculation, we assume that both companies will be able to pay their dividends out of their part of our profits.  This has always been the case in the past, but if we did have to make <u>a payment from one to the other</u> it could result in additional taxes, and reduce our combined earnings per share."  P. 41.

- "Both NV and PLC are listed on the New York Stock Exchange. . ."  P. 45.

- "Group companies included in the consolidation are those companies controlled by NV and PLC.  Control exists when the Group has the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities."  P. 72.

- "The companies listed below and on page 126 are those which, in the opinion of the Directors, principally affect the amount of profit and assets shown in the Unilever Group accounts."  The list includes Unilever United States, Inc. which is owned 56% by NV and 44% by PLC.  P. 125-6.

5

These themes are reinforced in the Annual Review 2007 for Unilever Group which is obtained from the Unilever.com website and attached as Exhibit 2. It describes the structure and governance of the Unilever Group as follows:

- "Corporate governance in Unilever has undergone radical change in the period since 2004." P. 6.

- "Unilever N.V. (NV) and Unilever PLC (PLC) are the two parent companies of the Unilever Group . . . However, together with their group companies, they operate effectively as a single economic entity and constitute a single reporting entity for the purposes of presenting consolidated accounts." P. 28.

- "Unilever's Directors are Directors of both NV and PLC. Taking into account their respective roles as Executive and Non-Executive Directors, collectively they are ultimately responsible for the management, general affairs, direction and performance of the business as a whole." P. 29.

Similarly, the corporate governance webpage on Unilever's website (http://www.unilever.com/ourcompany/investorcentre/corp_governance/) and attached as Exhibit 3 describes the structure and governance of the Unilever Group as follows:

- "NV and PLC together with their group companies operate effectively as a single economic entity. This is achieved by a series of agreements between NV and PLC (the foundation agreements, see below), together with special provisions in the articles of association of NV and PLC. NV and PLC have the same directors, adapt the same accounting principles, and their shareholders receive dividends on an equalised basis."

The Articles of Association of NV, posted on Unilever's website at http://unilever.com/Images/ir_Articles-of-Association-NV, and attached hereto as Exhibit 4, state:

- "Article 2. The objects for which the Company is established are to acquire interests in companies and business enterprises and to manage and finance companies and business enterprises regardless of whether these are group companies and to do all things which, directly or indirectly, may be deemed to be incidental or conducive thereto in the widest sense, including especially the carrying out of an agreement between the Company [NV] and [PLC]." P. 3.

6

The 2006 Annual Report of Unilever Group, posted at http://unilever.com/Images/ir_06_annual_review, and attached as Exhibit 5, describes the corporate governance as follows:

- "I would like to remind you that the dual structure refers to the legal framework of Unilever. When it comes to the day-to-day management of Unilever's operations the Group is run on the principle of one operating unit and as such the vast majority of employees are, quite properly, unaware of our legal structure."  P. 4.

On May 8, 2008, the Chief Financial Officer of the Unilever Group, Jim Lawrence, held a teleconference with securities analysts.  A copy of the written transcript from the teleconference is attached as Exhibit 6.  The following statements discussing the consolidated financials for the first quarter of 2008 demonstrate that the CFO considers that NV, PLC and all of their joint subsidiaries around the world are operated as one entity:

- "*We* are executing our strategy…"

- "*We* continue to invest behind our brands, whilst taking determined pricing action to recover sharply higher commodity costs.  Pricing is up across all regions and categories."

- "*We* have a strong innovation programme for 2008, with many initiatives already in the market."

- "The pricing action we are taking to recover commodity cost increases is essential to protect margins and to ensure that we can continue to invest behind our brands for long-term growth."

- "The Americas region grew by over 6% in the quarter, again mostly price.  The US grew by nearly 5% with good performances across most major categories."

- "*We* have a strong programme of new launches and renovations"

- "*We* also launched Hellmann's olive oil mayonnaise in North America."

- "*Our Personal Care innovation programme* was front-loaded in 2007, driven by major initiatives such as Dove ProAge and Clear shampoo."

- "*We* are completely renovating the core moisturising range with new products, packaging and communication."

- "*We* have launched a revolutionary 'upside down' deodorant roll-on"

- "*We* are executing our plans successfully – innovation, pricing, productivity improvement; portfolio development."

- "*We* continue to keep a close eye on our market competitiveness, remembering our business priorities:

    1st – to grow at least in line with our markets

    2nd – to improve margins

    3rd – to selectively invest for market share gain, where the return on investment is attractive."

Mr. Lawrence's admissions indicate that Unilever's programmes and initiatives in every region of the world are executed from the top down. As the above quotes indicate, the management of NV and PLC actively plans and executes the Group's initiatives, new launches, innovations, packaging, prices, margins, etc.

Mr. Lawrence's description of the Group's activities hardly supports the assertions of Mr. Williams in his Declaration of May 12, 2008 that PLC "operates solely as a holding company." Mr. Williams' implication that PLC is a mere passive recipient of dividends generated by independently operated subsidiaries around the world is disingenuous.

The corporate structure of NV and PLC is that they are one organic entity along with all of their group companies. They are both listed on the New York Stock Exchange. They have identical boards of directors. They have a Deed of Mutual Covenants that provides that NV, PLC and their respective subsidiaries shall co-operate in every way for the purpose of maintaining a common operating policy. They prepare consolidated financial statements that cover both corporations and all of the group companies. They equalize all dividends. They transfer assets between companies within the group for efficient allocation of resources. They

guarantee the borrowings of all companies within the group. They calculate earnings per share on a combined basis. NV and PLC together own 100% of most of the group companies. Unilever United States, Inc., for example, is owned 56% by NV and 44% by PLC. As Unilever itself admits, "when it comes to the day-to-day management of Unilever's operations the Group is run on the principle of one operating unit and as such the vast majority of employees are . . . unaware of our legal structure."

## Argument

### I. The Affidavits Should Be Disregarded

The self-serving affidavits submitted by Stephen Williams in support of Unilever NV and Unilever PLC's motions are inadequate to rebut the allegations of the complaint because they fail to demonstrate the basis for the affiant's knowledge, and are wholly conclusory in a number of their key allegations. Moreover, they are contradicted by the documents which are posted on the single Unilever website, which have been cited above. As a result, they cannot be relied upon, and should be stricken.

Although the affiant is a lawyer, he makes assertions about technical details of the day-to-day working relationships and operations of what he claims to be wholly independent companies. He works for two of these companies, and supposedly does not work for the third one of them, yet is making assertions about how the third one is run and conducts its business. Indeed, that third company is on a separate continent from this lawyer.

There is no assertion that the affidavit is based on personal knowledge. Even if the statements in the affidavit were true, which Plaintiffs believe they are not, those statements are almost certainly based on hearsay because how else could Mr. Williams opine as to how an "independent" company on a separate continent conducts its business.

The federal courts do not give any weight to wholly conclusory assertions in affidavits:

> "Where, as here, the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction *unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction*."

*Purdue Research Foundation v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 783 n. 13 (7th Cir. 2003) (*quoting Meier ex rel. Meier v. Sun Internal Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002); emphasis added). *Accord*, *Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 199 Fed. Appx. 738, 741 (11th Cir. 2006). *See Arnold v. Morton Internal, Inc.*, 2000 WL 1007176, *4 (S.D. Ind. July 19, 2000). As a result, the statements in the affidavits regarding the "independence" of Unilever United States should be disregarded.

## II. This Court Has Jurisdiction Over Defendants

This Court has jurisdiction over the Defendants for two separate but individually adequate reasons: 1) they committed an intentional violation of the antitrust laws in this country; and 2) they conduct business in this country.

### A. Defendants Intentionally Violated The Sherman Act

Committing an intentional violation of the antitrust laws aimed at fixing prices of goods sold in this country gives the courts of this country specific jurisdiction over a defendant, even when the defendant acted wholly from abroad:

> [I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States. See *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 582, n. 6, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*; *United States v. Aluminum Co. of America, 148 F.2d 416, 444 (CA2 1945)* (L. Hand, J.); *Restatement (Third) of Foreign Relations Law of the United States § 415*, and Reporters' Note 3 (1987) (hereinafter Restatement (Third) Foreign Relations Law); 1 P. Areeda & D. Turner, Antitrust Law P236 (1978); cf. *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 704, 8 L. Ed. 2d 777, 82 S. Ct. 1404 (1962)*; *Steele v. Bulova Watch Co., 344 U.S. 280, 288, 97 L. Ed. 319, 73*

> *S. Ct. 252 (1952)*; *United States v. Sisal Sales Corp., 274 U.S. 268, 275-276, 71 L. Ed. 1042, 47 S. Ct. 592 (1927)*. Such is the conduct alleged here: that the London reinsurers engaged in unlawful conspiracies to affect the market for insurance in the United States and that their conduct in fact produced substantial effect. See *938 F.2d at 933*.

*Hartford Fire Insurance Co. v. California*, 509 U.S. 764, 796 (1993) (footnotes omitted). Moreover, constitutional standards of due process, as well as the Illinois long arm statute, allow this Court to have specific personal jurisdiction over a defendant which has acted from abroad to commit a tortious act within the jurisdiction. *Honeywell, Inc. v. Metz Apparatewerke*, 509 F.2d 1137 (7th Cir. 1975). As Judge Alesia stated:

> With regard to minimum contacts, courts have recognized that " 'one who commits tortious acts against an Illinois business should reasonably anticipate being haled into court there.' " Digital Merch. Sys., Inc. v. Oglesby, No. 98 C 8003, 1999 WL 1101769, at *3 (N.D. Ill. Nov. 30, 1999) (quoting Telular Corp. v. Vitech Am., Inc., No. 96 C 4749, 1996 WL 616590, at *2 (N.D.Ill. Oct. 21, 1996)). "Therefore, '[a]llegations of tortious conduct directed at an Illinois business ... establish the minimum contacts necessary under the federal due process clause.' " Id. (quoting Telular Corp., 1996 WL 616590, at *2). Further, "the state in which the injury (and therefore the tort) occurs may require the wrongdoer to answer for its deeds even if events were put in train outside its borders." Janmark, Inc. v. Reidy, 132 F.3d 1200, 1202 (7th Cir.1997). Thus, even where all other conduct takes place elsewhere, jurisdiction is proper if the injury transpires in Illinois. Celozzi v. Boot, No. 00 C 3285, 2000 WL 1141568, at *3 (N.D.Ill.2000) (citing Stein v. Rio Parismina Lodge, 296 Ill.App.3d 520, 231 Ill.Dec. 1, 695 N.E.2d 518, 523 (1998)). But, where the injury is economic, the plaintiff must additionally demonstrate an intent to affect an Illinois interest. Id. (citing Arthur Young & Co. v. Bremer, 197 Ill.App.3d 30, 143 Ill.Dec. 736, 554 N.E.2d 671, 676 (1990)).

*Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.*, 262 F.Supp.2d 898, 910 (N.D. Ill. 2003).

Plaintiffs have alleged that Unilever NV and Unilever PLC conspired to fix the prices at which consumer goods are sold in this country and district, and those allegations clearly would confer jurisdiction on this Court. Yet nowhere in the affidavits submitted by defendants does

anyone state, even in a conclusory fashion, that the Unilevers did not agree to fix prices in the United States. At most, defendants can argue that their conclusory statements implied this. Implications from inadmissible conclusions clearly cannot shift the burden onto Plaintiffs. The Court should find that specific jurisdiction exists over the Defendants.

### B. Defendants Conducted Business Here

The statements on the single shared Unilever website establish that Unilever PLC and NV, which operate as a single corporation through their single board of directors, direct the business activities of Unilever United States. Many of Unilever United States' brands, including many of the brands at issue here, are sold throughout the world by other Unilever entities.

In *Chrysler Corp. v. General Motors Corp.*, 589 F. Supp. 1182 (D.D.C. 1984), the court found that Toyota USA's parent in Japan was subject to personal jurisdiction in an antitrust suit because its relationship with its American subsidiary was sufficient to conclude that it was conducting business in the District of Columbia. As the court explained,

> A control relationship has been found if the parent is transacting business through its subsidiary. *Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519, 529-30 (S.D.N.Y.1972). For example, a Japanese corporation and its American subsidiary were held to be a single entity for venue and jurisdiction purposes where they shared employees, presented a common image to the world through their advertising and the subsidiary was part of an integrated system of manufacture and sale. *Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co.,* 499 F.Supp. 829 (D.Oregon 1980).

598 F. Supp. at 1200. Similarly, in *In re Vitamins Antitrust Litigation*, 270 F.Supp.2d 15, 21 (D.D.C. 2003), the court used the following factors:

> (1) whether the subsidiary performs 'business activities in a district, for example, sales and servicings, that in a less elaborate corporate scheme the absent corporation would perform directly by its own branch offices or agents'; (2) whether the subsidiary and its parent are partners in 'world-wide business competition'; (3) whether the parent has the capacity 'to influence decisions of the subsidiary or affiliate that might have antitrust consequences,' e.g., '[c]ontrolling

stock ownership and interlocking directorates'; (4) 'the part that the subsidiary or affiliated corporation plays in the over-all business activity of the absent corporation'; (5) 'the existence of an integrated sales system involving manufacturing, trading, and sales corporations'; (6) '[t]he transfer of personnel back and forth between the absent corporation and its subsidiary'; (7) 'the presentation of a common marketing image by the related corporations ... [ (]especially true when those corporations hold themselves out to the public as a single entity that is conveniently departmentalized either nationally or worldwide[) ]'; (8) 'the granting of an exclusive distributorship by the absent corporation to its subsidiary or affiliate'; (9) 'whether the subsidiary pays cash for products sold or services rendered to it by the parent'; and (10) 'whether separate books, bank accounts, tax returns, financial statements and the like are kept.'

270 F.Supp.2d at 21 (*quoting Chrysler*, 589 F. Supp. at 1200-01).

These factors are present here. The Unilevers use common brands and trademarks throughout the world in order to portray them and their subsidiaries, such as Unilever United States, as a single economic entity.

### III.  **Plaintiffs Need Discovery**

Plaintiffs believe that Unilever NV and Unilever PLC's affidavits simply are not sufficient to require them to submit additional facts in support of their allegations that this Court has personal jurisdiction over Defendants. However, if the Court believes that these affidavits are not insufficient on their face, the Plaintiffs request that they be given leave to conduct discovery on this issue.

The Court stayed discovery in this case at the request of the then-defendants on May 13, 2008. The instant motions to dismiss on personal jurisdiction grounds had not been filed then, and Plaintiffs did not know they were coming. However, the attorneys that did file these motions were already arguing on behalf of Unilever United States that discovery should be stayed. Joint Initial Status Report filed May 1, 2008, at 4 (Docket No. 67).

While Plaintiffs believe that there are good reasons to throw out the Williams affidavits *in toto*, should the Court disagree, Plaintiffs believe that they should be given leave to conduct discovery concerning them and all of the facts concerning personal jurisdiction in this case. The statements in the Williams affidavits plainly contradict the statements Unilever has chosen to post on its own website, statements which are meant to be relied upon by its investors, its employees, and the worldwide public. If The Court is going to give any credence to Mr. Williams' self-serving affidavits, Plaintiffs should be given a chance to take discovery and cross examine Mr. Williams.

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions to dismiss filed by Unilever NV and Unilever PLC. In the alternative, Plaintiffs request that the Court lift the discovery stay and allow them to take discovery in order to further establish this Court's jurisdiction over Unilever NV and Unilever PLC.

Dated: June 23, 2008

Respectfully submitted,
Plaintiffs

By: s/*Matthew E. Van Tine*
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400

        Guri Ademi
        Shpetim Ademi
        David J. Syrios
        Corey M. Mather
        **ADEMI & O'REILLY, LLP**
        3620 E. Layton
        Cudahy, WI 53110
        (414) 482-8000

15

**CERTIFICATE OF SERVICE BY ELECTRONIC MEANS**

I, Matthew E. Van Tine, one of the attorneys for plaintiffs, hereby certify that on June 23, 2008 service of the foregoing ***Plaintiffs' Response To Unilever PLC and Unilever NV's Motions To Dismiss*** was accomplished pursuant to ECF as to Filing Users and I shall comply with LR 5.5 as to any party who is not a Filing User or represented by a Filing User.

      */s  Matthew E. Van Tine*
      Matthew E. Van Tine