**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMERCIAL STREET EXPRESS LLC, NICOLE VANDER MUELEN, SHASTA BURZYNSKI, KATHLEEN COULLARD on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SARA LEE CORPORATION, COLGATE-PALMOLIVE COMPANY, HENKEL CHEMIE VERWALTUNGSGESELLSCHAFT MBH, HENKEL CORP., UNILEVER N.V., UNILEVER PLC, UNILEVER UNITED STATES INC. | No. 08 C 1179 <br><br> JUDGE KENDALL |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE
*INSTANTER* A BRIEF IN EXCESS OF 15 PAGES**

Plaintiffs respectfully move this Court for leave to file *instanter* a single 23-page brief in opposition to the motions to dismiss filed by Defendants Sara Lee, Henkel, and Colgate-Palmolive. In support thereof, Plaintiffs state as follows:

1.    Defendant Sara Lee filed a 14-page brief in support of its motion to dismiss.

2.    Defendants Henkel and Colgate-Palmolive filed a combined 14-page brief in support of their motion to dismiss.

3.    Because there was some overlap in the arguments made in the two memoranda, Plaintiffs decided to file a single memorandum in opposition to the two motions.

4.      However, because the briefs did not make identical arguments, Plaintiffs were not able to keep their memorandum within the 15-page limit.

5.      Plaintiffs have kept their memorandum as concise as possible without compromising the arguments and analyses that are necessary to thoroughly address the important issues before the Court.   Therefore, in order to fully and adequately address the issues, the Plaintiffs request 23 pages – 8 pages over the page limit set forth in Local Rule 7.1.

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court grant them leave to file *instanter* the 23-page Plaintiffs' Response to Sara Lee, Colgate, and Henkel's Motions to Dismiss, attached hereto as Exhibit A.

.

Dated: June 23, 2008                                Respectfully submitted,
                                                    Plaintiffs


                                                    By:    */s/  Matthew E. Van Tine*
                                                    Marvin A. Miller
                                                    Lori A. Fanning
                                                    Matthew E. Van Tine
                                                    **MILLER LAW LLC**
                                                    115 South LaSalle Street, Suite 2910
                                                    Chicago, IL 60603
                                                    (312) 332-3400

                                                    Guri Ademi
                                                    Shpetim Ademi
                                                    David J. Syrios
                                                    Corey M. Mather
                                                    **ADEMI & O'REILLY, LLP**
                                                    3620 E. Layton
                                                    Cudahy, WI  53110
                                                    (414) 482-8000

2

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COMMERCIAL STREET EXPRESS LLC, NICOLE VANDER MUELEN, SHASTA BURZYNSKI, KATHLEEN COULLARD on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | No. 08 C 1179 JUDGE KENDALL |
| Plaintiffs, | ) ) | |
| v. | ) | |
| SARA LEE CORPORATION, COLGATE-PALMOLIVE COMPANY, HENKEL CHEMIE VERWALTUNGSGESELLSCHAFT MBH, HENKEL CORP., UNILEVER N.V., UNILEVER PLC, UNILEVER UNITED STATES INC. | ) ) ) ) ) ) ) ) | |

**PLAINTIFFS' RESPONSE TO SARA LEE,
<u>COLGATE, AND HENKEL'S MOTIONS TO DISMISS</u>**

Marvin A. Miller
Lori A. Fanning
Matthew E. Van Tine
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400

Guri Ademi
Shpetim Ademi
David J. Syrios
Corey M. Mather
**ADEMI & O'REILLY, LLP**
3620 E. Layton
Cudahy, WI  53110
(414) 482-8000

## TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

INTRODUCTION ............................................................................................................1

ALLEGATIONS OF THE COMPLAINT...........................................................................2

    The Parties ................................................................................................................2

    The Conspiracy .........................................................................................................4

ARGUMENT ..................................................................................................................11

I.   THE COMPLAINT ADEQUATELY STATES CLAIMS UPON WHICH
     RELIEF MAY BE GRANTED ................................................................................11

II.  THIS COURT HAS SUBJECT MATTER JURISDICTION FOR SHERMAN
     ACT VIOLATIONS THAT AFFECT PRICES IN THE UNITED STATES...............16

III. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF........................18

IV.  PLAINTIFFS' STATE LAW CLAIMS SHOULD NOT BE DISMISSED.................19

       A.     PLAINTIFFS DO NOT NEED A REPRESENTATIVE
             FROM EACH STATE.......................................................................19

       B.     PLAINTIFFS HAVE A CAUSE OF ACTION FOR
             UNJUST ENRICHMENT ................................................................20

       C.     PENNSYLVANIA RECOGNIZES A COMMON LAW
             ACTION FOR RESTRAINT OF TRADE ........................................21

       D.     THE IDAHO CONSUMER FRAUD ACTION SHOULD
             NOT BE DISMISSED .....................................................................22

CONCLUSION................................................................................................................23

## <u>TABLE OF AUTHORITIES</u>

*Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007) ...........14

*Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3rd Cir. 1994)...................21, 22

*Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007) ...............................................2, 11, 12, 13, 14 ,15

*In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002) .................................19

*In re Cardizem CD Antitrust Litigation*, 105 F.Supp.2d 618, 669-71 (E.D. Mich. 2000).........21

*Cleaver v. Lenhart*, 182 Pa. 285, 37 A. 811 (1897)....................................................................21

*Collins v. Main Line Board of Realtors*, 452 Pa. 342, 304 A.2d 493 (1972) ............................21

*In re Elevator Antitrust Litigation*, 502 F. 3d 47, 52 (2d Cir. 2007) ...................................12, 13

*Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) ....................................................................14

*Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102 (S.D.N.Y. 1984) ..........................17, 18

*F. Hoffman-Laroche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) ..................................17

*FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 41-42 (D.D.C. 1999)...........................21

*In re Grand Theft Auto Video Game Consumer Litig.*,
     No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. 2006).......................................19

*Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993).................................................17

*Hyland v. Homeservices of America*, 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007)..........14, 15

*In re Hypodermic Products Antitrust Litigation*, 2007 WL 1959224 (D.N.J., June 29, 2007) ..14

*Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614 (7th Cir. 2007) ...............................14

*In re K-Dur Antitrust Litigation*, 338 F.Supp.2d 517, 544-45 (D.N.J. 2004)............................21

*Kuhl v. Guitar Center Stores, Inc.*, 2008 WL 656049, *2-3 (N.D. Ill. Mar. 5, 2008) ..........19, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986)...................17

*Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573,
     591 (3rd Cir. 1979)........................................................................................................18

*Muehlbauer v. General Motors Corp.*, 431 F.Supp.2d 847, 852-54 (N.D. Ill. 2006)................21

*Nester v. Continental Brewing Company*, 161 Pa. 473, 29 A. 102 (1894)................................21

*In re New Motor Vehicles Canadian Export Antitrust Litigation,* 522 F.3d 6
     (1st Cir. 2008)................................................................................................................18

*Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999) ................................................................19, 20

*OSB Antitrust Litigation*, 2007 WL 2253419, at *3.4 (ED. Pa. Aug. 3, 2007) ........................15

*Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002) ....................................................19, 20

*Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000) ..........................................................20

*In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) ......................16

*Schwartz v. Laundry and Linen Supply Drivers' U., Etc.*, 339 Pa. 353, 14 A.2d
     438 (1940) ................................................................................................................20, 21

*State ex rel. Wasden v. Daciel Chem. Indus.*, 141 Idaho 102, 106 P.3d 428 (2005) ................22

*State v. Hobby Horse Ranch Tractor & Equipment Co.*, 129 Idaho 565, 567 (1996)...............23

*In re Static Access Memory Antitrust Litig.*, 2008 WL 426522, at *6
     (N.D. Cal. Feb. 14, 2008)..............................................................................................16

*Sun Drug Company v. West Penn Realty Company*, 439 Pa. 452, 268 A.2d 781 (1970)...........21

*Timberland Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976) .............................17

*United States v. Aluminum Co. of America*, 148 F.2d 416, 443-44 (2d Cir. 1945) .............16, 17

*XF Enters v. BASF*, 47 Pa. D. & C. 4th 147 (Pa. Comm. Pl. 2000) ...........................................22

**INTRODUCTION**

Defendants Sara Lee, Colgate-Palmolive, and Henkel participated in a conspiracy with Unilever and other to fix the prices of oral care, personal care and household care products in the United Sates.  Plaintiffs have identified the geographic and product markets and alleged that Defendants, who manage the subject products centrally and globally, grew into a habit of exchanging price information and coordinating price movements.  German antitrust enforcers have found that the alleged conduct occurred in their jurisdiction and beyond.  Antitrust enforcers in the United Kingdom and France are currently investigating these Defendants for price fixing and for exchanging price information in the subject product markets in their respective jurisdictions.

Each of the Defendants manages its oral care, personal care and household care products centrally and globally.  Henkel and Sara Lee manage these products from their offices in the Netherlands, Unilever from its offices in Germany, and Colgate from its offices in the United States.

The German authorities found that the price fixing commenced in early 2006.  As Henkel admitted in its annual report, growth in its laundry and home care products increased substantially in 2006 as a result of "price-driven" increases.  Industry price indices for soap and detergents in the United States showed several years of negative or low percentage price increases which suddenly and dramatically reversed in 2006.  Similarly, after several years of declining prices, the price of Colgate toothpaste leveled and increased in 2006.

Plaintiffs have plead, and the German Cartel Office has found, that these Defendants as well as others grew into a practice of price fixing and exchange of price information for their centrally controlled and globally managed oral care, personal care and home care products.  The

1

effects of the pricing violations are reflected in a reversal in price trends in the United States in 2006 in the subject products.

In sum, Plaintiffs have set forth sufficient factual allegations to demonstrate that the alleged practices are "*plausible*," "to *suggest* that an agreement was made," and/or "to raise a *reasonable expectation* that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007).

### ALLEGATIONS OF THE COMPLAINT

This case seeks injunctive relief, pursuant to §1 of the Sherman Act (15 U.S.C. § 1) and §16 of the Clayton Act, and damages for Defendants' price-fixing conspiracy regarding oral, personal and home care products, including toothpaste, toothbrushes, mouth rinses, dental floss, hand soaps (including liquid hand soaps), shower gels, shampoos, conditioners, deodorants, anti-perspirants, dishwashing liquids, laundry detergents, household cleaners and fabric conditioner.

### The Parties

Plaintiffs, Commercial Street Express LLC, Nicole Vander Muelen, Shasta Burzynski, and Kathleen Coullard, are residents of Wisconsin and Michigan. They seek injunctive relief under Section 1 of the Sherman Act (15 U.S.C. § 1), and damages under state antitrust and consumer protection laws on behalf of themselves and a class of all others similarly situated. Am. Complt. ¶¶ 7-10.

The Defendants, Sara Lee, Colgate-Palmolive, Henkel/Dial, and Unilever, are multinational consumer products manufacturers which do substantial business in both Europe and the United States. These companies dominate the oral, personal, and home care products markets.

Sara Lee Corporation ("Sara Lee") conducts business both directly and through wholly-owned and dominated subsidiaries worldwide.    Specifically, Sara Lee International, headquartered in the Netherlands, manages worldwide all Sara Lee brands regarding household and body care products.   Sara Lee's Household and Body Care business includes sales of soaps, shampoos, bath and shower products, deodorants, shaving creams, toothpastes, air fresheners, shoe polishes and cleaners, and insecticides. Am. Complt. ¶ 11.

Colgate-Palmolive Company also conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. Colgate's Oral, Personal and Home Care business is described in its Annual Report as follows:

> Colgate is a global leader in Oral Care with the leading toothpaste brand throughout many parts of the world, including the U. S., according to value share data provided by ACNielsen. Colgate's Oral Care products include toothpaste, toothbrushes, mouth rinses, dental floss and pharmaceutical products for dentists and other oral health professionals. .. .
> Colgate is a leader in many product categories of the Personal Care market. The Personal Care market includes shower gels, shampoos, conditioners, and deodorants and antiperspirants, as well as liquid hand soaps in which Colgate is the market leader in the U. S. .. .
> ***
> Colgate manufactures and markets a wide array of products for Home Care, including Palmolive and Ajax dishwashing liquids, Fabuloso and Ajax household cleaners and Murphy's Oil Soap. Am. Complt. ¶12.

Henkel Chemie Verwaltungsgesellschaft mbH ("Henkel") is a business entity organized under the laws of Germany which conducts business both directly and through wholly-owned and dominated subsidiaries worldwide. The 2007 Henkel Annual Report states that for the Cosmetics/Toiletries business sector, "our marketing strategies are centrally planned and globally implemented with respect both to our consumer brands and the hair salon business." The 2006

Annual Report states that for Laundry & Home Care Products, "our marketing activities are controlled from headquarters and the regional competence centers." Familiar Henkel brands sold in the United States include Purex, Soft Scrub, Coast, Dial, Dry Idea, Right Guard, Soft & Dri, and Tone. Henkel Corp. ("Henkel Corp.") is a United States subsidiary of Henkel. Am. Complt. ¶¶ 13-14.

Unilever N.V. ("Unilever NV") is a business entity organized under the laws of The Netherlands with its principal place in Rotterdam, The Netherlands, while Unilever PLC ("Unilever PLC") is a business entity organized under the laws of England with its principal place of business located in London, England. Together Unilever NV and Unilever PLC along with their subsidiaries operate as a single economic entity: Unilever Group ("Unilever"). Unilever conducts business worldwide. All of Unilever's Home and Personal Care products worldwide are the responsibility of a single "President Home and Personal Care" who is a member of a three-person group chief executive. Unilever website: http://www.unilever.com/ourcompany/aboutunilever/companystructure/. Unilever's Home and Personal Care products include such familiar brand names as Dove, Lux, Surf, Snuggle, Pond's, Rexona, Sunsilk, Suave, Clear, Lifebuoy and Vaseline, the Signal and Close Up toothpaste brands, and Calvin Klein fragrances such as cK one, Eternity and Obsession. Unilever United States, Inc. ("Unilever US") is a United States subsidiary of Unilever. Am. Complt. ¶¶ 15-16.

All four of the Defendants manage their oral, personal and home care products globally.

**The Conspiracy**

At some time prior to the beginning of 2006, Defendants and their co-conspirators entered into an agreement in restraint of trade to artificially raise, fix, maintain, and/or stabilize

prices of oral, personal and home care products in the United States, in violation of Section 1 of the Sherman Act (15 U.S.C. §1). Am. Complt. ¶35.

Based upon an investigation initiated upon admissions by Colgate-Palmolive of its participation in a conspiracy and the agreement among the Defendants to fix the prices of the subject products, the German Federal Cartel Office on February 20, 2008 issued a press release stating that it found that these Defendants had engaged in price fixing, specifically citing agreements to set prices of shower gel, toothpaste and dishwashing liquid. Am. Complt. ¶¶25-26. The Cartel Office imposed substantial fines on the Defendants, including Unilever, for their price fixing agreements. In addition, the Cartel Office said that it penalized the Defendants for exchanging information about ongoing price talks with retailers in an attempt to influence the market behavior of competitors and remove the uncertainty of competitive conditions. The Cartel Office further indicated that proceedings would be commenced against other unnamed companies which were involved in the conspiracy. Am. Complt. ¶¶25-26.

The Cartel Office's Report stated that the price coordination activities "were further likely to affect trade *between member states* and consequently also violate the prohibitions under Article 81 para. 1 EC." P. 20. The Report also noted that the illegal activities were "undertaken by companies with international operations, which are also selling their brand-name products *at least* across all of Europe…" P. 20 Since *each* of the 17 multi-national manufacturers in the subject trade association exchanged price information illegally, p. 22, it is no leap on the part of the Cartel Office to suggest that markets at least throughout the European Union were affected. In fact, the Report notes that "the exchange of information between competitors" was one of the targets of an investigation by French antitrust authorities. P. 23.

A Cosmeticsdesign-Europe.com article provided the following additional details:

5

> The Federal Cartel Office in Germany fined Sara Lee, Unilever
> and two units of Henkel after finding the companies guilty of price
> fixing at the start of 2006. The multinationals colluded to increase
> the prices of shower gel, toothpaste and dishwashing liquid by 5
> per cent.
> To sidestep the attempts by retail chains to prevent the price hikes,
> they kept each other informed about their actions and the moves
> made by retailers.
> Of the total €37m fine, €19m was imposed for price fixing and the
> other €18m was added for sharing information about their pricing
> discussions with retailers. Am. Complt. ¶26.

It has been reported that a spokesperson for Henkel has stated that "We made mistakes. We accept the fine of €21.6 [million]." Am. Complt. ¶27.

Colgate-Palmolive, as a member of the conspiracy, has cooperated with the investigation and will likely not be fined by the Cartel Office. Am. Complt. ¶28.

The Office of Fair Trading for the United Kingdom has opened an investigation of price fixing and exchange of price information between supermarkets and their suppliers covering over 100 leading household brands including Colgate toothpaste and various Unilever products. Article, "OFT investigates 100 household brands over price-fixing allegations," Telegraph, April 29, 2008.

France's Competition Council is currently investigating nine consumer products makers including Unilever and Colgate-Palmolive for price-fixing in the cleaning products sector covering toothpaste, shampoo, bleach and other household products. The investigation has included searches of the offices of the product makers. The investigation was initiated when a whistleblower and member of the conspiracy reported that since the end of 2004 the companies had fallen into the habit of telephoning each other regularly, holding secret meetings, exchanging emails, and pooling commercial information about their distributors. "Report: 9 consumer products companies suspected of price-fixing in France," AP wire, Feb. 27, 2008.

Also in France, Colgate has confessed to the French Competition Council about an understanding it had with Procter & Gamble and Unilever on personal hygiene products. Procter & Gamble has reported that it is "awaiting the decision of the Competition Council" on the Colgate disclosures. *Id.*

Colgate reports in its 2007 Annual Report that French, Swiss, German and Romanian competition authorities were investigating:

"In February 2006, the Company learned that French competition authorities initiated an inquiry into potential competition law violations in France involving exchanges of competitive information and agreements on selling terms and conditions among a number of consumer goods companies in France, including the Company's French subsidiary. In February 2007, the Company learned that the Swiss competition authorities opened an investigation against the Company's GAMA Holding AG (GABA) subsidiary regarding distribution policies, retail pricing and parallel trade. Governmental investigations or proceedings relating to competition law involving the Company have also been commenced in Romania and Germany." P. 55.

Forbes Magazine reported on February 27, 2008 that French antitrust authorities were investigating Henkel as part of a price-fixing ring in the household products industry. The article adds:

"[A]nother major American consumer goods company, Colgate-Palmolive, confessed to its own role in the cartel in 2006. This time around, the firm reportedly owned up to sharing information on body-care goods with Unilever and Procter & Gamble."

On June 20, 2008, Bloomberg reported that European Union and Dutch officials had raided Sara Lee and Unilever offices in June as part of the ever-widening price fixing probes.

Defendants' conspiracy dramatically increased their profitability, which included the United States market. For example, even with rising operation costs, in its annual report for 2006, Henkel reported record revenues and profits in its Home Care business of more than €4.1 billion and operating profit of €449 million, a 3.7% increase compared to 2005. Am. Complt. ¶29. Henkel explained the record revenues and profits as follows:

> The world market for laundry and home care products underwent further dynamic expansion, with the markets of relevance for us growing by more than 3 percent.
> *Market growth was more price-driven than in previous years because— unlike in 2005—it became possible to pass on raw material cost increases by raising products prices.* As a consequence, the decline of the last few years encountered in our largest market, Western Europe, was reversed to product gratifying growth. *In North America, too, there was a tangible price-driven upswing in the market dynamics, with a considerable expansion in sales. [***]*
> *In North America, the successfully implemented price increases and good performance of our air freshener business contributed to strong growth in organic sales.* [Emphasis added.] Am. Complt. ¶29.

The price indices for all manufacturers in the United States from 1998 to 2008 for two of the product categories in the market, namely, soap (bar soaps, liquid toilet soaps and other household soaps) and detergents (includes laundry and dishwashing detergents), show a clear jump in prices in 2006.

**Soaps**

| Year | PPI | Price Change |
|------|------|--------------|
| 1998 | 147.3 | |
| 1999 | 147 | -0.20% |
| 2000 | 145.6 | -0.95% |
| 2001 | 146.1 | 0.34% |
| 2002 | 146.1 | 0.00% |
| 2003 | 146.2 | 0.07% |
| 2004 | 147.1 | 0.62% |
| 2005 | 150.8 | 2.52% |
| 2006 | 160.8 | **6.63%** |

| | | |
|---|---|---|
| **2007** | 163 | 1.37% |

**Detergents**

| Year | Annual | Price Change |
|---|---|---|
| **1998** | 105 | |
| **1999** | 104.6 | -0.38% |
| **2000** | 107.1 | 2.39% |
| **2001** | 109.6 | 2.33% |
| **2002** | 108.1 | -1.37% |
| **2003** | 109 | 0.83% |
| **2004** | 111.1 | 1.93% |
| **2005** | 111.4 | 0.27% |
| 2006 | 117.5 | **5.48%** |
| **2007** | 118.3 | 0.68% |

Source:  North American Industry Classification System used by the US government to gather economic statistics.

Also in the Oral Care Products group, the price of Colgate brand and Colgate's Total brand toothpaste reversed a multi-year negative trend in 2006.

| Colgate | | |
|---|---|---|
| Year | Price | Price Change |
| 2003 | $2.21 | |
| 2004 | $2.05 | -7.15% |
| 2005 | $1.96 | -4.67% |
| **2006** | **$1.97** | **0.88%** |
| 2007 | $1.86 | -5.99% |

| Colgate Total | | |
|---|---|---|
| Year | Price | Price Change |
| 2003 | $2.57 | |
| 2004 | $2.45 | -4.59% |
| 2005 | $2.39 | -2.60% |
| **2006** | **$2.44** | **2.19%** |
| 2007 | $2.47 | 1.06% |

Also U.S. Department of Labor, Bureau of Labor Statistics, Consumer Price Index data reflects that across the spectrum of oral care, personal care and household care products there was a sharp increase in prices in 2006:

Average Annual U.S. Price Growth
By Product Group

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|---|
| **Household Cleansers** | -1.18% | 1.48% | 4.43% | 1.75% | 0.46% |
| ABRASIVE TUB/TILE CLEANER | 3.33% | 2.45% | 5.20% | 3.01% | -0.42% |

9

| | | | | | |
|---|---|---|---|---|---|
| ALL PURPOSE CLEANER/DISINFECTANT | -0.67% | 1.84% | 3.62% | 0.29% | -0.33% |
| FLOOR CLEANERS/WAXES/WAX REMOVERS | 0.93% | 3.34% | 2.79% | 1.87% | 2.87% |
| RUG/UPHOLSTERY CLEANER/DEODORIZER | 1.94% | 2.39% | 3.35% | 3.04% | -1.41% |
| NONABRASIVE TUB/TILE CLEANER | 0.75% | 0.52% | 17.15% | 1.38% | -1.39% |
| GLASS CLEANER/AMMONIA | -1.18% | 1.67% | 5.21% | -0.05% | -0.53% |
| TOILET BOWL CLEANER/DEODORIZER | 12.24% | 0.17% | 1.18% | -2.45% | -0.45% |
| FURNITURE POLISH | -0.42% | 1.47% | 3.78% | 1.58% | -0.12% |
| **Laundry Detergents (not including Softeners)** | **-6.36%** | **-0.05%** | **3.54%** | **-3.39%** | **1.24%** |
| LIQUID LAUNDRY DETERGENT | 0.11% | 3.31% | 5.72% | 2.91% | 5.27% |
| TABLET LAUNDRY DETERGENT | 19.27% | -2.75% | 8.64% | -17.92% | 15.38% |
| POWDER LAUNDRY DETERGENT | 1.30% | 3.92% | 4.12% | 1.68% | 2.16% |
| OTHER LAUNDRY DETERGENT (PACKET/BAR) | -8.58% | 13.01% | -6.90% | -2.81% | 12.74% |
| **Other** | | | | | |
| FABRIC SOFTENER LIQUID CONCENTRATE | -0.89% | 0.95% | 4.00% | 4.78% | 4.29% |
| FABRIC SOFTENER SHEETS | 1.34% | 1.70% | 3.55% | 3.78% | 1.99% |
| DEODORANTS | 1.45% | 2.46% | 3.07% | 5.23% | 3.04% |
| DISH DETERGENT | -2.70% | 1.39% | 7.42% | 1.61% | 0.91% |
| DISHWASHER DETERGENT/ADDITIVE | 1.80% | 3.73% | 6.10% | 2.60% | 2.70% |
| HAIR CONDITIONER/CREME RINSE | 3.52% | 4.95% | 8.37% | 3.62% | 3.02% |
| REGULAR SHAMPOO | 1.86% | 3.42% | 7.30% | 4.35% | 2.18% |
| LIQUID BODY WASH/ALL OTHER | -3.10% | -2.09% | 2.47% | 3.69% | 1.80% |
| MANUAL TOOTHBRUSHES | 0.17% | 0.74% | 4.31% | 7.76% | 0.02% |
| MOUTHWASH/DENTAL RINSE | 1.35% | 2.19% | 4.42% | 3.56% | 0.70% |
| POWER TOOTHBRUSHES | -2.03% | 2.97% | 2.83% | 6.04% | -5.15% |
| TOOTHPASTE | 0.49% | -0.50% | 0.19% | 0.99% | -0.75% |
| DENTAL FLOSS | -0.92% | -0.54% | 4.36% | 2.04% | -0.52% |

The oral, personal and home care products market is large, with Unilever's 2006 global sales at €18.297 billion, and sales in the United States of more than €3 billion, Henkel's 2006 sales in the United States of more than €1 billion, Sara Lee's global sales for fiscal year ended July 2007 of more than $2 billion, and Colgate's 2006 sales in the United States of $2.211 billion. Am. Complt. ¶30.

10

Defendants' combinations, conspiracies and agreements have had the following effects, among others: (a) price competition in the oral, personal and home care industry has been suppressed, restrained and eliminated; (b) the prices of oral, personal and home care products have been raised, fixed, maintained and stabilized at artificial and non-competitive levels; and (c) consumers of oral, personal and home care products were deprived of free and open competition. Am. Complt. ¶ 31.

As a result of the conspiracy, the complaint alleges that Plaintiffs and the other class members paid higher prices for oral care products, personal care products and home care products than they would have paid in the absence of the illegal contract, combination or conspiracy, and, as a result, have been injured. Am. Complt. ¶32.

## ARGUMENT

### I.    THE COMPLAINT ADEQUATELY STATES CLAIMS UPON WHICH RELIEF MAY BE GRANTED

Plaintiffs' factual allegations easily satisfy Twombly's requirement of "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). No inferences from "parallel conduct" need be made here. The specific time, place, and companies involved in the alleged conspiracies are set forth. *Id.* at 1971, n. 10.

The global conspiracy has already been exposed in Germany, France and England.  In Germany one of the defendants confessed to price fixing and exchange of price information and another admitted mistakes and accepted a substantial fine.  Allegations that one or more of the participants have confessed to the conspiracy go far beyond establishing that the conspiracy is "plausible." Because an amnesty applicant in Germany must admit the existence of the conspiracy and its participation in the conspiracy, allegations that there is an amnesty applicant constitute direct evidence of the violation, equivalent to a confession or a video recording. Where

there is direct evidence of conspiracy, *Twombly*'s concerns that the Plaintiffs are relying on ambiguous circumstantial evidence, such as parallel conduct, to prove agreement are not relevant.  Based on Henkel's admissions and Colgate-Palmolive's amnesty application, alone, the Court must deny Defendants' motion.

In France, Colgate confessed to the Competition Council about an agreement (an "entente") among Colgate, Unilever and Procter & Gamble on "personal hygiene products."  AP wire, Feb. 27, 2008.

In England, the Office of Fair Trading is engaged in a price fixing investigation involving over 100 household products including Colgate toothpaste and Unilever's Dove moisturizer. Telegraph, April 29, 2008.

Under *Twombly*, a complaint need plead only "enough factual matter (taken as true) to suggest that an agreement was made," which "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S. Ct. at 1965.  Plaintiffs' factual allegations here do much more than raise a "reasonable expectation." Plaintiffs' factual allegations identify an admitted conspiracy that increased prices commencing in 2006 in Germany, France, England and the United States and for which substantial fines have been imposed in Germany, for which investigations are in process in France and England.

Plaintiffs are not alleging simply that "if it happened there, it could have happened here." *In re Elevator Antitrust Litigation*, 502 F. 3d 47, 52 (2d Cir. 2007). Plaintiffs provide factual allegations that Defendants benefited from the conspiracy, not only in Europe, where the conspiracy has been exposed, but also in the United States, where Henkel boasted that it was able to increase its prices, Am. Complt. ¶29, and where price data for the industry reflects in 2006, the year that the conspiracy began, a reversal in the trend of prices from prior years.

This is the factual basis precisely called for by the Second Circuit in *Elevator*, where that court held that a complaint only citing violations of European Commission rules cannot survive a motion to dismiss if there are "no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct." *Id.* at 52. In *Elevator*, the plaintiffs defended their Second Amended Complaint by the following argument (as summarized by the Second Circuit): "The European misconduct is alleged to reflect the existence of a worldwide conspiracy; and even if the misconduct took place only in Europe, it is alleged that the market in elevators is a "global market, such that prices charged in the European market affect the prices in the United States and vice versa." *Id.* at 51.

In this case, Plaintiffs' allegations are more specific. Plaintiffs point to Defendants' own statements that pricing increases were imposed in both Europe and the United States during the period of the conspiracy. Am. Cmplt. ¶29 . Indeed, since the filing of the Amended Complaint, Plaintiffs have gathered additional data that the Defendants raised their prices in the United States on products which are the subject of this case during the conspiracy period, much as Henkel stated in its Annual Report currently cited in the complaint. Consistent with the German Cartel Office findings, this data shows that soap and detergent prices rose 6.6% and 5.5% respectively in 2006 after years of primarily stagnant prices.  As the Second Circuit noted in *Elevator*, "While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *Id.* at 50. Plaintiffs allegations easily satisfy that requirement.

*Twombly* did not change the normal pleading rules. *Twombly*, 127 S. Ct. at 1964-65 ("We do not require heightened fact pleading of specifics ...") Fed. R. Civ. P. 8(a)(2) requires only a short and plain statement of a claim showing that the pleader is entitled to relief, in order to give

a defendant fair notice of what the claim is and the grounds upon which it rests. *Id.* Although a complaint needs more than labels and conclusions, the court, in ruling upon a motion to dismiss must accept as true all of the factual allegations of the complaint and draw all reasonable inferences in plaintiffs' favor. Fed. R. Civ. P. 12(b)(6).  *Id.*  In *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007), decided two weeks after *Twombly*, the Supreme Court stated that

"Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" (quoting *Twombly*, 127 S. Ct. at 1964). Our Circuit, in *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663 (7th Cir. 2007), adopted the concept that to withstand a Rule 12(b)(6) motion, the complaint must be more than "sketchy." The Court said that, "[t]aking *Erickson* and *Twombly* together, we understand the Court to be saying only that at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8. " Id. at 667. See also, *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614 (7th Cir. 2007).

Therefore, courts construing *Twombly* have determined that antitrust complaints should be liberally construed in view of the fact that proof of an illegal and criminal conspiracy is largely in the hands of the alleged conspirators. *In re Hypodermic Products Antitrust Litigation*, 2007 WL 1959224 (D.N.J., June 29, 2007).

Many complaints have survived post-*Twombly*. The allegations in Plaintiffs' complaint are more analogous to those in the post-*Twombly* decision *Hyland v. Homeservices of America*, 2007 WL 2407233 (W.D. Ky. Aug. 17, 2007). Plaintiffs there alleged that the defendants conspired to fix the prices of brokerage fees, and included:

[R]eferences to the enforcement actions brought by the Department of Justice; alleged admissions of price-fixing by real estate brokers; an exchange of price-information and catalogues between the parties; price increases while the Defendants' costs and non-real estate broker fees declined; allegations of improper franchising; and references to Kentucky regulations that the Defendants helped to implement through the Kentucky Real Estate Commission (the anti-rebate rule).  2007 WL 2407233, at *3. The court found that the plaintiffs alleged "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* (quoting *Twombly*). Importantly, the overriding question is whether a complaint alleges enough to make the claims "plausible" and not "speculative." See *Hyland*, 2007 WL 2407233, at *3 ("*Twombly* does not require a 'heightened' pleading standard, but instead looks at what information is provided by a plaintiff, not the amount.").

The Plaintiffs' allegations here also go well beyond those held to satisfy *Twombly* in *In re OSB Antitrust Litigation*, 2007 WL 2253419, at *3.4 (ED. Pa. Aug. 3, 2007) ("OSB"), where the plaintiffs alleged that the defendants - nine major manufacturers of oriented strand board ("OSB") - "tacitly agreed to raise OSB prices and so revitalize the stagnating OSB market":

Defendants took the following concerted actions to reduce the supply of OSB (and so drive up the price): (1) kept OSB from the market through mill shutdowns; (2) delayed or canceled the construction of new OSB mills; (3) bought OSB from competitors instead of manufacturing it themselves (which they could have done at a lower cost); and (4) maintained low operating rates at mills.

These allegations were sufficient because the plaintiffs "set out in some detail an alleged nationwide scheme," and *Twombly* "does not ... require Plaintiffs to prove their allegations before taking discovery." Id. at *5.

15

Similarly, in *In re Rubber Chemicals Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007), the court held that allegations of parallel pricing which included that certain people were present at trade shows and discussed how to fix prices were sufficient to allege a conspiracy.

Also, the court in *In re Static Access Memory Antitrust Litig.*, 2008 WL 426522, at *6 (N.D. Cal. Feb. 14, 2008) denied defendants' 12(b)(6) motion and held that plaintiffs pleaded "sufficient facts plausibly to suggest a § 1 price-fixing conspiracy," where the complaint alleged "that Defendants had an ongoing agreement to exchange price information and intended that this exchange would lead to price stabilization or increases," and that the "SRAM market was one in which such information exchanges would lead to price stabilization or increases."

**II.    THIS COURT HAS SUBJECT MATTER JURISDICTION FOR SHERMAN ACT VIOLATIONS THAT AFFECT PRICES IN THE UNITED STATES**

Defendant's jurisdictional argument is a red herring because it relies on a misreading of the Plaintiffs' complaint. Plaintiffs are not challenging the foreign effects of Defendants' conspiracy, but rather the domestic effects of that conspiracy. The mere fact that a conspiracy was worldwide does not deprive this Court of jurisdiction over domestic effects of that conspiracy.

Count I alleges that Defendants entered into "a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices of oral, personal and home care products *in the United States*." Am. Cmplt,¶ 35.

Paragraph 17 of the Amended Complaint, incorporated into Count I, defines the plaintiff class as "all persons or entities who acquired *in the United States* oral, personal and home care products (as defined below) manufactured and/or distributed by one or more of the Defendants."

The four class representatives are identified in paragraphs 7-10 of the Amended Complaint incorporated into Count I as American consumers who made their purchases of the subject products *in the United States*.

In *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993), the Supreme Court held that "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States." See also, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 582 n.6 (1986); *United States v. Aluminum Co. of America*, 148 F.2d 416, 443-44 (2d Cir. 1945); FTAIA, 15 U.S.C. § 6a (1982)[This Act endorsed the "effects test," H.R. Rep. No. 97-686 at 5]; *F. Hoffman-Laroche, Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004).

The Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a, was intended to provide a more objective test than some of the earlier cases. The notion of intent to affect prices or output in the domestic market discussed in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), and *Timberland Lumber Co. v. Bank of America*, 549 F.2d 597 (9th Cir. 1976), was "replaced by a more objective inquiry into the nature, extent, and foreseeability of the impact on U.S. foreign and domestic trade" in the Act. H.R. Rep. 686, 97th Cong., 2d Sess. 9 (1982), 1982 U. S. Code Cong. & Adm. News 2487, 2491 (indicating that Congress intended the standard to be "an objective one ... [designed] to avoid – at least at the jurisdictional stage – inquiries into the actual, subjective motives of defendants."). See, Holmes, *Antitrust Law Handbook* 2007-2008 Edition 863-4.

In *Eurim-Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102 (S.D.N.Y. 1984), cited by Defendants, the plaintiffs did not allege that a price fixing agreement made in Europe covered the sale of Defendants' products in the United States, as Plaintiffs allege here.   Instead, in

*Eurim-Pharm* plaintiffs alleged that Pfizer in the United States forced its distributors in Europe to maintain resale prices and sales within their respective country boundaries. There was no allegation how the agreement for Europe affected the United States. Here plaintiffs specifically allege that the Defendants agreed to fix prices in the United States, Am. Complt. ¶ 35, and that the price fixing agreement caused damages in the United States to American consumers. Am. Complt. ¶ 37. As a result, Defendants' jurisdictional argument should be rejected.

### III.     <u>PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF</u>

Defendant Sara Lee's argument that Plaintiffs have not sufficiently pled standing to seek injunctive relief under the Sherman Act lacks any merit. No where does the complaint state that the conspiracy to fix United States prices has ended. Since it is not over, it still threatens American consumers. Nothing more is needed to support a request for injunctive relief at the pleading stage.

Neither of the cases cited by Sara Lee even discusses the standards for pleading a request for injunctive relief under the Sherman Act. *Mid-West Paper Products Co. v. Continental Group, Inc.*, 596 F.2d 573, 591 (3rd Cir. 1979), decided a motion for summary judgment. Similarly, *In re New Motor Vehicles Canadian Export Antitrust Litigation,* 522 F.3d 6 (1st Cir. 2008), was an appeal of an order granting a class certification. Indeed, in *Canadian Export*, the court  decision was based on changed factual circumstances which made the alleged conspiracy no longer profitable, even though it might have been in the past. *Id.* at 14-15.

### IV.    PLAINTIFFS' STATE LAW CLAIMS
####        SHOULD NOT BE DISMISSED

#### A.    PLAINTIFFS DO NOT NEED A
####        REPRESENTATIVE FROM EACH STATE

Defendants contend that the state law claims should be dismissed on standing grounds to the extent that the Amended Complaint does not identify class representatives from those states. The applicable case law in this circuit does not impose such a requirement. Defendants' motion which addresses this point should be denied.

The United States Supreme Court has instructed that in evaluating consumer class action cases involving multiple states, it is not necessary to have a class representative from every state to assert ancillary state claims as long as the class representatives are adequate for the case as a whole. *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999). Courts have repeatedly refused to dismiss complaints for lack of standing where named plaintiffs in class action litigation have brought state law claims on behalf of plaintiffs in states other than those in which the named plaintiffs resided. *See, e.g., Kuhl v. Guitar Center Stores, Inc.*, 2008 WL 656049, *2-3 (N.D. Ill. Mar. 5, 2008); *In re Buspirone Patent Litig.*, 185 F.Supp.2d 363, 377 (S.D.N.Y. 2002); *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. 2006). Relying on *Ortiz v. Fibreboard*, 527 U.S. 815, 831 (1999), both decisions held that, in these circumstances, class certification issues should be resolved before standing issues. *Id.*

The Seventh Circuit similarly has ruled in *Payton v. County of Kane*, 308 F.3d 673 (7th Cir. 2002), concluding that the plaintiffs – arrestees charged a bond fee, above and beyond their set bail amount, as condition of their release –who brought an action against county jails, may be entitled to represent a class suing all 19 defendant counties. "We have begun our analysis with

the question of class certification, mindful of the Supreme Court's directive to consider issues of class certification prior to issues of standing." See *Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999): "the class certification issues are ... logically antecedent to <u>Article III</u> concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about <u>Rule 23</u> certification should be treated first." *Id.* at 831 (citations omitted).  The court noted further, "If the defendants with whom the named representative did not interact directly are following a common statute (and this common factor assures that the representative has the same legal claim as the unnamed parties-or, to use the terminology other courts have adopted, the defendants are "juridically linked"), we see nothing in either standing doctrine or <u>Rule 23</u> that automatically precludes use of the class action device." *Payton*, 308 F.3d at 682.

Plaintiffs here allege injuries from these Defendants and purport to represent a class of those similarly injured under analogous laws in other states.[1]  *See also*, *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002), *supra.*  Defendant's assertions as to count II and III in this regard should be rejected.

### B.    PLAINTIFFS HAVE A CAUSE OF<br>ACTION FOR UNJUST ENRICHMENT

Sara Lee's request that the Court dismiss Plaintiffs' unjust enrichment count is based on grossly ignoring reality.  Sara Lee is a consumer products company.  Its business is to sell

---

[1]  *Schultz v. American Family Mutual Insurance. Co.*, 2005 WL 5909003 (N.D. Ill. Nov. 1, 2005), cited by Sara Lee, is inapposite.  The *Schultz* court's finding was based on the named plaintiff's admission that he lacked standing to bring the claims in question.  *Id.* at *7.  Indeed, Judge Gottschall rejected this holding in *Kuhl v. Guitar Center Stores, Inc.*, 2008 WL 656049, *2 (N.D. Ill. Mar. 5, 2008).  *Prado-Steiman v. Bush*, 221 F.3d 1266 (11th Cir. 2000), also cited by Sara Lee, is even more inapposite, because it was an appeal of an order granting class certification, and did not involve a motion to dismiss.  In addition, *Prado-Steiman* did not involve the laws of more than one state.

products that consumers such as the Plaintiffs buy. Indeed, it markets its products directly to consumers. Plaintiffs conferred a benefit on Defendant by purchasing Defendant's products.

Courts have upheld unjust enrichment counts by indirect purchasers in antitrust cases such as this one.[2] *In re K-Dur Antitrust Litigation*, 338 F.Supp.2d 517, 544-45 (D.N.J. 2004) (rejecting defendants' arguments that unjust enrichment claims of indirect purchasers should be dismissed because plaintiffs had not conferred a benefit on defendants); *In re Cardizem CD Antitrust Litigation*, 105 F.Supp.2d 618, 669-71 (E.D. Mich. 2000) (rejecting defendants' arguments that indirect purchasers had not conferred a benefit on defendants). Moreover, the argument that an indirect purchaser plaintiff did not confer a benefit on a manufacturer for the purposes of an unjust enrichment count when he bought its products was also rejected by Judge Moran in *Muehlbauer v. General Motors Corp.*, 431 F.Supp.2d 847, 852-54 (N.D. Ill. 2006).

### C.   PENNSYLVANIA RECOGNIZES A COMMON LAW ACTION FOR RESTRAINT OF TRADE

Both the Pennsylvania Supreme Court and the United States Court of Appeals for the Third Circuit have recognized that Pennsylvania has a common law cause of action against agreements in restraint of trade. *Collins v. Main Line Board of Realtors*, 452 Pa. 342, 304 A.2d 493 (1972); *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1014 (3rd Cir. 1994). As the Pennsylvania Supreme Court stated in *Collins*,

> The courts of Pennsylvania have long recognized that agreements in unreasonable restraint of trade are invalid. *See Sun Drug Company v. West Penn Realty Company*, 439 Pa. 452, 268 A.2d

---

[2]  In a footnote, Sara Lee claims that *FTC v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 41-42 (D.D.C. 1999), held, in Sara Lee's words, "unjust enrichment is an impermissible end-run around *Illinois Brick*." Sara Lee brf at 14 n. 4. Sara Lee is wrong. *Mylan* held that an indirect purchaser suing under the federal antitrust laws could not use a disgorgement remedy under the federal antitrust laws to avoid *Illinois Brick*. Here Plaintiffs are relying on state laws for their unjust enrichment claim, not the federal antitrust laws.

781 (1970); *Schwartz v. Laundry and Linen Supply Drivers' U., Etc.*, 339 Pa. 353, 14 A.2d 438 (1940); *Cleaver v. Lenhart*, 182 Pa. 285, 37 A. 811 (1897); and *Nester v. Continental Brewing Company*, 161 Pa. 473, 29 A. 102 (1894).

452 Pa. at 348, 304 A.2d at 496.  Therefore, Sara Lee's motion to dismiss that claim should be denied.[3]

### D.    THE IDAHO CONSUMER FRAUD ACTION SHOULD NOT BE DISMISSED

The Idaho Consumer Protection Act ("ICPA") prohibits "unconscionable method[s], act[s] or practice[s] in the conduct of any trade or commerce," including "sales conduct or pattern[s] of sales conduct " which "would outrage or offend the public conscience," Idaho Code 48-603C, a standard Plaintiffs believe is easily met here.

Sara Lee contends that *State ex rel. Wasden v. Daciel Chem. Indus.*, 141 Idaho 102, 106 P.3d 428 (2005), bars Plaintiffs' Idaho Consumer Protection Act claims as a matter of law. Defendants overstate the actual holding in *Wasden*. The plaintiff in *Wasden* had unsuccessfully sought leave to amend its pleading to assert under the ICPA certain price-fixing claims involving sorbates (antimicrobial agents used as preservatives in a wide variety of foods, beverages and animal feed).  Obviously, this component made up a miniscule amount of the price of the good purchased by a consumer.  On appeal, the Idaho Supreme Court held that the trial court did not err in denying leave to amend because the plaintiff failed to show that it could state a valid claim

---

[3]  Sara Lee relied on a Pennsylvania state trial court case, *XF Enters v. BASF*, 47 Pa. D. & C. 4th 147 (Pa. Comm. Pl. 2000), for its claim that there was no common law antitrust action in Pennsylvania.  While *XF* did consider the Pennsylvania Supreme Court's *Collins* case, it tossed it aside, characterizing the statements that there was an action against agreements in restraint of trade as "dicta" in a "minority opinion."  47 Pa. D. & C. 4th at 149.  A reading of *Collins* shows that this is wrong.  The majority, concurring, and dissenting opinions in *Collins* all recognized the existence of the cause of action. Moreover, *XF* did not consider the Third Circuit's opinion in *Alvord-Polk*.  Finally, while the *Collins* court did not award damages, it did so because the evidence before it, not the law, prohibited them.   452 Pa. at 352, 304 A.2d at 498 ("The record, however, does not provide any legal basis for an award of damages.")

under the ICPA; specifically, the plaintiff failed to present any argument or authority that its allegations of price-fixing of the sorbate ingredient constituted "sales conduct" directed at the consumer in a manner which "would outrage or offend the public conscience" so as to fall under § 48-603C(2)(d), the only ICPA provision invoked by the plaintiff. 141 Idaho at 108-09, 106 P.3d at 434-45.  The Idaho court in particular noted that the plaintiff did not contend that the defendants had sold the sorbates to consumers in Idaho. 141 Idaho at 109, 106 P.3d at 435. *Wasden* thus did ***not*** hold that no indirect purchaser antitrust claim could ***ever*** be actionable under Section 48-603C(2)(d).

*Wasden* did not hold, and nor should this Court rule, that Defendants' conspiracy to fix the prices of consumer goods themselves cannot amount to "sales conduct" directed at the consumer in a manner which "would outrage or offend the public conscience" so as fall within Section 48-603C(2)(d), 141 Idaho at 108, 106 P.3d at 434, especially given the unbroken line of Idaho authority holding that the ICPA is to be "liberally construed," *State v. Hobby Horse Ranch Tractor & Equipment Co.*, 129 Idaho 565, 567 (1996) (and cases cited therein).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Defendants' motions to dismiss be denied.

Dated: June 23, 2008

Respectfully submitted,
Plaintiffs


By: s/Matthew E. Van Tine
Marvin A. Miller
Matthew E. Van Tine
Lori A. Fanning
**MILLER LAW LLC**
115 South LaSalle Street, Suite 2910
Chicago, IL 60603
(312) 332-3400

Guri Ademi
Shpetim Ademi
David J. Syrios
Corey M. Mather
**ADEMI & O'REILLY, LLP**
3620 E. Layton
Cudahy, WI  53110
(414) 482-8000